P1EKDAMO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

NOAM DAMRI, Individually and
on Behalf of All Others
Similarly Situated,

                    Plaintiff,

            v.                              23 CV 10517 (PAE)

LivePerson, Inc., et al.,

                                            Oral Argument

                    Defendants.

------------------------------x
                                            New York, N.Y.
                                            January 14, 2025
                                            2:00 p.m.

Before:

                    HON. PAUL A. ENGELMAYER,

                                            District Judge

                         APPEARANCES

POMERANTZ LLP
     Attorneys for Plaintiff
BY:  TAMAR A. WEINRIB

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON
     Attorneys for Defendants
BY:  PETER L. SIMMONS
     SAMUEL MARK LIGHT

P1EKDAMO

(Case called)

MS. WEINRIB:  Tamara Weinrib, from Pomerantz LLP, on behalf of plaintiffs.  Good afternoon.

THE COURT:  Good afternoon, Ms. Weinrib.

MR. SIMMONS:  Good afternoon, your Honor.  Peter Simmons and Samuel Light, from Fried Frank, for the defendants.

THE COURT:  Good afternoon, Mr. Simmons; good afternoon, Mr. Light.

Mr. Simmons, will you be taking the lead today?

MR. SIMMONS:  You're stuck with me, Judge.

THE COURT:  Okay, very well.

Happy to be stuck with everyone who's here.  And thank you, as well, to the other members of the public who are here.

I take it these are lawyers affiliated with one side or the other?

MR. SIMMONS:  I think they are largely from my side.  This is mainly a training exercise for them.  But I said since this is a subway ride, they might as well come on down.

THE COURT:  Great.  So have a seat.

I should say, the briefing in the case has been excellent by both sides, and I want to take a moment, then, to commend the junior lawyers who worked with the people who are at the tables here.  I used to do what all of you did for a living, and I'm mindful that there's a lot of work that goes on behind the scenes.  So thank you for all you did.

P1EKDAMO

In any event, Happy New Year to everybody.  We're here for oral argument on the motion to dismiss in Damri v. LivePerson.

I'll hear from the defense first.  You should feel free to either speak from the table or speak from the podium, as long as you speak into the microphone.

MR. SIMMONS:  If I can use the podium, your Honor, I actually prefer to stand.

THE COURT:  Be my guest.

MR. SIMMONS:  Okay.

It's on, and you can all hear me?

THE COURT:  I can.

MR. SIMMONS:  Perfect.

Your Honor, obviously, you've read the briefs.  It's not my intention to go over everything that we submitted in writing.  There are a few points I think are worth highlighting.

The way I think about this case — when little kids are in elementary school, they sometimes play the game of telephone, where information gets whispered in one ear and repeated down the line, and as the kids repeat it, sometimes the message gets distorted, until the end, it often bears little resemblance to where things started.  That's part of the problem with the plaintiff's complaint here and its attempt to rely on the confidential witness in the separate Delaware

P1EKDAMO

litigation brought by Starboard, because in trying to parrot the allegations from elsewhere, it doesn't even get the Starboard confidential witness' claims right.

Without the Starboard confidential witness, whom plaintiffs, in their opposition, never claim to have actually interviewed, their complaint is much thinner. Now, like in many 10b-5 cases, the plaintiffs rely on confidential witnesses to try to establish both falsity and scienter. And we'll come back to what the other CW supposedly say, because those alone won't support the claims in the complaint.

But I want to spend a few minutes discussing the Starboard confidential witness and dissecting what that person said and what is ascribed to them here.

THE COURT: Before you do, just so that I understand the Starboard saga, it looks to me as if there are effectively two parts. And there is one part that, in effect, predates the stock drops in this case that ultimately results in Starboard getting three board members. And then there is something else going on in Delaware afterwards that largely postdates the stock drops in this case. I could use your help just explaining to me functionally what that litigation is about.

MR. SIMMONS: Sure, sure.

THE COURT: Is what I said about accurate?

MR. SIMMONS: Yeah.

THE COURT: Okay.

MR. SIMMONS:  So, February 2022, Starboard's well-known activist investor announces it's accumulated a position in LivePerson, reaches out and says, we think you should throw out everyone — the management, the board — and start all over again with our people.  The parties engage in a several-month public proxy fight that culminates in a settlement agreement with Starboard in July of 2022, in which there's an agreement on a couple of directors rolling off, a couple of new nominees coming on.

THE COURT:  What had been the heart of the allegation?  There had been some allegation of misfeasance, not necessarily of corruption, but of just rotten management, something that Starboard was alleging that ultimately was the basis for it saying we need to clean house here.  At a high level, what was it alleging?

MR. SIMMONS:  At a high level, in 2021, the stock was at 70 bucks a share, and in February of 2022, it was at 20 bucks a share.  At a high level, that was their complaint, that is, that the company was not running well, it's not performing well, it's too diffuse, you've been engaging in too much M&A activity, you're not focused on your core business, and your founder/CEO has been there too longer, your directors have been there too long, it's time for new blood, a fairly standard activist claim.

THE COURT:  Okay.  So, in July of 2022, Starboard

P1EKDAMO

settles with the company and gets three-sevenths of the board, and then somehow later on, Starboard resurfaces, and it's in that context that the Starboard CWs allegations are made, right?

MR. SIMMONS:  Right.

So, Starboard makes its deal, so withdraws the proxy fight, and everyone agrees what the new composition of the board will be, and they're working on getting the new directors appointed.  Now, while that's going on, the company, of course, is continuing to run its business, and in early August of 2022, the company, in the normal cadence of things, announces its Q2 earnings results and updates its guidance, saying, you know, things have not gone as well as we'd like, we're okay in Q1 and Q2, but as we're looking at the rest of the year, we're not going to be able to hit the guidance we'd previously given the market three and six months earlier, so we're cutting our revenue guidance by $40 million.

THE COURT:  Out of approximately how much?

MR. SIMMONS:  500 and some odd million.

THE COURT:  Right.  It looks like it had been 544 to 563, and they cut it to 507 to 518?

MR. SIMMONS:  Right.  Using the midpoint of the range, the $40 million cut.

Starboard's obviously not happy at the idea that -- you know, it still owns stock, it's busy putting directors on,

P1EKDAMO

but it still owns a big block of stock in the company, they're not happy about that.

THE COURT:  It doesn't look like, at least according to the complaint, there's any stock drop.  At least that's part of the allegations in this case that comes with the August 8, 2022 announcement to that effect.

MR. SIMMONS:  There was some.  That's not, of course, their focus.  Starboard's focus is not so much on class-wide stock --

THE COURT:  No, no, I'm saying even in our case, where the loss matter is a central ingredient to a plaintiff's class action, securities class action, there are plenty of ensuing stock drops.  Unless I'm missing something, there's not a big deal on August 8th.

MR. SIMMONS:  It's not a big deal.  I carry around -- given I'm dealing with these cases, I carry around the stock price chart.

THE COURT:  Right.  Okay.

MR. SIMMONS:  So, no, there is some drop, but it's not dramatic, it's not what you would typically see.  It didn't fall off a cliff.

THE COURT:  Right.

So, what does Starboard do then?

MR. SIMMONS:  So, in tandem with Starboard being unhappy, they, according to their allegation, get a call from

P1EKDAMO

the confidential witness, who says, in substance, I just heard management's earnings release and analyst call, and what they didn't say is that their Q1 forecast was artificially inflated by some double-booked revenue.  And that's what Starboard then flags to the company in August of 2022.  First on a phone call, then in a letter, then in some follow-up phone calls and letters is this allegation made by, you know, ostensibly a senior executive, who called them supposedly unsolicited, that says, the reason that the guidance was cut was because they had started too high and that the Q1 numbers, the previous guidance, was artificially inflated by double-booked revenue.

THE COURT:  The guidance that has been cut had been the product of allegedly double-booking, that's the allegation?

MR. SIMMONS:  Correct.

So, that is the thrust of what they allege in the Delaware --

THE COURT:  When does Starboard file its second Delaware action?  When does Starboard file an action after this, and what relief is it seeking?

MR. SIMMONS:  So it was filed on February 12, 2024.

THE COURT:  So, how come it takes Starboard a year and a half to make this allegation?

MR. SIMMONS:  Funny you ask.  That's on the list of questions I intend to ask Starboard's principals in two weeks when I take the deposition.

P1EKDAMO

THE COURT:  Mr. Smallman asks me to direct you to speak closer to the mic.  Thank you.

MR. SIMMONS:  I'm sorry.  Most people tell me I'm too loud.

THE COURT:  It takes a year and a half.  What are they seeking when they file in February 2024?

MR. SIMMONS:  So, they are seeking damages because their theory is that having learnt this, they didn't feel comfortable selling down their stock, that one of two things — either had they known this, they would never have entered into the settlement, in which case, they would have gotten a different composition of the board, and/or, in the alternative, that we should pay them the delta between the value of their stock when they bought it and what they ultimately sold it for, and they said they didn't feel comfortable selling when they heard this in August, that they wrote the stock down and down and down and then sold it out.

THE COURT:  But this is not a derivative claim, it's a direct --

MR. SIMMONS:  It's a direct claim.

THE COURT:  A direct claim by a single plaintiff, not purporting to act on behalf of a class?

MR. SIMMONS:  Correct.

THE COURT:  And the theory of the direct damages is that we stuck with our company, we relied on your integrity,

P1EKDAMO

and we would have sold at a higher price?

MR. SIMMONS:  Correct.

THE COURT:  Okay, got it.

MR. SIMMONS:  In fact, since you're anticipating where I was going to be going in a few minutes, I actually have a copy of the Starboard complaint, which turns out we -- they've obviously referred to it, so I think it's fair game for 12(b)(6).  I'm happy to hand up a copy so you have it and your law clerk has it to refer to.

THE COURT:  How many copies do you have?

MR. SIMMONS:  I think I brought six.

THE COURT:  Let's give me one and have somebody give one to my law clerk.  Thank you.

(Pause)

MR. SIMMONS:  You'll see, your Honor, there is a little bit of yellow highlighting --

THE COURT:  I'm going to mark this as Court Exhibit 1, in the event that there's occasion to quote it in the decision.

MR. SIMMONS:  That's fine.

As I was saying, I did add a little bit of yellow highlighting in a couple of paragraphs because I do want to focus the Court on the difference between what Starboard ascribes to their CW as opposed to what the plaintiffs in their complaint here say the Starboard witness said.  Because in the Starboard complaint, Starboard is very clear that what it

P1EKDAMO

ascribes to its confidential witness is a claimed overstatement of revenue guidance, not actual historical reported revenue, which is not challenged, just the forward-looking guidance.

What I marked, you can see this in paragraphs 57 --

THE COURT:  57 or 67?

MR. SIMMONS:  57, 59, 70, 74, 75, 95, just by way of example.

THE COURT:  One moment.

Okay, I see, yes.  Shot throughout it is the expression "revenue guidance."

MR. SIMMONS:  So their challenge is all about guidance.  Nothing in the Starboard complaint or the accusations ascribed to the confidential witness in the Starboard case support a challenge to any actual reported historical results.

THE COURT:  The Starboard complainant is not identified here.

MR. SIMMONS:  It is not.

THE COURT:  Does the Starboard complainant make allegations with respect to revenue guidance after 2022?

MR. SIMMONS:  No, sir.

THE COURT:  So, what's the last period of revenue guidance implicated by the comments attributed to the Starboard complainant in the Starboard complaint?

MR. SIMMONS:  One period, Q1 2022.

P1EKDAMO

THE COURT:  Q1 2022?

MR. SIMMONS:  Correct.

Because he calls in the aftermath of the downward guidance given in Q2, and said the reason for the downward guidance was artificially inflated earlier.

THE COURT:  What is the start date of the class period here?

MR. SIMMONS:  In this case, I believe they go back to mid-2021, your Honor.  I'll double-check that right now.

THE COURT:  Let me just quickly ask plaintiff's counsel.  Do you recall the start date of the class period?

MS. WEINRIB:  In this case?

THE COURT:  In this case.

MS. WEINRIB:  May 9, 2022.

THE COURT:  May 9, 2022.

MR. SIMMONS:  Okay.

THE COURT:  Mr. Simmons, is there some mileage you are attempting to get out of the date, the last date that's implicated by the Starboard complaint, which is Q1 2022, and the date of the beginning of the class period here?

MR. SIMMONS:  That is only part of the problem with the complaint in this case, which is obviously the Starboard complainant talks about one quarter only.  Their claim is much broader.  But they have other confidential witnesses that they think support their own time periods here.

P1EKDAMO

THE COURT: Right. But I'm wondering if a point you're making, or not, is that there's some disjuncture between the period of time where the Starboard complaining witness says as to which guidance was overstated and the later period of time in which people start to buy in this case, in other words -- look, let me play it out. I appreciate you've got a bunch of other points, even as to Starboard, including methodologically why the complainant ought to be off-limits or heavily discounted. Putting that aside, if the Q1 2022 guidance had been overstated, if Q1 '22 is over and done with by the time the class period begins and somebody buys, is there a theory under which anyone could be relying on guidance that has been overtaken by the issuance of the Q1 numbers?

MR. SIMMONS: I think the plaintiff's theory here is that there were other problems later on.

THE COURT: I understand.

MR. SIMMONS: I certainly agree.

THE COURT: Hold on. There is an overall narrative, and I appreciate that. But as to the specific falsity that the Starboard complainant identifies, I take it you have available to you the argument that it doesn't affect anything that a person could rely on in the class period because if Q1 2022 was overstated, that would have been revealed whenever Q1 2022 earnings were revealed, which is presumably in or around May of 2022, which is about the time of the class period, which is to

P1EKDAMO

say that the projections for Q1 2022, by then, would have been overtaken by the actuals?

MR. SIMMONS:  That is certainly true.  The May date was when they had their Q1 earnings announcement.

THE COURT:  Right.

MR. SIMMONS:  So that reported actual numbers, and the complaint — and it's a bit of a jumble, because, on one hand, they say, well, all the numbers, including the actuals, were wrong, but they don't actually then explain why they were wrong.

THE COURT:  But your point is that the Starboard complaint doesn't impugn the actuals --

MR. SIMMONS:  Correct.

THE COURT:  -- except as a matter of bad character by the people who run this company?

MR. SIMMONS:  No, it doesn't impugn the actuals at all --

THE COURT:  Right.  Except in --

MR. SIMMONS:  -- except in the forward-looking guidance.

THE COURT:  But on the theory that if one portion of the soup is rotten, you might not want to eat the rest of the soup, if these characters who run the company are messing around with the guidance, I understand plaintiff's point that it's not irrelevant in trying to make a plausible allegation

P1EKDAMO

that shot throughout the numbers, real and projected, are inaccuracies?

MR. SIMMONS:  Right, but they need more than conjecture and propensity; they need facts.  And that's one of the places where they fall short.  But let's start with this difference between actuals and projections, because the Starboard complaint is crystal clear — no challenge to actual reported historical results — but the plaintiffs, in trying to rely, we contend inappropriately, on the Starboard CW, this witness who, from all we can tell, they've never spoken to — I don't even know if they can identify the person — they try to transform this into a claim about reported historical results, because the complaint here attacks not just guidance, but also attacks, or at least purports to, reported results.

THE COURT:  Let's pivot from that.  I understand your point that, viewed in isolation, the Starboard complainant only attacks guidance, or at least based on the highlighting you've given to me.  The heart of the matter, though, in the complaint appears to address a slightly different period, specifically a series of revelations largely in late February and the first half of March in 2023, which caused the stock to drop serially based, apparently, on things that are real, not things that are projected.

So, the complaint itself is basically saying, in effect, you, LivePerson, can't stand behind the prior guidance

P1EKDAMO

anymore with respect to these noncore businesses, you're not even able to recognize revenue from them given the government investigation.  In other words, the allegation as to that is there's a problem with your actuals.

MR. SIMMONS:  Right, except there isn't.  There actually is no problem with the actuals.  So let's first start with the fact there was no reported number with respect to that WildHealth business that was the subject of the control deficiency at the end of the year and the delayed 10-K.  That was a business that they first bought in February of 2022 that was an immaterial part of the company as a whole, was not, in and of itself, a reporting business segment, it was a small part of the smaller business segment.

THE COURT:  Look, I saw that, and I understand the argument.  I'm not sure whether you meant it as a freestanding argument of immateriality, but I understood the point that on the dollars, it's a modest fraction of the overall revenue. But the market reaction would be inconsistent with any argument on the pleadings anyway of immateriality, in that within a 16-day period, there is a 14-plus percent drop, a nearly 7 percent drop, and a 57 percent drop in the stock price, all seeming to trip off of issues with respect to Wild revenue suspension and recognition.

The market certainly seems to think that whatever the small slice that Wild may occupy of the overall business, this

P1EKDAMO

bad news as to Wild is awfully material.

MR. SIMMONS:  It is certainly true, your Honor, 2022 was not a good year for the company, but the problem with --

THE COURT:  This is 2023.

MR. SIMMONS:  Well, it was the 2023 announcement of the 10-K for fiscal '22.

THE COURT:  Fair enough.  I don't want to get too detained on it, but you used the word immaterial.  The market on the pleadings, the extent of the serial drops, stock drops, after adverse announcements about Wild, I don't think, would allow a judge to dismiss on grounds of immateriality on the pleadings.  The market, for whatever reason, seems to think this bad news affecting this small segment of the company is quite material.

MR. SIMMONS:  And we can come back to whether it was material in Q4 and when the announcement was made in March of '23, but their theory — and this is where we have to do a little bit of math because I think I can demonstrate to you that it was immaterial to what they claimed — they say that the Q1 2022 guidance was overstated because of the double-counting of supposed WildHealth revenue.  That's what they allege.

THE COURT:  Well, the Starboard complainant speaks to a period before Wild -- Wild enters the fold in, what, February of 2022?

MR. SIMMONS:  Right.  And so its results could not

P1EKDAMO

have captured more than two out of the three months in Q1.

THE COURT:  Right.

MR. SIMMONS:  Now, WildHealth accounted for --

THE COURT:  Sorry, I thought that the Starboard complainant was speaking about more than just the Wild revenue. I didn't understand the Starboard complainant's claim of double-booking to be just about Wild.

MR. SIMMONS:  It's a little vague.  According to the Starboard complaint, it certainly focuses on WildHealth as double-booked.  I think it said, among others, among other acquired businesses — there's no breakdown — but WildHealth for the full year accounted for 2 percent of LivePerson's revenue. It's right in the 10-K.  The revenue is $500 million for the company.  2 percent means WildHealth for the full year is $10 million.

So, an alleged overstatement in two months out of three months, in one quarter, means it's a -- whatever the debate is about the alleged double-booking is a tiny fraction of that $10 million.

THE COURT:  So, how do you account for, among other things, a 57 percent stock drop on one day based on bad news about Wild?

MR. SIMMONS:  Well, it was more than just WildHealth. There were material weaknesses in the accounting process, in the controls, around WildHealth that were disclosed, and the

P1EKDAMO

chief accounting officer was taken out of his seat and replaced.  So the markets reacted to a number of different things, not just reported numbers, but also the question of, you know, the change in management --

THE COURT:  But then isn't that what plaintiff is alleging?  Plaintiff has seven different buckets of alleged false statements, misstatements, and unifying at least a few of them is that the company is not ready for prime time and isn't quite disclosing it, in other words, that what's being revealed here in February and March is something that should have been, from plaintiff's perspective, revealed earlier, which is not just the mixed numbers on Wild, but that the company, in general, is the B team, including as it relates to accounting controls.  I mean, that's the reason the market appears to drop like a stone, because it's not just about Wild, it's about corporate character.

MR. SIMMONS:  Or it's about yet another problem coming off a proxy fight and things like that.  I mean, we shouldn't engage in speculation, which is why ultimately the question is, well, what facts have they pled, not conjecture.

THE COURT:  Look, I was pushing back merely on what I took to be an independent argument you're making that this complaint can be dismissed on account of immateriality.  And I'm pushing back because, on the pleadings, with the stock drop at that level, I think that is an ambitious argument.  If you

P1EKDAMO

didn't have the stock drop, the argument would have more teeth to say, look, the percentage that Wild is particularly isolated to a few quarters is too small, but the market is clearly perceiving the announcement here is about something bigger.

MR. SIMMONS:  I would say, your Honor, with respect to the alleged double-booking and overstatement of Q1 results, it is immaterial because mathematically we're talking about a very tiny piece of a very tiny business.

THE COURT:  Right, but you're also caricaturing the plaintiff's complaint that way, in a way that is a little myopic.  The complaint speaks to broader things than just that.

MR. SIMMONS:  Well, the complaint is a bit of what I'll loosely call the spaghetti theory of wrongdoings — all these different things, and if you don't like this argument, Judge, how about that one? — because they've got a number of different theories, and, frankly, their witnesses are talking across purposes to one another half the time, and I will walk you through that, because sometimes they say the reason for the stock drop and the earnings guidance cut was this WildHealth double-counting, and then they put in their CW 1 and CW 2 that says, well, no, actually, the reason for the guidance cut was, you know, they had a bad sales team or --

THE COURT:  But, look, over a 16-day period, the stock, just quantifying these numbers, drops by almost -- if you add up the three big drops, it adds about 80 percent.

P1EKDAMO

What's the big-picture takeaway that the market is getting that leads it to cut the price by that much?

MR. SIMMONS:  Of course, 80 percent, when you're dealing with a stock that's already significantly down, sort of exaggerates because it's -- but, yes, there was certainly a sizeable drop in the wake of the delay and then released 10-K.

THE COURT:  If you were explaining this to a nonlawyer in a sentence, what's the message the market appears to have gotten that has driven the stock down that much?  What's the one-sentence headline?

MR. SIMMONS:  I think the message is, this is a company that still needs to really work on turning its business around, focusing on its core business, it's recently acquired WildHealth, maybe it was a distraction.

THE COURT:  Okay.  And put differently, that message must be new because under the efficient market theory, if it wasn't new, that would have been factored into the stock price. So, apparently, that sentence was new to the market.

MR. SIMMONS:  What was new to the market was the revelation that there was a CMS investigation into the billing for this one program at WildHealth.  What was new to the market was the material weakness on internal controls relating to WildHealth, not the business as a whole, but relating to WildHealth.

THE COURT:  Right.

P1EKDAMO

MR. SIMMONS:  What was new to the market was the announcement that the CAO was going to be replaced as CAO.

THE COURT:  Well, is your point here that, in effect, the market is taking a glitch with respect to a small corner of the company and extrapolating from it in the way that the market sometimes does, but that that which is real about the announcement here is limited to a small subset?

MR. SIMMONS:  I think that is fair.  And, obviously, the market is kind of exaggerating its response because this is a company that had been going through a lot of turmoil over the prior year, it changed its business strategy a couple of times, it changed its sales strategy a couple of times, the market was aware of that.  So I think there may have been a sense in the market, these guys need to get their act together.  And there are obviously problems, and this recently acquired WildHealth business, as small as it is, is obviously creating another distraction.

THE COURT:  So let me ask you about the WildHealth.  I focused my review on this, to some degree, on the stock drops, because, as a practical matter, that's where the rubber tends to meet the road notwithstanding the matter before and after and in between.  It looks as if the market reacts with some degree of alarm to the announcement of the regulatory Medicare investigation and the consequence suspension of recognition of revenue.  All of that is revealed on or about February 28 of

P1EKDAMO

2023 and in the days thereafter.  From the pleadings, it looks as if the company knew about the Medicare investigation in November.

One question is:  Do the publicly cognizable materials tell us when in November the company learned of the Medicare investigation?

MR. SIMMONS:  I'm pausing only -- I know what the date was, but I'm pausing only on the question of, you know, from the materials here.  It was certainly after -- it was long after Q3 had been announced.

THE COURT:  That's around November 7, right?

MR. SIMMONS:  Right.

THE COURT:  That's question one.

MR. SIMMONS:  So it's after --

THE COURT:  There's nothing pled here that situates the company's knowledge of that prior to the earnings announcement of Q3?

MR. SIMMONS:  Correct.

THE COURT:  And then the question is, there doesn't seem to be anything pled in the complaint about statements made by the company between November 7th and February 28th, and certainly nothing in this space.  And so if the nondisclosure up through February 28th of the Medicare investigation is said to be actionable, it has to be on a duty-to-speak theory, an affirmative disclosure duty.  I think your point is there is

P1EKDAMO

none?

MR. SIMMONS: Right, there is none. And like most companies, when you get an allegation, the first thing you want to do is get your arms around it. And this company did do a whole bunch of investigations, ultimately believed they were going to get the revenue, that nothing wrong had happened, and PS, the public filings show that a year later, in 2023, they eventually convinced CMS there was nothing wrong. CMS basically issued a great big, oh, never mind, removed the suspension, paid the bill. That's precisely why the law says you don't need to reveal every accusation, every investigation, when it happens because sometimes the market reacts in a panic to something that may not actually be real.

THE COURT: And sometimes the market reacts to a press release about a subpoena as if the sky is falling even though it only deals with a small corner of the company.

MR. SIMMONS: Correct.

THE COURT: But is there anything in the complaint in our case that, rightly or wrongly, accuses the company of making a statement with respect to WildHealth prior to, let's say, November 7, 2022?

MR. SIMMONS: Other than that the company's general expectations, as you would expect for any company that buys a business, is that this is a business that's going to help us and be accretive over time, and that it's a strategic fit,

P1EKDAMO

that's why we're buying it.  That would be true whether you're buying WildHealth or anyone else.

THE COURT:  Right.  So the complaint is essentially attacking the rosy projections, which you would contend are forward-looking and protected as to WildHealth, but is there any more specific allegation in the complaint about WildHealth, about any falsity or anything misleading about it, other than the rosy projections?

MR. SIMMONS:  Nothing -- and, by the way, nothing even on the rosiness that was specific.  It was sort of the rosiness in generalities.  So the answer is, no, your Honor.

THE COURT:  Other than the fact that there was this Medicare investigation, whatever its outcome turned out to be, is there anything separate about WildHealth that is pled as having been undisclosed or inaccurately disclosed?

MR. SIMMONS:  They attempt to conflate the control deficiencies that were identified at WildHealth during the course of the yearend audit, and suggest that somehow that's the same as control deficiencies elsewhere in the company that surely somebody must have known about and that must have infected everyone.  There is a lot of backward thinking there and expansive thinking.

So they attempt to take the material weakness on ICFR, which was specific to WildHealth, and it's important to focus on the definition of what a material weakness is, and suggest

P1EKDAMO

that that must have also infected the guidance.

THE COURT:  You mentioned a moment ago that eventually the company, from your perspective, got a clean bill of health as it related to the Medicare investigation --

MR. SIMMONS:  Yes.

THE COURT:  -- of Wild.  Where can I find that in the record?  You've mentioned it --

MR. SIMMONS:  It's in the 2023 10-K.  So it's a public document, it's certainly something we can furnish, but there is --

THE COURT:  What's the gist of that?

MR. SIMMONS:  The gist of it is that CMS was satisfied that all the product that we had said we sold, we sold, they withdrew the billing suspension, and they paid the bill.

THE COURT:  And what happened to the stock price when that was announced?

MR. SIMMONS:  Nothing.  Bear in mind, the company by then -- its overall performance had continued to drop.  This is a small piece of a small piece.  The market is not reacting to that.  The market is looking at the company as a whole.  So, no, the stock didn't come bouncing back.

THE COURT:  Right, but it looks as if, in a way, what happened here is that the market, in some sense, took the Wild information from late February/early March and drew a larger conclusion about the company that maybe it shouldn't have

P1EKDAMO

because, ultimately, the Medicare allegation was false, but it turned out that the market sorta-ish got it right in that when the Wild factors corrected, the market didn't bounce back up because the market, in effect, had drawn a message of underperformance, which turned out to be right.

MR. SIMMONS:  I think you're -- you know, with all due respect, your Honor, that's a big leap because there were a lot of other things that were happening in there in terms of other investors, in terms of management changes.  Mr. LoCascio was gone from the company, there was a new CEO.  There were a lot of other things that go into it.  I don't think you can say, your know, we were dealing otherwise with a static state, and the only thing that happened is that CMS withdraws the allegation and that the money comes in.  There were a lot of other things.

THE COURT:  Absolutely fair point.

Let me ask you, though, about the sequence of Wild announcements.  The first one says the company needs more time to review and test revenue recognition with regard to this Medicare investigated program; the stock drops a little over 14 percent.  A week later, the company can't file the 10-K essentially on account of the same; the stock drops 6.8 percent.  And then nine days later, the company says it's missed its guidance for Q4, but basically because of Wild, it says, and then the stock drops 57 percent.  I'm trying to

P1EKDAMO

understand what's new in the third announcement, let alone what's new to lead the stock to drop so much more than before. It feels like it's just a sequel of the first two announcements.

MR. SIMMONS:  It is, except that in the third -- because they didn't take the revenue, since CMS was questioning it, they ended up missing their guidance.  And so, on the heels of other earnings misses earlier in the year, the market beat them for it.  The market didn't like it.

But I agree, in terms of what's new, the only thing that's new is what we've been discussing, right?  The investigation is done, they decide they're not going to show the revenue, they reserve against it while they try to sort things out with CMS.  It's a couple of million dollars on this $500 million company.  But the effect of not taking that 4, 5 million dollars, whatever the number was, was that they missed their guidance, and the market punished them for it.

THE COURT:  All right.

I want to pivot to the other CWs.  I've heard what you said about the Starboard CW.  CW 1 exists at the company through September 2022, so well enough into the Wild era --

MR. SIMMONS:  Correct.

THE COURT:  -- and number 2 goes all the way through 2023, so virtually through the whole class period.

Why aren't the accounts of those CWs of assistance to

P1EKDAMO

plaintiff?

MR. SIMMONS:  Well, let's dissect that.  Because I agree, CW 5 is the only one, I think, who wasn't there during the class period; he or she had left by 2021.  So these people are there.

Now, CW 1, you'll recall, is the junior analyst, and the only one of the CWs who purports to work in the financial planning and analysis group at the company, and the others have some unspecified jobs in finance or accounting that we're not told what they are.  But CW 1 is the only one who works in the FP&A, which is the group that helps with the guidance.

What they say is, he's a junior analyst, he gets numbers from the business lines, he puts them together, he gives them to somebody who gives them up the line, and two or three layers later, once it's gone through the VP and up to the CFO, guidance comes out the other end, and, you know, lo and behold, what he put together and what the company issued differed.

Well, that's not shocking.  He's a junior guy, right? I can say the same thing, your Honor, with no disrespect to my associates here, right?  They're going to give me work product, they're going to do research, they're going to give me a draft brief.  It's not coming to the Court exactly the way --

THE COURT:  No, but facts are stubborn things as opposed to legal documentation.  If the CW 1 is basically

P1EKDAMO

saying, in effect, when I saw the numbers, they were X, and when they came out to the public, they were X plus, you know, those two things both can't be true.

What's wrong with that as a basis for a pleading?

MR. SIMMONS:  Well, it's a question of what he knows and where he knows it from.  The fact that the numbers, as he put them together, were X, and they came out as Y — although, by the way, they don't quantify what the X and Y was, what the variance was — he's a junior analyst, he's not the one making the corporate perspective on what do we realistically think we can do and why.

THE COURT:  The numbers in question really are about, to your point, anticipated revenue --

MR. SIMMONS:  Forward-looking projections.

THE COURT:  And that is something that is a little more like your associate to partner analogy in the sense that there's a more subjective judgmental aspect?

MR. SIMMONS:  Absolutely judgmental.  Remember, there is no realistic challenge.  Despite their conclusory rhetoric, they don't identify a single number in the reported historical results that was ever wrong.  And throughout this entire period, and notwithstanding the material weakness, the company got unqualified audit opinions, there's never been a restatement, they never pulled the numbers.  So the reported actuals have always been right.  This is all about

P1EKDAMO

forward-looking projections and whether — for instance, projections are inherently, as you said, subjective, a matter of opinion — whether, in effect, management was lying, knew that these were unachievable at the time they made the projections.

THE COURT:  It falls under the category of opinion statements and what is required to make those actionable?

MR. SIMMONS:  Correct.

And neither CW 1 nor CW 2, nor, frankly, 3, 4, and 5, claim to have been in the wrong when the guidance was determined by management and the board.  None of them claim to have been part of the strategy sessions on how to respond to the Starboard proxy fight that was ongoing.  So, these allegations that, well, management must have come up with crazy numbers, and it must have been because they were trying to look good to defeat Starboard, are not actually supported by the CWs.  There are no facts pled that would give them any firsthand knowledge.

THE COURT:  But this would be an *Omnicare* type of analysis, and the notion is there's nothing that says, in effect, that the opinion as to the projection is insincerely held?

MR. SIMMONS:  Correct, that is absolutely the problem here.  And the mere fact that the CWs, for better or worse, believe in conspiracy theories, think it must have been true,

P1EKDAMO

their speculation does not become factual evidence because it's dumped into a 10b-5 complaint.  There are no facts that establish a basis for their speculation since they were not part of the decision on what the guidance should be.  They're not in the boardroom when those are discussed with the board.  They're not in the boardroom with management when the people are debating how are we going to respond to Starboard and should we tweak the numbers to make them look better for the street.

THE COURT:  So CW 2 has a somewhat different take on things.  CW 2 basically says that Defendant Collins alters the metrics that the company publicly projects with an agenda, and the agenda is to cover up for the public what is material bad news, which is a heightened attrition rate.

What's the problem with that?  Is it that CW!2 is factually not a percipient witness to that?  What is it?

MR. SIMMONS:  I think it's severalfold.  Number one, he's not a percipient witness.  There are no facts that would enable him to understand what was in Mr. Collins' state of mind at the time.

Number two, Mr. Collins and the company transparently disclosed what the change in the non-GAAP metric was.  There's no allegation that the numbers, as reported under the revised non-GAAP metric, were in any way inaccurate.  The company just said we're shifting our measure of metric, we think this is a

P1EKDAMO

better way to look at it.

THE COURT:  But the falsity that's alleged here is the stated reason for shifting, which is, we think it will benefit the reader more or something like that, in point of fact, says CW 2, Collins' motive was not that, Collins' motive was to smudge over the growing attrition rate, and in that respect, the notion is the failing here by Collins was in giving a false statement as to why the change in methodology was being made. He was allowed to make the change, but not to account for it inaccurately.

MR. SIMMONS:  Well, that's a very interesting theory, but, as you said, there is nothing that establishes how that person would know what was in Mr. Collins' mind.  Did he have a conversation?  Did anybody say anything?  Did he overhear anything?  None of that is pled, as far as we can tell --

THE COURT:  I thought it was pled.  I thought they did say — maybe I'm wrong — that -- maybe he simply says that that's why Collins did it without saying he was in the room.

MR. SIMMONS:  It's a naked conclusion.  He's doing his carny act routine.  He puts the envelope to his head, and he says, John must have been thinking this.  There are no facts.

THE COURT:  There's a reference to CW 2 talking about the company's retention of a law firm — I gather an independent or special committee or something like that — to analyze issues in this space in 2022.

P1EKDAMO

To begin with, just as you understand the allegation, what was the charter of the law firm?  What was the issue that they were --

MR. SIMMONS:  There were actually two investigations, your Honor, and Starboard refers to one of them.  The first was the independent investigation that was done in response to this double-booking allegation, where Starboard brings it to the audit committee, the audit committee does the responsible thing, they hire Williams & Connolly that does an investigation and the report.  As Starboard alleged — I'm not telling you anything that's not in the public record — is that there was no finding of any misconduct by management.

THE COURT:  Were they hired by an independent special committee of the board, or were they hired --

MR. SIMMONS:  By the independent members of the audit committee, all outside directors.

THE COURT:  Okay.  And what was the second law firm investigation?

MR. SIMMONS:  The second investigation was with respect to the CMS inquiry at WildHealth.

THE COURT:  And that was also commissioned by independent members of the --

MR. SIMMONS:  Right.  In addition to the work that the company's regular healthcare law firm was doing, you know, at the request of the auditors, the audit committee hired special

P1EKDAMO

investigative counsel to assist in that yearend process.

THE COURT:  Does the cognizable public record identify who that counsel was?

MR. SIMMONS:  I don't think that is in the 10-K, so I don't think that is as obvious.

THE COURT:  Okay.

MR. SIMMONS:  It did happen.

THE COURT:  All right.

I've been peppering with you questions.  Let me give you a few minutes to wrap up if there are other things you want to make sure to say to me, and then we'll take a comfort break.

MR. SIMMONS:  So, your Honor, on an overarching basis, I would say, number one, the debate we've been having about what Starboard's witness said and how they've characterized it shows exactly why they should not be allowed to rely nakedly on allegations from another case that they haven't properly vetted.  Even if you take the Starboard allegations as alleged in Delaware as opposed to as slightly mischaracterized here, it's inconsistent, in part, with some of their own witnesses' theories, because they say, well, the reason for the cut in guidance is this double-booking, and then their CW 1 and CW 2 say, well, no, actually the reasons for the cut in guidance is because the sales team wasn't delivering, and we had customer attrition, and we weren't converting contracts.

So, completely different theories — I think they have

P1EKDAMO

to pick a horse and ride it — as opposed to, you know, different things.  They say all these other witnesses corroborate the Starboard witness.  I think they're actually in conflict.

I would say that the CWs that they rely upon — 2 through 5 — don't actually have sufficient firsthand knowledge alleged to support anything.  There's a lot of surmise, there's a lot of conjecture, but nothing that actually establishes that opinions were not honestly held or that the reasons for doing things were not as stated.  These are, in many cases, people who were not in the right place or, if you use the line from the Hamilton musical, they weren't in the room where it happens, for those of you who haven't seen it.

THE COURT:  Just back to the stock drops for one question.  I think you attributed the stock drops to shifts in management, but my understanding of the events here is that the CEO, in particular, steps down in the middle of 2023, after the three stock drops that I quantified earlier.

MR. SIMMONS:  Correct, but I answered that with respect to your question, why didn't the stock go back up in late 2023, when they finally got the --

THE COURT:  It's because there's been intervening troubling news.

MR. SIMMONS:  Right.  By then, the company had been through even more turmoil.  There had been CEO turnover as

P1EKDAMO

well.

THE COURT:  What happened to the company after all this?

MR. SIMMONS:  The company continues to work on retrenching.  It's trying to restructure its debt, it's trying to restructure its business.  They have new directors.

THE COURT:  It's not dead person, but it's not fully LivePerson.

MR. SIMMONS:  Right.  The stock is still a dollar or two dollars a share.  It's not --

THE COURT:  Life support person.

MR. SIMMONS:  Not where anyone wants it to be.

THE COURT:  Very good.  Thank you very much.

We'll take about a ten-minute comfort break, and then I'll hear from plaintiff's counsel.

MS. WEINRIB:  Sure.

THE COURT:  Thank you.

(Recess)

THE COURT:  I'll hear now from you, Ms. Weinrib.

MS. WEINRIB:  Thank you, your Honor.

Good afternoon, your Honor.  I'd like to address some of the inaccuracies that were discussed earlier.  There were some factual questions that your Honor had that I would like to clarify.

THE COURT:  Inaccuracies by LivePerson or inaccuracies

P1EKDAMO

by its counsel here?

MS. WEINRIB:  I'll change the word to "clarifications."  Your Honor had some questions about the timeline with Starboard.

THE COURT:  Right.

MS. WEINRIB:  So, Starboard initiated its position in LivePerson in February of 2022.  It took a large position, almost 10 percent of the company, and it initiated a proxy contest.  Because the company was in financial decline and was being mismanaged, among other things, they wanted to replace certain board members.  The board had been largely entrenched, the company wasn't being well run, Starboard felt that Defendant LoCascio's control over the company was unchecked.  And following the initiation of the proxy contest, Starboard and the company engaged in conversations.  So they didn't just initiate the contest and walk away.  There were conversations between Starboard and the company.  The company tried to get Starboard to withdraw its proxy contest.  Unsurprisingly, Starboard declined.

On May 9, 2022, which is the start of the class period, LivePerson files its first quarter 2022 results the same day that Starboard publishes a letter listing all the reasons for its proxy contest.

THE COURT:  So, does the class period presuppose that there's some falsity in the first quarter 2022 results that are

P1EKDAMO

posted the same day?

MS. WEINRIB:  Correct, your Honor.

THE COURT:  What is the falsity in those quarterly financials?

MS. WEINRIB:  The amended complaint alleges that the first quarter 2022 results were inflated as a result of -- well, the inflation was dual.  So, there was a double-booking of revenues, which is covered in the Starboard complaint, and I will --

THE COURT:  Double-booking of what revenues?

MS. WEINRIB:  A double-booking of revenues from noncore ventures that from the company pursued that included WildHealth.

THE COURT:  Does it include anything else?

MS. WEINRIB:  According to the Starboard complaint, there were other noncore ventures that were part of that double-booking.  It does not list or identify them.  The only noncore venture that is identified by name is Wild.

THE COURT:  May I ask you, then — it's a good detour just to ask you about this — have you ever spoken to the Starboard CW?

MS. WEINRIB:  The Starboard CW is anonymous, and their identity is still being protected by privilege in that litigation.  However, plaintiffs did undertake their own investigation --

P1EKDAMO

THE COURT:  No, no.  Look, since you're quoting somebody else's complaint, it's absolutely fair game to ask the question whether there is double hearsay here.

You have not spoken, to your knowledge, to the person who is the Starboard CW; is that correct?

MS. WEINRIB:  That was a fair clarification.  To our knowledge, we have not spoken --

THE COURT:  It's possible that somebody you spoke with in this investigation or on the subway was the Starboard CW, but, as far as you are concerned, you don't know that?

MS. WEINRIB:  Correct.  And because we didn't have the identity of the CW, we took steps to confirm those allegations by other means.

THE COURT:  Okay.  Here's the question:  Did you ask Starboard who the CW was?

MS. WEINRIB:  No, your Honor.  We don't have a joint agreement with Starboard whereby they would --

THE COURT:  No, but did you ask the question of Starboard?

MS. WEINRIB:  No, your Honor.

THE COURT:  Did you ask the question of Starboard about any characteristics of the Starboard CW beyond those which appear in the Starboard complaint?

MS. WEINRIB:  We relied upon the descriptions that were provided in the Starboard complaint, particularly because

P1EKDAMO

we felt there was credibility lent to those allegations given that they were corroborated by additional confidential witnesses that we spoke to.

THE COURT:  All right.

So, who else says that the Wild results in Q1 2022 were double-booked, meaning larger than they should have been?

MS. WEINRIB:  Confidential 1 corroborates that allegation.  Confidential Witness 1 states that the revenue from noncore ventures, including WildHealth, was double-booked in the first quarter of 2022.

THE COURT:  But your adversary says that that's not actually what the Starboard CW is said to have said.  He points out, in the highlighted portions, that the Starboard CW is claiming that the anticipated, the future, the revenue projections, as opposed to the actuals, were double-booked. You're saying CW 1, though, is addressing actuals.

Is that a fair critique?

MS. WEINRIB:  Well, just to be clear, and we'll look at the paragraph directly in the Starboard complaint --

THE COURT:  What paragraph?

MS. WEINRIB:  -- paragraph 59, which defense counsel has highlighted.

THE COURT:  69?  One moment.

MS. WEINRIB:  59, on page 21.

THE COURT:  One moment.

P1EKDAMO

They say it's revenue guidance in each case.

MS. WEINRIB:  It says that Starboard later learned that the reported revenue guidance was intentionally overstated as company management double booked revenues.

THE COURT:  Sorry, later learned that the reported guidance was intentionally overstated?

MS. WEINRIB:  Right.  As the company management double-booked revenues and inflated the company's financial performance as disclosed in the Q1 2022 earnings.

THE COURT:  Question for you:  That sentence doesn't even attribute it to any anonymous person.

MS. WEINRIB:  It does elsewhere in the complaint.

THE COURT:  No, no, no, but paragraph 59, it just says Starboard later learned.  It's a passive voice, in effect, and it's an unattributed.  I've learned stuff from the internet, but you'd never consider that cognizable.  And you're a step removed because you're not the author of the Starboard complaint.

On what legal authority can I, in effect, give any weight in assessing the plausibility of the complaint to an attribution in paragraph 59, which doesn't even cite what Starboard's source is?

MS. WEINRIB:  Elsewhere in the Starboard complaint, it attributes that it learned that knowledge from the Starboard CW.

P1EKDAMO

THE COURT:  Where does it say that?  Because the Starboard CW is, according to Mr. Simmons — and I think he's right about this — there are attributions about the revenue guidance being overstated being attributed to the Starboard CW. You've pointed out that the back half of that first sentence in paragraph 59 does appear to get to the actuals, in that it says the company management double-booked revenues and inflated financial performance, but there's no attribution of that in paragraph 59, even to the Starboard CW.  It's --

MS. WEINRIB:  I'm happy to find the paragraph reference.  It's definitely in here.  If you'll give me a moment, I'll find it.

THE COURT:  Please do.

(Pause)

MS. WEINRIB:  The first example is in paragraph 5, your Honor.  And I can go on and find the other references, but it says on page 5, paragraph 5, that shortly after the settlement agreement was signed — and we'll come back to that because the date of that signature is important — and one week before the company's earnings for Q2 2022 were announced, the CW — and that's referring to the Starboard CW — who reported to the company's head of sales at the time of the fraud made unsolicited contact with Starboard to inform Starboard that the company was in turmoil and would significantly adjust down its annual revenue guidance to back out revenues from an acquired

P1EKDAMO

business called WildHealth that had been double-counted in the first quarter.

So, again, it's speaking to actual results.  It's saying that revenues from WildHealth were double-booked.  And it is talking about how in --

THE COURT:  No, no.  It says that the earnings haven't been announced yet, and it says, in effect, that whatever had been double-counted was going to be backed out, the implication being that the -- yes, and then it says when Q2 earnings were announced, annual revenue guidance was indeed adjusted down.  The statement is that prior guidance had been falsely too high, but that the actual numbers, as reported, are not being impeached.

MS. WEINRIB:  So the settlement agreement occurred after the first quarter 2022 results were released.  And the allegations from the Starboard CW are that in the first quarter of 2022, the company issued guidance for the year, and that because it had double-counted revenues from noncore ventures, including WildHealth, that those numbers were inflated, and that they would have to back that revenue out to reduce guidance in the second quarter of 2022.

And those results were revealed a week after the Starboard CW contacted Starboard.

THE COURT:  I'm not following that.  In other words, is your complaint — let's start with your complaint — is your

P1EKDAMO

complaint stating that there was factual inaccuracy in the reported numbers for Q1 2022?

MS. WEINRIB:  Yes.  The complaint alleges that the revenue guidance was inflated in this --

THE COURT:  No, no, no, not the guidance, the actual reported numbers.  Listen to my question, because the language of these documents is saying guidance, and your answer is saying actuals.  So my question, right now, is about actuals.

Does your complaint allege that there was something inaccurate about the actual reported numbers for Q1 2022?

MS. WEINRIB:  The amended complaint is alleging that the guidance was inflated as a result of --

THE COURT:  You're not answering my question, and I'm now getting annoyed because this is the third time.

MS. WEINRIB:  I apologize.

THE COURT:  Stop talking about guidance.  We're talking about cold hard numbers, what the revenues were, that sort of thing.

For Q1 2022, does your complaint allege that there was anything inaccurate about the actual numbers that were reported by the company — not guidance, not forward-looking — the actual numbers for a completed quarter?

MS. WEINRIB:  No, your Honor.  The first quarter 2022 results are alleged to be misleading not because of the actuals, but because revenues from noncore ventures, including

P1EKDAMO

WildHealth, were double-counted when putting together the full year guidance.

THE COURT:  Sorry, it's the last clause that's messing me up here.

Putting aside the full-year guidance, and just answering my question, which involves this one quarter, Q1 2022, is there anything wrong with the financials as alleged in your complaint?

MS. WEINRIB:  Not to our knowledge.

THE COURT:  Okay.

Your point is that in looking forward, your complaint alleges that the company double-counted, and on the strength of that, came up with a falsely rosy projection going forward, correct?

MS. WEINRIB:  Yes, your Honor.

THE COURT:  Okay.

Is there any part of your complaint that alleges, at this point in time, that any actual performance numbers, as opposed to forecasts or guidance, were inaccurate at any time?

MS. WEINRIB:  No, your Honor.

THE COURT:  Okay.

So, the complaint, as it relates to performance, is about projections and guidance?

MS. WEINRIB:  It's about projections and guidance, and it is about the alteration of metrics for reasons that were

P1EKDAMO

undisclosed.

THE COURT:  All right, thank you.  That's helpful.  But you understand it's important to get to the bottom of that.

The CW, in the Starboard complaint, does address guidance?

MS. WEINRIB:  Yes, your Honor.

THE COURT:  What other CW of yours -- you've said now several times that person was corroborated.

MS. WEINRIB:  Yes.

THE COURT:  By whom was that CW corroborated insofar as that CW alleges falsified guidance?

MS. WEINRIB:  Specific to the double counting, solely Confidential Witness 1.  However, with regard to the inflation of guidance, because they included revenues from projects and renewals that had not been executed, that is attributed to CW 1 and CW 2.

THE COURT:  That's a matter of the issue of how far along in the pipeline or development something had to be counted, right?

MS. WEINRIB:  Correct, correct, yes.

THE COURT:  Why isn't that in the nature of a judgment call?  Is there some accounting rule that was breached by counting something at stage five that's not at stage six?  I was having difficulty understanding what's not about judgment in that determination.

P1EKDAMO

MS. WEINRIB:  So, according to CW 1, they had no basis for reasonably anticipating that those contracts would, in fact, be executed.  And the fact that that could not have been really anticipated is proven when we look at the end of the class period, and the company had to slash its guidance by a quarter of its revenue base, or a hundred million dollars, because, among other things, of worsening rates of customer attrition that had been building over time.  Customer attrition meaning customers that did not execute their contracts, either new contracts or renewals.

THE COURT:  That's the 2024 stock drop of 47 percent on February 28th?

MS. WEINRIB:  Correct, your Honor.

THE COURT:  I was asking a bunch of questions about the first three stock drops, which are tightly packed in the late February through mid-March phase of 2023.  Those appear essentially to be about a different subject, which are about WildHealth and the Medicare investigation?

MS. WEINRIB:  Correct, your Honor.

THE COURT:  Is that a separate thing from what you're talking about with respect to February 2024, which appears to be about the outlook being $100 million below expectations, which has to be something other than WildHealth?

MS. WEINRIB:  Correct, that's a separate --

THE COURT:  It's totally separate?

P1EKDAMO

MS. WEINRIB:  Yes.

THE COURT:  So, to the extent that you are building a case based on the announcement in February 2024 that the outlook was $100 million below expectations, what are the false statements that are corrected by that statement in February 2024?

MS. WEINRIB:  So, in addition, first of all, to the fact that the company disclosed that $100 million revenue guidance, they also disclosed a lack of transparency in talking about revenue segmentation and key performance indicators. They talked about the fact that WildHealth, in fact, suffered annual losses of $10 million and had not actually overperformed, like they had been saying throughout the class period, and they, in fact, had to sell WildHealth because it had performed so poorly.  And that the reason for the $100 million reduction was because of worsening trends in customer attrition, downselling, and the like, things that they were masking all along the way by altering metrics, such as NRR and ARPU.  Again, that's another category of misstatement where defendants altered those metrics to make things look better than they actually were, but provided investors with a different justification for why they made those alterations.

THE COURT:  It sounds as if, though, we've got two different streams of allegedly actionable statements going on here.  We'll get to Wild, but one set involves Wild, and

P1EKDAMO

involves what I gather, from your perspective, are corrective

disclosures in the February-March range of 2023.

MS. WEINRIB:  So, there are two categories of

misstatements with regard to WildHealth.

THE COURT:  Okay.

MS. WEINRIB:  One bucket is corrected with those first

three disclosures.  The second bucket is corrected with the

final disclosure in February 2024.

THE COURT:  What is corrected with the first three set

of disclosures, the ones about Medicare?

MS. WEINRIB:  So, your Honor, because WildHealth was

performing so poorly, they were instructed by LivePerson to

find new revenue streams.  And they pursued this Medicare

demonstration program without divulging that they had pursued

that program.  And that program was heavily scrutinized by

regulators because it has been found to be subject to rampant

fraud.

THE COURT:  Sorry, what's the correction, though?  In

other words, it looks to me as if the company learns at some

date, apparently after the Q3 revenues are announced in 2022,

about a Medicare regulatory issue.  There's not pled any

intervening statement, and the next statement that gets made is

the series of statements beginning February 28th that reveal

this bad Medicare inquiry news.

Where I'm going here is:  I understand it's bad news,

P1EKDAMO

and it understandably hurts the stock, but I'm trying to understand it in the context of the '34 Act, which is where's the fraudulent statement?  Where's the misrepresentation that's being corrected?  What is that?

MS. WEINRIB:  So, that's one of the things I wanted to correct about what was stated earlier, which is that the amended complaint alleges that they found out about this before November 2022.

THE COURT:  "This" meaning what?

MS. WEINRIB:  About Medicare suspending the reimbursement.

THE COURT:  Where is that in the amended complaint?

MS. WEINRIB:  Paragraph 64, your Honor.

THE COURT:  Six-four?

MS. WEINRIB:  Yes, 64, on page 20.

THE COURT:  One moment.

Right.  But here's the problem.  It says November 2022.  The earnings statement is November 7.  Where does it say that before that earnings statement, the company was aware of the Medicare investigation?

MS. WEINRIB:  So, that paragraph references 42 CFR 405.372, which requires Medicare to give a company a heads-up that they might suspend it, and then give the company a chance to rebut.  So, what happened in November 2022 was the end of that process.

P1EKDAMO

THE COURT:  Wait a minute.  There's no citation that says upon information and belief, and you're asking me to infer from something that isn't said here that Medicare abided by some regulatory obligation to give prior notice.  That isn't even said on information and belief.

MS. WEINRIB:  Well, your Honor, the section that's cited here requires Medicare to go through that process.  That's true, we don't have that information in our possession to verify that they, in fact, went through that process, but given that those are the requirements, in common sense, the likelihood would dictate that they did, in fact, inform WildHealth before they actually put the suspension into effect.

THE COURT:  All right.  So let's assume, for argument's sake, that it was well pled that before the November 7 or so earnings announcement in 2022, the company had received this notification of an intent to suspend payments.

What, then, is false or misleading about the intervening financials, the Q3 financials, that are issued in November 2022?

MS. WEINRIB:  So, the statements with regard to WildHealth that we allege are misleading are the company's statements touting WildHealth as overperforming, exceeding expectations, talking about how WildHealth will double its revenues in 2023, all the while knowing, firstly, that WildHealth was actually suffering millions in losses, and also

P1EKDAMO

knowing that it would have suspensions of reimbursements from Medicare, which ultimately amounted to $2 million.

THE COURT:  Sorry, but as to that, I take it it's cognizable that, ultimately, there was no "there" there to the investigation.  So, if the company can be presumed to have known better than the regulator whether there was any "there" there, why was it under an obligation to report an investigation whose thesis the company rejected and which turned out to be right about?

MS. WEINRIB:  Because, at that point in time, they didn't know how the investigation could conclude.

THE COURT:  Right, but where does the affirmative obligation to report an investigation come from?

MS. WEINRIB:  It came from the fact that they warned of the hypothetical risk of regulatory scrutiny, all the while they were already facing regulatory scrutiny by Medicare in addition to other regulators.  The FDA and the DOJ are alleged to have also scrutinized WildHealth for its conduct under the Medicare demonstration program.  That was part of one of the three disclosures that occurred midway through the end of the class period.

THE COURT:  So your point is, essentially, once they know that there is an investigation, the risk disclosure about a theoretical investigation becomes misleading because there's actually a real investigation, it's not merely a contingent, a

P1EKDAMO

possibility?

MS. WEINRIB:  Correct, your Honor.  In addition to which it's yet another piece of information they have proving that WildHealth was not actually performing well.

THE COURT:  But that's a separate point.  I take your point that Wild's numbers are bad, and the implication being if these people were anything other than asleep, they would have seen the bad news coming sometime earlier.  I get that fully.  But the idea that the existence of a government investigation proves the outcome of it is quite another story.

MS. WEINRIB:  No, I take your point, your Honor, and it is more directly related to the hypothetical risk disclosure, the regulatory scrutiny.  I'm merely suggesting that it is somewhat related in that it is yet another piece of information that shows that WildHealth was looking at greater losses when they were all the while saying that they were overperforming.

THE COURT:  So let's put aside the Medicare suspension, which is essentially the subject of the three announcements in February and March, and focus on the merits of Wild's performance.  What is inaccurate or actionable about the portrait of the Wild performance that is given by the company prior to the disclosure of the investigation?  For example, in November, which seems to be the last statement, what do they say that's actionable about Wild's performance?

P1EKDAMO

MS. WEINRIB:  About WildHealth's performance aside from the hypothetical risk disclosures, your Honor?

THE COURT:  Aside from your point that they should have been more actual and not theoretical about the possibility of a regulatory risk.

MS. WEINRIB:  So, the statements that they made during the class period with regard to WildHealth's performance remains misleading throughout the class period, not just pre-November 2022.  That's one of the things that we say was revealed in the February 2024 disclosure.  So they had been saying throughout that WildHealth had overperformed and would double its revenue in 2023, all the while WildHealth had been contributing $10 million in annual losses to the company, and was constrained to grow because the company had instituted capital cuts and layoffs.  So they had no reasonable basis for stating to investors that revenue would double the following year, and had no basis for stating that WildHealth was overperforming at that time.

THE COURT:  So, to put this in a legal bucket, this is an *Omnicare* opinion statement, insincerely held?

MS. WEINRIB:  Certainly insincerely held to the extent it could be seen as an opinion statement, yes, your Honor, because they had facts in their objectively verifiable facts in their possession at the time demonstrating that it was not, in fact, true.  Not only was WildHealth not overperforming, it was

P1EKDAMO

underperforming.  It was contributing losses and no revenues.

THE COURT:  Did they say that it was overperforming?

MS. WEINRIB:  Yes, your Honor.

THE COURT:  All right.

MS. WEINRIB:  In fact, your Honor, in the third quarter of 2022, when the company raises its guidance, defendants attribute the guidance raise to WildHealth's performance.

THE COURT:  And what, in fact, according to the pleadings, did they know that was contrary to that?

MS. WEINRIB:  That WildHealth was, in fact, incurring millions in losses, and there was zero basis for attributing any raise in guidance, and certainly no basis for projecting a doubling of revenues in 2023 to WildHealth.

THE COURT:  Do you need CWs to get to that conclusion, or is that something that you can get to by other means?

MS. WEINRIB:  Don't necessarily need CWs to get to that conclusion because the February 2024 disclosure admits that that's what was occurring.

THE COURT:  Sorry, it admits back in Q3 2022 that Wild was losing money?

MS. WEINRIB:  The February 2024 disclosure states that WildHealth had, in fact, incurred $10 million in annual losses, and that it would have to be sold.

THE COURT:  And it had losses going back to 2022?

P1EKDAMO

MS. WEINRIB:  Yes, your Honor.

But speaking to the CWs, CW 1 attested to the fact that WildHealth was a problem from the outset, from the moment of the acquisition, and CW 2 states the same.  CW 2 states that WildHealth never earned anywhere near enough to validate the output of cash that the company had to spend to acquire the company, and that --

THE COURT:  But that's a performance deficiency.  The issue here is what in realtime they were saying that is inaccurate, and I take it what you're saying is that the sunshine that they are blowing about WildHealth throughout is inconsistent with their secret knowledge concealed by the manner in which they chose to break out, or not, their revenues that WildHealth was actually in the red $10 million a year?

MS. WEINRIB:  Correct, your Honor.

THE COURT:  Defense counsel suggested that there was a materiality issue if one focuses just on Wild.  What's your response to that?

MS. WEINRIB:  So, your Honor, defendants talk about WildHealth as a percentage of LivePerson's overall business.  They don't talk about WildHealth -- they were talking about the materiality, if I understand correctly, of the $2 million in suspended reimbursement specifically.  And WildHealth, as -- the materiality is evidenced by multiple things.  One is the massive stock drop, when the investors learn the truth in

P1EKDAMO

February/March of 2023 with regard to the suspended reimbursements. Clearly, the market found it material.

THE COURT: But as to that, I think, as the colloquy I had with your adversary suggested, there's a suggestion there that the reason the market finds this announcement material isn't necessarily because of the dollar amounts implicated, but because of the DOJ and regulatory threat to the C-Suite that, in effect, it presented by this investigation as opposed to the actual economic consequence.

MS. WEINRIB: Even if that's the case, your Honor, that's all inextricably intertwined with one another and is also the reason why the Second Circuit typically doesn't impose a numerical threshold.

THE COURT: No, I understand. Look, materiality is a multisplendored thing, and on the pleadings, it's a hard thing to get the dismissal on. Nevertheless the point has been made, so I'm asking you to respond.

MS. WEINRIB: Yes, your Honor.

The reason the market is responding is because the market was unaware that the company was facing this regulatory scrutiny because the investors didn't know that WildHealth had made this foray into the Medicare demonstration program, which was scrutinized heavily by regulators. And, in fact, throughout those three disclosures, because the truth was kind of dribbled among the three, we learned that not just Medicare

P1EKDAMO

scrutinized WildHealth, but also the DOJ and the FDA.  So, it was multifaceted, and, your Honor, at the time the investors did not yet know how much in losses WildHealth contributed to the bottom line.  So, I'm not going to stand here and suggest that the $2 million as a percentage of the $10 million is material in the eyes of the investor because the investor didn't learn that until February of 2024, but we know it to be material.

And investors certainly responded to the information they did receive at that point, sending the stock spiraling downward.  And the fact that investors placed a great importance on WildHealth is also demonstrated by the fact that analysts asked questions about WildHealth on earnings calls, and the WildHealth CEO participated in an earnings call.

So, for all of defendants' comments about how insignificant and meaningless this tiny little portion of the overall company was, clearly, they recognized that investors placed importance on it.  And they --

THE COURT:  When there are references to noncore businesses, is there much to that beyond WildHealth, or is WildHealth essentially overwhelmingly what is being discussed when they say noncore businesses?

MS. WEINRIB:  I'm sorry, your Honor, can you clarify?

THE COURT:  Are there other noncore businesses of any consequence beside WildHealth?

P1EKDAMO

MS. WEINRIB:  WildHealth is the one of great consequence to this case, but the company had pursued other noncore ventures that were not accretive, as well, which contributed to the company's financial decline, but WildHealth is the company regarding which we allege a number of misstatements were made.

THE COURT:  But assuming that I discounted altogether the Starboard complaint and the Starboard CW, explain to me the basis on which you plead a viable claim as to WildHealth.

MS. WEINRIB:  So, your Honor, we contend that the company misstated WildHealth's performance.  The company stated that WildHealth overperformed when, in fact, it contributed millions in losses.  The company stated that WildHealth would double its revenues in 2023, again all while knowing that WildHealth, in fact, floundered, and also knowing that LivePerson itself had instituted capital cuts and layoffs that constrained WildHealth's growth.  And, further, made statements regarding the hypothetical risk of regulatory scrutiny, all the while knowing that WildHealth had made this foray into the Medicare demonstration program and faced actual regulatory scrutiny from three separate regulators.

THE COURT:  Coming back, for a moment, to the Starboard CW, did you ask any of your CWs if they were the Starboard CW?

MS. WEINRIB:  No, your Honor.

P1EKDAMO

THE COURT:  So, it is theoretically possible that the Starboard CW could be one of your CWs?

MS. WEINRIB:  It certainly is possible.

THE COURT:  Is there a reason you didn't ask Starboard who the CW was or ask Starboard to ask whether its CW was willing to speak with you?

MS. WEINRIB:  No, your Honor.  This was merely just trying to respect the anonymity of the CW in that case, and --

THE COURT:  Sure, but you're operating on the assumption that that person would be unwilling to speak with you under the similar conditions.  That person could have potentially been a CW of yours, had you asked Starboard to make the introduction or to reach out.

MS. WEINRIB:  Potentially, your Honor.  However, the steps that we did take gave us comfort that the allegations were credible because we had our own CWs that said the same thing.

THE COURT:  I understand that, but the problem is you can't even tell me that your CW isn't the same person and that there isn't, if you will, double-counting in your own complaint, to the extent you're counting on the Starboard CW and your own.  Had you taken that step, you would have been in a somewhat better position at least to be able to say, please consider the Starboard CW for what it's worth.  We at least can tell you, to a fare-thee-well, it's a different human being.

P1EKDAMO

We're not even there.

MS. WEINRIB:  Understood, your Honor.  And though the question may not have been asked directly, each CW was given a chance to review the allegations attributed to them, and, in certain circumstances, the complaint in its entirety, and none of the CWs came forward to say that we are, in fact, the Starboard CW.  And considering how forthcoming they were with their knowledge about the company, I can think of no reason they would have any motivation to withhold that piece of information.

THE COURT:  All right.

Just give me one moment.

(Pause)

THE COURT:  The refinancing, explain to me how that is a basis for a 10b-5 claim.

MS. WEINRIB:  So, your Honor, the company made comments during the class period, starting in the wake of the Q2 2022 results, assuring investors that they had taken proactive steps to strengthen their balance sheet in a couple of different ways.

One, they said that they offloaded lower quality revenue sources, like COVID-19, unrelated to WildHealth — this was a different COVID-19 operation — and gainshare labor, but they also said that they strengthened the balance sheet by refinancing a group of other notes — I'll call them the 2024

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P1EKDAMO

notes — and that offloading those notes strengthened the balance sheet considerably.  All the while they knew that they had the 2026 notes still on the books, $517.5 million worth of notes, that they had the opportunity to refinance, and according to Confidential Witness 2, Defendant Collins directed the board not to refinance in the hopes that their machinations would cause the stock price to rise, and they would be able to refinance at more advantageous --

THE COURT:  Sorry, but I'm having difficulty understanding why that's not a debatable business judgment, but not a fraudulent statement.  In other words, did the company ever make a statement that tended to deny the truth about the 2026 notes?

MS. WEINRIB:  Your Honor, the company did not make an affirmative misstatement with regard to opportunities to refinance the 2026 notes.  What we allege in the amended complaint is that, having touted steps they took to strengthen the balance sheet, and having referenced steps they took with regard to the 2024 notes, they incurred a duty to reveal that because the company's financial condition was rapidly deteriorating, which they took great pains to mask in other ways — alteration of the metrics, inflation of revenue guidance — that they were facing the real risk that they would not be able to refinance these other notes without material --

THE COURT:  I don't understand, though, why the fact

P1EKDAMO

that they list certain steps that they did take obliges them or makes it misleading to not reveal that there were other potential balance sheet moves, potential moves they could have made that they didn't take.  In other words, you're not saying that there's an affirmative freestanding duty to make that disclosure, right?

MS. WEINRIB:  Correct, your Honor.

THE COURT:  So if it arises, it arises because the omission of it makes some other statement incorrect.  The statements they do make are setting out affirmative steps that they have taken, but they're not stating, unless I'm missing something, that there were no other actions that could have been taken.  Had they made that statement, I would understand better the argument that the silence as to the inaction as to these notes made the statement misleading, but I don't see you pointing to something to that effect.

MS. WEINRIB:  Well, the context is important, your Honor.  So, we allege that the company was experiencing a steady financial decline throughout the class period.  We allege that starting with the second quarter of 2022 and the reduced guidance, they reveal negative results, they're trying to assure investors they are taking steps to make things better.  So they tell investors that they are proactively offloading low quality revenue, they tell investors that they are getting rid of these 2024 notes, they say that these steps

P1EKDAMO

are simplifying the business model, that these steps are strengthening the balance sheet --

THE COURT:  But is there anything inaccurate about what they say about the steps that they did take?

MS. WEINRIB:  Yes, your Honor, because those steps didn't have the effect that they said they were having because the root causes of the financial decline were not addressed. They did not address the material risk raise by still holding onto the 2026 notes.  They didn't reveal the worsening trends with regard to customer attrition downselling and the like. All of these root causes that they did not address, and that they did not take proactive steps to remedy, basically rendered those statements meaningless because the steps that they had taken, according to CWs, including CW 2, were a complete fabrication.  Those were not steps that had any --

THE COURT:  You're saying they lied in saying they took those steps, or that those steps were simply not efficacious?

MS. WEINRIB:  Correct, your Honor, that --

THE COURT:  Which one is it?  Those were alternatives.

MS. WEINRIB:  Well, yes, the latter.  CW 2 is stating --

THE COURT:  So they made a false statement about the efficacy of the steps they did take?

MS. WEINRIB:  Yes, your Honor.  We --

THE COURT:  What was the false statement?

MS. WEINRIB:  Although, your Honor, with regard to the offloading of the COVID-19 operation, we would allege that that is false as well, because when the revelations in February and March of 2023 occurred, they say that, as a result of the Medicare and DOJ and FDA scrutiny, that both WildHealth and LivePerson had to cease all COVID-19 activities.  But, wait, they had told us a few months earlier they had already done that.  So, they're contending to have taken steps that maybe they took, maybe they didn't.  We contend they probably didn't take that one, but the fact of the matter is that they're trying to tell investors, don't worry, we're on this, we're doing what we need to do to makes things better, and CW 2 is saying, no, you're not.  Even if you're doing those things, you're not doing anything that's addressing the real root of why the company is spiraling downward.  So, things aren't going to get any better, but you're telling investors that what you've done will make it better.

THE COURT:  Let me ask you about internal controls, which I think is your seventh category, if you will.

Putting aside the control issues that might be implicated by the Medicare review, what are the best pleadings about internal controls?  And do they extend beyond WildHealth?

MS. WEINRIB:  Yes, your Honor.  We contend that though that is what was revealed in the 2023 disclosures, which is

P1EKDAMO

that there was an internal control deficiency relating to WildHealth, the amended complaint alleges that --

THE COURT:  Sorry, but those disclosures were about Medicare's review.  So it's not that they are revealing the internal controls disclosures, it's that they're revealing an investigation and a suspension attributable to the investigation of the controls.

MS. WEINRIB:  No, your Honor.  There is an additional revelation that there was a deficiency --

THE COURT:  I'm sorry, you're absolutely right; my bad.  You're absolutely right because it does say that.  You are a hundred percent right, the March statements do say that, yes.

MS. WEINRIB:  And, your Honor, the amended complaint alleges that the internal control deficiencies went beyond just the WildHealth piece of it, and that if the internal controls had been as effective as they certified, that defendants would not have been able to disseminate the misleading statements that the amended complaint alleges were disseminated.

THE COURT:  I'm sorry, when?

MS. WEINRIB:  Throughout the class period.

THE COURT:  That presupposes that it's well pled that there is sort of systemically inaccurate statements throughout the class period.  I think you've told me, though, that the complaint is just about projections, not about actual numbers.

P1EKDAMO

If that's the case, where is there any false statement other than as a projection?  I thought earlier we covered this, and the transcript will tell the tale, but I think you were admirably clear that the thrust here is that it's the projections, the forecasts, the guidance that is awry — from your perspective, fraudulently so — but that it's not pled that there is actual inaccuracies about numbers.

If that's the case, I'm having difficulty understanding your statement that the bad internal controls can be inferred from bad actual numbers.

MS. WEINRIB:  Well, internal controls are in place to assure that the financial statements in their entirety are disclosed accurately.  And we allege that there were misstatements in each of the disclosures that were made throughout the class period, including the revenue guidance numbers, including the justification for the alteration of metrics, including statements with regard to regulatory scrutiny and WildHealth, and that those statements would not have been able to be disseminated if the internal controls had been in place.

And CW 2 describes that the company did not have proper processes and procedures in place to ensure the accurate dissemination of guidance numbers.

THE COURT:  And remind me, CW 2 is -- what's CW 2's position again?

P1EKDAMO

MS. WEINRIB:  CW 2 was a senior level employee in finance during the class period directly reporting to both of the individual defendants and was present at weekly finance and FP&A meetings with the defendants where these matters were discussed.

THE COURT:  CW 2, I think, also makes a reference to a law firm being independent, not finishing its work, but nevertheless reaching a conclusion that is favorable to the company.

What's that about?  And what do I do with that?  It's inconsistent with the idea of it being an independent law firm for it to just stop its work, but nevertheless pretend to have completed its work enough to give a conclusion.

MS. WEINRIB:  Thank you for bringing that up, because you reminded me that I didn't finish going through the timeline with Starboard earlier, which is that following the disclosure of the first quarter 2022 results, and in reliance on the integrity of those results that were reported and the guidance numbers showing that things were about to improve, Starboard entered into a settlement agreement with the company which effectively ended the proxy contest, and there was a standstill provision, which basically meant that Starboard could not initiate another proxy contest for a determined amount of time.

After the settlement agreement was announced publicly, that very same day, LivePerson belatedly scheduled their

P1EKDAMO

shareholder meeting, which CW 2 states they had been delaying until the settlement agreement was in place, and a week later, they disclosed their second quarter of 2022 results, where they reduced guidance and showed that the picture was not as rosy as they had implied in the first quarter.

At that point, Starboard couldn't do anything about it because they were in the midst of this standstill provision, they were beholden to the standstill provision, they had been contacted by the CW, Starboard's CW, after the execution of the settlement agreement, but before the issuance of the second quarter results. So, Starboard, in the complaint, states that they couldn't trade out of their position because they considered the information provided by the Starboard CEO material and nonpublic. And they were also, again, beholden to the standstill provision when things continued to worsen over time, and when the standstill provision had expired, Starboard -- apologies, let me backtrack.

Starboard, understandably, was quite upset after the issuance of the second quarter 2022 results. They state in the complaint that before they signed the settlement agreement, they specifically asked Defendants LoCascio and Collins if there was anything they needed to know that might cause them to back out of the settlement agreement, anything about the company's performance. They were told no. They enter into the settlement agreement, and then a week later, the second quarter

P1EKDAMO

results come out.

THE COURT:  This is not about a fraud on Starboard. That, apparently, is its own litigation.

MS. WEINRIB:  Yes.

THE COURT:  Beyond window dressing, what is the alleged deception of Starboard?  Where does that get you?

MS. WEINRIB:  I'm trying to get to the point where they hire the law firm.

THE COURT:  Oh, okay, yeah.

MS. WEINRIB:  Apologies, I'll try to get there faster.

THE COURT:  No, go ahead.

MS. WEINRIB:  Starboard reaches back out to the company — they're very upset — to sort of appease Starboard. The company says, okay -- sorry, Starboard issues a books and records demand.  This is before the February 2024 lawsuit. This is further back in time.  They initiate a books and records demand.

Rather than respond to the books and records demand, the company says to Starboard, we're not responding, but we'll conduct this investigation, back off.  They conduct this investigation.  According to CW 2, the investigation was not complete.  They did not interview anybody they were supposed to interview.  CW 2 states that whatever results they did provide to the board were quashed.  And then the timeline --

THE COURT:  How does CW 2 know any of that?  Was CW 2

P1EKDAMO

working with the law firm?  Was it privy to their work stream?

MS. WEINRIB:  CW 2 was a member of the finance team, and the members of the finance team were interviewed, or some of them were.

THE COURT:  Sorry, I used to do this sort of stuff on behalf of special committees.  People who we interviewed didn't know who else we were interviewing.  Why would CW 2, if they were interviewed, have any idea of the shape of the hole?  In fact, it's special committee independent counsel 101 that you don't anchor a witness with other information like that.

MS. WEINRIB:  CW 2 purported, in CW 2's position, to be aware of what was going on with regard to the investigation and who was being interviewed on the finance team --

THE COURT:  Why is that credible?  Why would CW 2 be sort of Forrest Gump?  Why would they know all this stuff?

MS. WEINRIB:  Understood, your Honor.  However, the way that the timeline progresses certainly seems to suggest that something was a little bit amiss here because when the law firm calls Starboard to say, oh, we didn't find anything problematic, it was the eve of February 27, 2023.  All the while that this was happening, Starboard couldn't trade out of its position because it was privy to the fact that this investigation was ongoing, the public didn't know about it, Starboard held its shares.

THE COURT:  Sorry, the complaint is suggesting that

P1EKDAMO

this investigation, in some respect, notwithstanding being by a law firm, is a sham, that it's a ploy, to buy time to come up with an incomplete rosy piece of information.

That seems to turn on CW2's purported omniscience about the investigation, right?  Without CW 2, you don't have anything in that space.

MS. WEINRIB:  Partially, your Honor, but as I was about to say, at the eve of February 27th is when they transmit those results to Starboard.  The following morning is our first corrective disclosure.

THE COURT:  Right.

MS. WEINRIB:  So, Starboard was basically kept at bay for the entirety of this period where they couldn't trade out of their majority position, and then the moment they are able to trade, which is February 28th, is the day that the company says, actually, things are not so great, we have to delay our filing.  All of this is going on with WildHealth.  Medicare is suspending reimbursements.  They ultimately state they're going to also miss guidance.  Going back to the materiality question with WildHealth --

THE COURT:  Wait a minute.  February 28th, the disclosure is only about WildHealth and the investigation. Later on, you do get to the guidance point, although the company says it's only about noncore lines, and it basically says, were we to have recognized the suspended WildHealth

P1EKDAMO

income, we would actually be within guidance.

So, all of that stuff there is essentially about WildHealth.  I'm ultimately trying to, though, big-picture figure out what the ostensible dissembling to Starboard, who isn't a plaintiff here — the statements to Starboard aren't a part of the cause of action, they're not publicly made — I'm trying to figure out, beyond a black eye for the company, how it gets you anywhere in which you have to plead in this 10b-5.

MS. WEINRIB:  It just shows a pattern of withholding information in order to give investors, including Starboard, an appearance of a company that was trying to reverse its financial decline, but not actually reversing its financial decline.  Things were getting worse, and the company was doing everything they could to mask it.

THE COURT:  Does the fact that the company has an interest in icing Starboard help you on scienter?  Is that the point here, which is it doesn't really get you to falsity or misleadingness, but it reinforces a motive to dissemble because they're facing scrutiny from somebody who's trying to take control of the board?

MS. WEINRIB:  We don't rely on the Starboard allegations for scienter, though certainly --

THE COURT:  Why not?  I would have thought that the Starboard allegations are most useful to you in underscoring a motive to pretty up the performance guidance.

P1EKDAMO

MS. WEINRIB:  Well, let me correct myself.  Because when it comes to motive, we do allege that one of the motivations that defendants had was to thwart the Starboard --

THE COURT:  To my mind, I assume that's why there's so much of a detour in the Starboard saga --

MS. WEINRIB:  Apologies.

THE COURT:  -- which is, it's the more Starboard can be kept at bay with false numbers, the better self-interest, including for people who are ultimately tossed out.

MS. WEINRIB:  Correct, your Honor.  That was one of the allegations that we list for motive, that they were trying to thwart the Starboard proxy contest, which is clearly not a general motivation held by most corporations.

THE COURT:  Right.

MS. WEINRIB:  But we also have a myriad of allegations of recklessness in addition.

THE COURT:  I had interrupted you repeatedly.  Let me give you a couple of minutes if there's something else you wanted to cover.

MS. WEINRIB:  Your Honor, I was just hoping to clarify any open points that you had.  I think that the opposition brief covers all of this comprehensively.  I'm happy to address any other points that would be helpful.

THE COURT:  Just one moment.

(Pause)

P1EKDAMO

THE COURT:  Nothing further from me.  Thank you.

MS. WEINRIB:  Thank you, your Honor.

THE COURT:  All right.

So, brief rebuttal from you, Mr. Simmons?  Ideally focus on the specific points that Ms. Weinrib made.

MR. SIMMONS:  I will try to do so, and try to be succinct, because I realize we've been at this for a while.

THE COURT:  That's okay.  It's an important case.

MR. SIMMONS:  So let me start with the question of internal controls.

As I started to mention earlier, the problem with internal controls and material weakness is a term of art in the accounting industry.  And it's defined, and I picked this up off the PCAOB, but in the accounting literature, it will say that it's a flaw in the company's control systems that make it reasonably possible that a material misstatement in the company's financial statements will not be prevented or corrected.  It addresses financial reporting, internal controls over financial reporting — ICFR — actual results in the financial statements.  It has nothing to do with forecasting.

The auditors who opine on ICFR don't audit forecasts, or the methodologies for forecasts, or the business judgments that go into forecasts.  The controlled efficiencies identified have nothing to do with the forecasts that are at issue, and, therefore, it doesn't help their case.

P1EKDAMO

THE COURT:  Wait a minute, though.  But Ms. Weinrib makes the point, for example, with respect to the Medicare investigation that the company, from her perspective, appears to have the standard issue recitation of the generic regulatory risk, which it doesn't then make more pointed when, in fact, there is actually awareness of a regulatory investigation on the horizon or in progress.  That is part of the financials, is it not, which is the 10-Qs?  Isn't that something that a company is obliged to report, the existence, for example, of legal risks, regulatory risks, and to go beyond the generic, where there is specific information known?  Isn't that something that auditors review?

MR. SIMMONS:  Well, not quite.  First of all, the control deficiencies deals with the numbers, not the qualitative disclosures.

THE COURT:  Wait a minute.  You said it has to do with the financial statements.  Is it really correct, though, because those financial statements often do have risk disclosures?

MR. SIMMONS:  That is true.

THE COURT:  You've got to wait for me.

Are you just saying it, or is there something you can point to that says internal controls do not include risk disclosures?

MR. SIMMONS:  I believe the accounting literature and

P1EKDAMO

that definition and the way the accountants understand that term is perfectly clear.

THE COURT:  Well, the latter, the way the accountants understand that term, we'll deal with at summary judgment, if we get there, but the issue as to how internal controls are defined in some objective sense by GAAP or whatever, I'm asking you, do you have something that says to me, in a categorical way, it's numbers only, it's not risk disclosures?

MR. SIMMONS:  I don't believe there is anything we've cited in our papers.  If that's something you want a letter brief, we're happy to get you some authority on that, but --

THE COURT:  I'm trying to figure it out.  You said it in a way that suggested you felt it with certitude, like you knew it based on some source.

MR. SIMMONS:  Based on plenty of accountants, auditors, and others I've spoken to, but if you actually want a citation --

THE COURT:  Let me do it this way:  I don't want argument, but if you want to give me a letter — the opposing side can do the same — that literally gives me a citation, but I'm really going to get annoyed if I get argument because I'm not opening the door to that, but each of you, if you want, by the end of the day tomorrow, just get me a letter that literally cites something on this specific point on whether internal controls are limited to actual cold hard numbers.

P1EKDAMO

MR. SIMMONS:  That, we will certainly do.

THE COURT:  Go ahead.

MR. SIMMONS:  I would also point out, and I think you see this at, I believe it's, pages 27 to 28 of our brief, we cited a whole series of cases, including from the Second Circuit, dealing with there is no obligation of realtime disclosure every time there's an investigation or a subpoena --

THE COURT:  No, I understand that, but the issue becomes, if you've made a statement that it's theoretically possible that we could be sued about a tort, and, in fact, you've been sued, and you don't update the disclosure to make concrete that, in fact, the tort has actually happened or the tort suit has happened, that's a separate problem.  It's not responsive in the sense that the issue is whether the generalized statement put in terms of abstract potential needs to be freshened up when the real thing has happened.

MR. SIMMONS:  Well, as I said, your Honor, if you look at what we actually disclosed in the risk disclosure — that in the ordinary course of business, the company gets these things, and we may get them in the future — and you couple that with the cases that we cited, that is absolutely sufficient and customary disclosure, without needing to update it every time one materializes.

THE COURT:  Let's get to the specific allegation as to the Medicare, DOJ, et cetera investigation.  Ms. Weinrib cites

P1EKDAMO

a portion of their brief that embeds a regulation that requires, from her perspective — I didn't run it to ground myself — advanced prenotice, if you will.

Is that correct?

MR. SIMMONS:  The regulations require prenotice that something may happen — we're conducting an investigation, the consequences may include.  That's no different than getting any other investigative subpoena that may have consequences or may be much ado about nothing.

THE COURT:  I thought what she read to me suggested that the notice was of a forthcoming suspension, not merely that you're under investigation.

MR. SIMMONS:  I don't have the regulation in front of me --

THE COURT:  Ms. Weinrib, what was the paragraph?

MR. SIMMONS:  I had it before.

THE COURT:  Just one moment.  Let's all look at the language together.

MS. WEINRIB:  It was paragraph 64, your Honor.

THE COURT:  64?

MS. WEINRIB:  Yes.  Page 20 of the complaint.

THE COURT:  Thank you.  One moment.

Let's turn to page 20.

The CFR that's referred to on the fourth line from the bottom is quoted as requiring Medicare to notify the provider

P1EKDAMO

or supplier of the intention to suspend payments before putting the suspension in effect.

Are you in a position to comment on whether that's an accurate description, first of all, of the regulation?

MR. SIMMONS:  I am not, your Honor, nor could I say whether that's actually what CMS's contractor put in their notice when they had the billing order.

THE COURT:  The pleading says here on information and belief.  Consistent with that provision, Medicare informed WildHealth of the impending suspension, and, in effect, what counsel is saying here is, no, we haven't done discovery yet, we don't have the document, but, on information and belief, we assume Medicare abided by the Code of Federal Regulations.

That sounds like the kind of thing on which information and belief is more properly used.  On that inference, why isn't it fair to infer that, as of November 7th, 2022, your client was on notice of the impending suspension?

MR. SIMMONS:  Because there are a lot of assumptions in there.  Medicare, number one, used a contractor here, as they often do, to do their audits.  We can't assume that the contractor necessarily got it as precisely right as the CMS central home office in Washington would.

It may well be that their notice said, we're investigating, we're concerned, and the consequence may be. Again, because we don't have the notice, and they don't have a

P1EKDAMO

witness to specify what the notice said, there's a lot of guesswork going on here.

THE COURT:  Assuming that I were to credit this statement on the face here — that is, the statement on information and belief that Medicare, in fact, notified WildHealth of the impending specification — and assuming, given the tight time frame here that it was fair to infer that that was known before November 7, in your view, was there anything misleading about the November 7 Q3 2022 financials?

MR. SIMMONS:  No, there was not.  Because if you read on, and the language that she cites makes the point, that CMS/Medicare also has to give the company the chance to respond and rebut.  And the company had every reason to believe that the concern raised by CMS was not well grounded and that they would be able to rebut it, and they went through considerable trouble to rebut it.

So, even if they were told, you know, here's your chance, like a Wells notice, right — we're thinking of bringing charges, and here's your chance to rebut it — just like not every Wells Notice results in actual charges being filed, not every CMS notice of impending suspension necessarily results in an actual suspension.

THE COURT:  And what --

MR. SIMMONS:  And the company believed, your Honor, and as ultimately proven out, unfortunately a year later, that

P1EKDAMO

they could rebut it.

THE COURT:  Remind me — it's been some time — where a company has gotten a Wells notice from the SEC — which, for the benefit of others in the room, is a notice of effectively an intent to bring charges, but it's not binding, and the whole point of the notice is to invite a spew of white papers and the like — in that situation, what is the obligation of the company with respect to the Wells notice --

MR. SIMMONS:  I think --

THE COURT:  -- in terms of disclosure?

MR. SIMMONS:  I think the answer is the market practice is most companies do disclose.  I don't believe there is any case law that says you have to, and some companies do not, where they're sole-contesting it through that process.

THE COURT:  Does it help you in that context that eventually you got a clean bill of health?  Does that help you in defending your client's nondisclosure of the suspension, intent to suspend notice subject to your right to rebut?

MR. SIMMONS:  I believe it does, because even if they were told, as in a Wells notice, we're likely to do this, here's your chance to rebut it, the company believed, and was ultimately proven right, that it had a substantive answer, and this would be much ado about nothing.  And in that context, since the suspension was not assured, and they thought they had an answer, and that, therefore, this would go away, much like

P1EKDAMO

those cases we cited in our brief say, you know, unnecessarily alarming the market with news that may be much ado about nothing is itself a problem, and there is no duty to make that disclosure in realtime to give people updates as things are unfolding.

THE COURT:  Ms. Weinrib noted that later on, the company reports — I think this was in early 2024, but regardless — that historically there had been $10 million in annual losses, I think attributable to WildHealth, going back.

Given that, doesn't that impeach earlier statements about WildHealth's performance by the company?

MR. SIMMONS:  No, your Honor, it does not.  It's actually one of the things I wanted to draw your attention to.

THE COURT:  Go ahead, please.

MR. SIMMONS:  First of all, when we talk about historically, we're talking about a limited period of time. They only owned the business from February '22 on.

THE COURT:  Sure.  But that means that for each of the two years, let's say, there's a $10 million losses.

MR. SIMMONS:  But we need to distinguish between revenues and earnings.  What the company said is WildHealth is ahead of plan on revenues.  They bought it as a growth business.  LivePerson itself, like many tech companies, was not a profitable business.  They were EBITDA negative in Q1, Q2, Q3 of 2022, they were EBITDA negative in the entirety of fiscal

P1EKDAMO

'21, I believe, and their original projection for fiscal '22 is they were hoping for somewhere between 20 million of losses and being flat.  This is a company that was judged mainly on revenues, not earnings.  So the idea that WildHealth was generating revenue, but causing costs, are not inconsistent statements.  Like many aspects of LivePerson's business, they were costs that had to be invested upfront to grow, and what the market wanted to know is, is this bearing fruit, are you growing revenues, even if there's going to be near-term losses?

So, those are not inconsistent statements.  The idea that there were losses while it was growing its business -- Amazon had that problem when it got started.  How many years before Amazon made any money?

THE COURT:  You're saying the company never represented that it was in the black profitably, just that it made statements about success that were not specific to profitability?

MR. SIMMONS:  Right.  And that revenues at WildHealth were starting to improve, which is true.  There were signs of revenues increasing.

THE COURT:  Why was WildHealth eventually spun off? Does the record say anything about that?

MR. SIMMONS:  Because, ultimately, I think, the board, which turned over, and management, which turned over, exercised a business judgment as to whether this was likely to be a

P1EKDAMO

worthwhile venture to continue investing in.  It was always a noncore operation, and they kind of decided to go back to their knitting and focus on core businesses.  They got rid of a number of their noncore operations.

THE COURT:  One point that Ms. Weinrib made was that the $100 million loss, if that's the right way to put it, from February 2024, among other things, was attributed then to worsening attrition, which her complaint alleges was, in fact, something that was obscured by the discretionary change in metrics reported.

What's your response to that?

MR. SIMMONS:  My response, your Honor, is that in the Q2 2022 earnings call with analysts — this is the quarter where they say, you know, we were hiding all of this — and they cite this call, by the way, at paragraphs 159 to 166 of their complaint, they cite elements of the transcript — I've pulled it, and maybe you want to mark this as Court Exhibit No. 2, because I'm happy --

THE COURT:  It's a publicly available --

MR. SIMMONS:  It's a publicly available document that we just pulled off of S&P.

THE COURT:  Let's hand up a copy.

MR. SIMMONS:  As I say, they do cite to it.

THE COURT:  I'll mark this as Court Exhibit 2.

Thank you very much.

P1EKDAMO

And show me the relevant part.

MR. SIMMONS:  So, your Honor, at page 7 of the transcript --

THE COURT:  One second.

Okay.  And where within it?

MR. SIMMONS:  So there's discussion throughout page 7 of the changes being made to the business, to the sales organization, they're cutting gainshare, but I would focus you, for instance, on the last paragraph on that page, where Mr. Collins, the CFO, talks about net revenue retention was just below our target rate.  Revenue retention is customer attrition — am I keeping my customers — and he's acknowledging there in the earnings call to the analysts --

THE COURT:  This is line 6, net revenue retention was just below our target range?

MR. SIMMONS:  Target range.

Driven primarily by lower variable revenue and labor-based downsales.  Remember, she said, oh, and they didn't tell you that customers were downselling, taking cheaper opportunities.  Well, here's Mr. Collins talking about it to the analysts in that very call as a reason for the disappointing results.  You can read on to the next line — we expect modest pressure on net revenue retention in the short term.  Going forward, we're going to continue to suffer from this until we turn it around.  It was not hidden.  It was

P1EKDAMO

openly discussed.

THE COURT:  According to the company in 2024, how did the company, at the time, account for the $100 million loss publicly?

MR. SIMMONS:  There have been a number of problems with the company's business.  Some of it is whether they're getting their core business back on track and getting the sales.  They've also had a number of these M&A deals that have not gone well and that they've disposed of at a loss.

THE COURT:  But I'm asking how they accounted for it. Was it consistent with what you just said?

MR. SIMMONS:  I believe it was.  I don't have the 10-K in front of me to be able to tell you authoritatively.

THE COURT:  Anything else from you?  If there were other points that were made that you want to respond to, go ahead.

MR. SIMMONS:  We've done most of it.  Let me just see if there was anything else I made a note of.

One brief point, I guess, on the question of the refinancing of the notes:  As you heard from Ms. Weinrib, they took steps to refinance their 2024 notes.  They said they were going to try to improve the balance sheet.  All this discussion in the earnings call, by the way, was about things we're doing to try to improve our balance sheet.  The $500 million notes, the 2026 notes, was a line item on the financial statements.

P1EKDAMO

The existence of those notes was not hidden.  The company has been taking steps to address it.  So, merely saying we're going to be taking steps to address it, with no promise as to exactly how or when, is not a false statement.  Their difference in business judgment, that you should have done it sooner, you should have deployed assets differently, is just that, it's a nonactionable difference --

THE COURT:  It would only be actionable if there was an implication that there was nothing more that could be done.

MR. SIMMONS:  Right.  And the company did actually, after the class period, go and do that, right?  In 2024, they refinanced a hundred million dollars of the 2026 notes, and they bought back about another 50 million at a discount, and that's in their later public disclosures.  So, they've been doing exactly what they said.  Maybe the timing was a little later than Mr. Collins originally hoped, maybe the plaintiffs would have liked them to have done it differently, but that's not a misleading statement.

I think with that, we've covered the important points, and I appreciate your patience, your Honor.

THE COURT:  Of course.  Look, thank you.

Thank you to both counsel for a very illuminating effective argument.  I'm reminded of the value today of these arguments in a complicated fact pattern just to engage with both of you.  I learned a ton more, and I've become more facile

P1EKDAMO

with the timeline and the facts and each of your respective arguments.

In any event, I'm the better for today's argument. Thank you to both of you for your preparation and your skill. And thank you, again, for the wind beneath your wings, the people on your teams.

Thank you.  We stand adjourned.

MS. WEINRIB:  Thank you, your Honor.

(Adjourned)