UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NOAM DAMRI, *individually and on behalf of all others similarly situated*,

Plaintiff,

-v-

LIVEPERSON, INC. *et al.*,

Defendants.

23 Civ. 10517 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

Lead plaintiff Noam Damri brings this putative class action against LivePerson, Inc. ("LivePerson" or the "Company") and its chief executive officer Rob LoCascio and chief financial officer John Collins (together, "Officer Defendants," and collectively, "defendants"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the implementing rule of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240b-5 ("Rule 10b-5").[1] On behalf of himself and others who purchased LivePerson securities between May 10, 2022 and February 28, 2024 (the "Class Period"), plaintiff claims that defendants made a series of false and misleading statements or omissions regarding LivePerson's past performance, future prospects, and internal controls, and in particular about the performance of its WildHealth, Inc. ("WildHealth") subsidiary.

Defendants move to dismiss the Amended Complaint ("AC") for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b). Defendants also move to strike certain

---

[1] Specifically, Damri brings a claim for violations of § 10(b) and Rule 10b-5 against all defendants, and a claim for violations of § 20(a) against the Officer Defendants.

allegations in the AC under Rule 12(f). For the following reasons, the Court grants the motion to dismiss, and, accordingly, denies the motion to strike as moot.

## I.    Background[2]

### A.    The Parties

Founded in 1995, LivePerson is a publicly traded company headquartered in New York and incorporated in Delaware. AC ¶¶ 2, 36. It "deliver[s] mobile and online messaging solutions to its customers" through technology that "enable[s] machines to understand, process, and respond to human language generally, including chatbots and virtual assistants," known as "Conversational Artificial Intelligence." *Id.* ¶ 2. LivePerson's "Conversational Cloud" enables customers to communicate with chat bots across electronic mediums, such as mobile applications, web browsers, SMS messaging, social media, and third-party platforms. *Id.* ¶ 3. This, in turn, allows human agents to more effectively manage customer correspondence. *Id.*

LivePerson is organized into two operating segments: the business segment, comprising its core operation of technological communication software, and the consumer segment, which

---

[2] These facts are drawn primarily from the AC. For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of Damri. *See United States ex rel. Camburn v. Novartis Pharms. Corp.*, 124 F.4th 129, 135 (2d Cir. 2024). The Court also considers documents incorporated by reference in the AC, documents publicly filed with the Securities Exchange Commission ("SEC"), *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007), transcripts of relevant earnings calls, *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018), and other "matters of which a Court may take judicial notice," *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 627 (S.D.N.Y. 2008). As all documents attached to defendants' declaration in support of dismissal or plaintiff's declaration in opposition fall into one or more of these categories, the Court considers them in resolving this motion. *See* Dkt. 31 ("Light Decl."), Exs. A ("3/10/17 Form 10-K"), B ("2/28/22 Form 10-K"), C ("5/9/22 Press Release"), D ("5/9/22 Form 8-K"), E ("5/9/22 Earnings Call Tr."), F ("5/10/22 Form 10-Q"), G ("8/8/22 Press Release"), H ("11/8/22 Form 10-Q"), I ("2/28/23 Form 8-K"), J ("2/28/23 Form 12b-25"), K ("3/15/23 Form 8-K"), L ("3/16/23 Form 10-K"), M ("8/7/23 Form 8-K"), N ("11/9/23 Form 10-Q"), O ("3/4/24 Form 10-K"), P ("Collins Form 4s"), Q ("LoCascio Form 4s"); Dkt. 36 ("Weinrib Decl."), Exs. A ("5/13/22 Schedule 14"), B ("3/15/23 Earnings Call Tr."), C ("2/28/24 Earnings Call Tr.").

encompasses its non-core ventures. *Id.* ¶ 51.  The latter includes COVID-19 testing, GainShare labor,[3] and, as discussed extensively *infra*, WildHealth. *Id.* ¶¶ 4, 11.

During the COVID-19 pandemic, LivePerson experienced rapid growth, largely due to the increased demand for mobile messaging and virtual customer engagement. *Id.* ¶ 52.  Its share price peaked at $72.23 in February 2021, *id.*, but declined thereafter, *see, e.g., id.* ¶ 130.

LoCascio is LivePerson's founder and former chief executive officer and board chair. *Id.* ¶¶ 24, 37.  In August 2023, following a downturn in LivePerson's performance and a shareholder campaign waged by an activist investor, LoCascio stepped down from his positions, serving instead as a board advisor until December 2023. *Id.* ¶¶ 24, 132–33.  At all relevant times, Collins has served as LivePerson's chief financial officer. *Id.* ¶ 38.

Lead plaintiff Damri is an individual investor.  During the Class Period, he purchased LivePerson securities at what he alleges were "artificially inflated prices," which declined after the Company announced decreases in profitability. *Id.* ¶ 35.

## B.      The WildHealth Acquisition

In February 2022, LivePerson acquired, for approximately $150 million, *id.* ¶ 56, non-core venture WildHealth, a "precision medicine service which purportedly 'leverages advanced machine learning to combine DNA analysis, biometrics, microbiome testing and phenotypic data to provide people with a blueprint for truly optimized health and a maximized health span,'" *id.* ¶ 4. The AC alleges that, by doing so, LivePerson "diverted focus and significant Company resources away from its core operation to pursue non-core ventures that were not accretive, and which caused substantial losses." *Id.* ¶ 4.

---

[3] Gainshare is an online engagement model through which LivePerson passes fixed fees incurred from labor providers and hosting services to its customers based on orders they place through its platform. *Id.* ¶ 50.

WildHealth thereafter became a part of LivePerson's consumer segment. According to the AC, a confidential witness ("CW-2")[4]—a senior finance employee with "direct reporting lines" to LoCascio and Collins, *id.* ¶ 43—alleges that, since its acquisition, WildHealth never generated enough revenue to justify its cost, *id.* ¶ 59. The AC further alleges that, "[i]n an effort to mask" WildHealth's "substantial losses," LivePerson "never revealed what portion of revenues or losses were attributable to WildHealth," *id.* ¶ 59, opting to instead "tout[] WildHealth's performance throughout the Class Period," *id.* ¶ 60. According to CW-2, defendants "could not have reasonably expected WildHealth to exhibit the growth [they] promised in their 2022 or 2023 public statements because . . . LivePerson instituted capital cuts and layoffs at WildHealth which . . . 'tied their hands' and 'hampered their ability to grow.'" *Id.* ¶ 60. Per CW-2, the AC alleges, these issues were discussed during weekly meetings with Collins and the financial planning and analysis ("FP&A") team. *Id.*

### C.    Starboard's First Proxy Fight[5] and Litigation

Also in February 2022, Starboard Value LP (with its affiliates, "Starboard"), one of LivePerson's largest shareholders, commenced a proxy contest to replace four directors on LivePerson's seven-member board. *Id.* ¶ 81. As reasons to do so, Starboard cited LivePerson's "deteriorating financial performance, widespread corporate culture problems[,] . . . and issues with corporate governance." *Id.* On February 28, 2022, Starboard filed with the SEC a Schedule

---

[4] The AC relies on six confidential witnesses ("CWs") who allegedly worked at LivePerson to corroborate its pleadings. One is a confidential witness to whom statements were attributed in the Verified Complaint filed in a separate civil litigation for breach of fiduciary duty. *See Starboard Value LP v. LivePerson, Inc.*, C.A. No. 2024-0103-JTL, 2024 WL 658827 (Del. Ch. Feb. 12, 2024) ("Starboard Compl." or "Starboard Complaint"). The Court (like the AC) refers to that witness as the "Starboard CW." All other CWs are referred to here by number.

[5] Much of this account is drawn from the Starboard Complaint and reiterated in the AC, *see* Starboard Compl.; *see e.g.*, AC ¶¶ 25, 83, 86, which defendants move to strike, Dkt. 32 at 8–10.

13D stating that, three days earlier, it had delivered a letter to LivePerson nominating four director candidates for election to the Company's board in advance of its 2022 annual meeting of stockholders. *Id.* ¶ 82. Between March 1 and April 4, 2022, Starboard representatives and LivePerson management discussed the Company's performance, after which Starboard issued a public letter to the board, stating that it had nominated the four new directors "to address the Company's governance issues and improve performance, which had deteriorated in the aftermath of the COVID-19 pandemic." *Id.* ¶ 83. (citing Starboard Compl. ¶ 46). On April 8, 2022, LivePerson responded publicly, "touting its 2021 financial results," and promising further updates. *Id.* ¶ 84.

On April 20, 2022, Starboard filed its preliminary proxy statement with the SEC, in support of its director nominations. *Id.* ¶ 87. On May 2, 2022, Starboard amended its preliminary proxy statement, further detailing its concerns about management and governance. *Id.* ¶ 88.

### 1.    Q1 2022 Statements

On May 9, 2022, Starboard filed with the SEC an open letter to LivePerson shareholders, reviewing its proxy filings, and identifying what it termed "systemic problems" at the Company. *Id.* ¶ 91.

That same day, LivePerson announced positive earnings for Q1 2022, noting that it had "exceeded the top end of [its] guidance" for the quarter, and "reaffirmed its revenue guidance of $544.8 million to $563.3 million for FY 2022." *Id.* ¶ 93. On May 10, 2022, LivePerson filed a Form 10-Q to the same effect. *Id.* The AC, however, citing several CWs, alleges that LivePerson, to blunt Starboard's proxy contest, artificially inflated its Q1 2022 forecasts by

(1) double-booking revenue from non-core ventures,[6] (2) including anticipated business in its tabulation of present performance, and (3) manipulating financial metrics, and ineffective internal controls enabled it to take these steps. *Id.* ¶¶ 10, 25, 69–70, 76–78.

On May 13, 2022, LivePerson issued a response to Starboard's May 9, 2022 letter. *Id.* ¶ 94. It reaffirmed its "strong start to the year," and accused Starboard of "mischaracterizations that absolutely do not reflect reality." *Id.* On May 31, 2022, Starboard issued a public letter to shareholders, noting that LivePerson had not yet held its annual meeting, which, in earlier years, had been held by late May. *Id.* ¶ 95 (citing Starboard Compl. ¶ 61). It accused LivePerson of delaying the meeting to avoid appointing new directors. *Id.* On June 2, 2022, LivePerson responded that Starboard had "misrepresent[ed] the facts." *Id.* ¶ 96. It stated that the delay had been due to meeting with Starboard's director nominees before listing them on the ballot. *Id.*

Throughout June 2022, LivePerson, its board, and Starboard engaged in discussions aimed at resolving the proxy contest. *Id.* ¶ 97. On July 1, 2022, LivePerson filed a preliminary proxy statement in connection with the 2022 annual meeting, including a proposal to re-elect three existing board members, and stating that the board did not endorse any of Starboard's nominees. *Id.* ¶ 98.

On July 20, 2022, LivePerson and Starboard entered into a Settlement Agreement, which resolved Starboard's proxy contest. *Id.* ¶ 99. LivePerson agreed, among other things, to "expand the Board to nine members, add one independent director appointed by Starboard (subject to Company approval), add a second independent director approved by Starboard from a list of candidates provided by the Company, and replace a [departing] director . . . [with] a third

---

[6] "Double-booking" refers to recording the same economic activity multiple times, leading to inflated financials.

independent candidate approved by Starboard." *Id.* Starboard, in turn, agreed to withdraw its proxy contest and vote its shares in favor of the board's director nominees. *Id.* ¶ 100. It also agreed to a standstill provision that precluded it from "initiating another proxy contest before the earlier of (a) 15 days prior to the submission of shareholder nominations for the Company's 2023 annual meeting or (b) 100 days prior to the anniversary of the 2022 annual meeting (the 'Standstill Period')." *Id.* Starboard's rights to appoint or approve board appointees during the Standstill Period were subject to its continued beneficial ownership of at least 3% of LivePerson's then-outstanding shares of common stock. *Id.* ¶ 101.

The next day, LivePerson publicly filed the Settlement Agreement and announced it would hold its annual shareholder meeting on August 4, 2022. *Id.* ¶ 103. The AC alleges that, according to CW-2, the defendants "had purposefully delayed both the issuance of the Q2 2022 results and the scheduling of the annual shareholder meeting until the Company had resolved the negotiations with Starboard and executed the Settlement agreement." *Id.* ¶ 104.

The AC attributes further allegations about this time period to the Starboard CW, drawing on statements attributed to him in a Complaint filed in a separate Delaware litigation. *See supra* note 5. It alleges that, on August 1, 2022, the Starboard CW—a senior sales executive alleged to have direct knowledge of LivePerson's revenue reporting practices, *id.* ¶ 47—told Starboard that LivePerson had "double booked revenue from acquired businesses including WildHealth[,] and had thus unjustifiably inflated the Company's actual performance following Q1 2022," *id.* ¶ 105 (citing Starboard Compl. ¶ 74). It alleges that the Starboard CW claimed that the Officer Defendants "knew about the double-booked revenue before the earnings release but allowed the dissemination of the inflated results in order to defeat Starboard's proxy contest." *Id.* ¶ 105 (citing Starboard Compl. ¶ 74). The Starboard CW is alleged to have obtained this knowledge

by attending a conference call during which senior executives discussed cutting guidance for Q2 2022 because of double-booked revenue. *Id.* ¶ 106 (citing Starboard Compl. ¶ 75).

### 2.    Q2 2022 Statements

On August 8, 2022, LivePerson announced its Q2 2022 results. *Id.* ¶ 107.  It lowered its financial guidance for the year by approximately 7–8% due to, it claimed, steps that would ultimately improve its profitability: reducing costs, "eliminating low-margin revenue," and "ramping" its sales force. *Id.*  After an earnings call that day, the AC alleges, the Starboard CW told Starboard that LivePerson's justifications for the guidance reduction were false. *Id.* ¶ 109 (citing Starboard Compl. ¶ 78).  According to CW-2, LivePerson's declining revenue was actually due to "terrible bookings, the sales force not executing, as well as customer attrition and down-selling."[7] *Id.* ¶ 110.

Starboard refrained from trading out of its position, allegedly viewing the Starboard CW's disclosure as material and non-public. *Id.* ¶ 111 (citing Starboard Compl. ¶ 79).  It instead organized a call, on August 18, 2022, between the board's audit committee and Starboard representatives. *Id.* ¶¶ 111–12 (citing Starboard Compl. ¶ 80).  During the call, Starboard demanded the removal of LoCascio and other management changes, which the audit committee denied. *Id.* ¶ 112 (citing Starboard Compl. ¶ 81).  On August 22, 2022, the audit committee sent Starboard a letter, stating that it was reviewing the issues Starboard identified. *Id.* (citing Starboard Compl. ¶ 82).

On September 23, 2022, Starboard issued a formal books and records demand, under Delaware law, to LivePerson's general counsel. *Id.* ¶ 113.  It asked LivePerson to "investigate potential wrongdoing, mismanagement, corporate waste, and breaches of fiduciary dut[y]" in

---

[7] "Down-selling" occurs when a customer chooses an alternative product at a lower price. *Id.* ¶ 110.

connection with its Q1 2022 revenue, FY 2022 guidance, and Starboard's proxy contest. *Id.* (citing Starboard Compl. ¶¶ 85–86). LivePerson engaged an independent law firm to investigate the Starboard CW's allegations, and Starboard "back[ed] off its demand." *Id.* ¶ 114 (citing Starboard Compl. ¶ 87). On February 27, 2023, the independent law firm informed Starboard's counsel that "it had concluded its investigation without any material findings of 'misconduct by management.'" *Id.* ¶ 116 (citing Starboard Compl. ¶ 91).

### D.    WildHealth's Medicare Program and Suspension

As a result of its financial struggles throughout 2022, LivePerson allegedly instructed WildHealth to identify and pursue additional revenue streams. *Id.* ¶ 61. To this end, WildHealth joined a Medicare initiative (the "program") in which eligible providers would receive Medicare reimbursements for shipping over-the-counter COVID-19 tests to Medicare beneficiaries. *Id.* WildHealth's participation in the program was distinct from LivePerson's COVID-19 operations, which also delivered products and services related to COVID-19 testing. *Id.* ¶ 65.

In November 2022, a "professional corporation managed by WildHealth received notice," pursuant to 42 C.F.R. § 405.372, "that Medicare reimbursements for its services rendered under [the program] . . . were suspended pending further review." *Id.* ¶ 64. That provision requires Medicare, before suspending reimbursements, to "notify the provider or supplier of the intention to suspend payments, in whole or in part, and the reasons for making the suspension," and "give the provider or supplier an opportunity for rebuttal in accordance with § 405.374." *Id.* (quoting 42 C.F.R. § 405.372).

### 1.    Delayed 2022 Form 10-K

LivePerson did not publicly disclose WildHealth's suspension from Medicare reimbursements until February 28, 2023, in a Notification of Late Filing on Form 12b-25 regarding its delayed 2022 Form 10-K. *Id.* ¶ 13. The Notification stated:

> In view of the in-process integration of the Company's 2022 acquisition of
> WildHealth, the Company requires more time to perform additional review and
> testing of revenue recognition with respect to a recently discontinued WildHealth
> program, for which Medicare reimbursement is suspended pending further
> governmental review, and to complete its in-process review of internal controls and
> procedures.

*Id.* ¶ 180. On this news, LivePerson's share price fell $1.69 per share, or 14.31%, to close at

$10.12 per share. *Id.* ¶ 181. The AC alleges that LivePerson violated the securities laws by

failing earlier to disclose WildHealth's entry into the Medicare Program and its suspension. *Id.*

¶¶ 7–8.

On March 6, 2023, LivePerson filed a Form 8-K, to "provide additional clarity to

investors." *Id.* ¶ 182. It stated "that the referenced review of WildHealth revenue is anticipated

to affect fourth quarter 2022 revenue attributable to WildHealth's participation in a Medicare

demonstration program, due to suspension in November 2022 of Medicare reimbursements under

the program and pending further governmental review." *Id.*

### 2. Q4 2022 Statements

After the market closed on March 15, 2023, LivePerson announced its Q4 2022 financial

results. *Id.* ¶ 184. It stated that it had missed guidance for the quarter and announced

disappointing guidance for FY 2023. *Id.* LivePerson attributed these results to "its plan to exit

non-core lines of business," and "decreases in non-Core revenue . . . including decreasing

Gainshare labor and variable revenue and decreasing professional services revenue from

healthcare." *Id.* LivePerson also stated that, as a result of WildHealth's Medicare suspension, it

"elected to take a reserve for revenue associated with services delivered under the Program in the

fourth quarter of 2022 for which payment has not yet been collected." *Id.* ¶ 186. "Had the

Company recognized revenues associated with services delivered under the Program,"

LivePerson explained, its "revenue would have been within the previous guidance ranges for the fourth quarter and full year." *Id.*

That same day, LivePerson held an earnings call with analysts regarding the Q4 2022 results. *Id.* ¶ 187. Discussing LivePerson's financials, LoCascio stated, as "facts," that the Company would "start generating positive margins" and "positive cash flow in Q2." *Id.* LoCascio also explained proposed changes to certain of the Company's reporting metrics. *Id.* ¶¶ 191–92. "As for net revenue retention, consistent with [LivePerson's] focus on the [business-to-business] core and recurring revenue growth," LivePerson would begin reporting net retention for *recurring* revenue ("NRR") as opposed to net retention for *total* revenue in order to benefit investors. *Id.* ¶ 192. The AC alleges that LoCascio's statements were misleading, about both LivePerson's declining profitability and its motivation for changing the metrics issued, which "was to keep investors in the dark regarding the accelerating rate of customer attrition and declining revenues." *Id.* ¶ 193.

### 3.    2022 Form 10-K

On March 16, 2023, the day after it disclosed that it had missed its guidance estimates, LivePerson filed its 2022 Form 10-K. *Id.* ¶ 199. It disclosed a "material weakness in the Company's internal control over financial reporting." *Id.* The Form 10-K stated:

> The control deficiencies, which in aggregate constitute a material weakness, were identified in connection with the Company's previously disclosed review of certain transactions related to its subsidiary WildHealth, which was acquired in February 2022, and primarily include a combination of ineffective operation of controls and inadequate controls related to: formal review, approval, and evaluation of non-core, complex transactions as well as engagement with government agencies; segregation of duties between accounting and contracting approval functions for non-core, complex transactions; and formal review, approval and evaluation of manual journal entries.

*Id.* According to CW-4—an accountant who worked at LivePerson between 2020 to 2022, *id.* ¶ 45—defendants' statements before this disclosure had misleadingly conveyed that

LivePerson's internal controls were effective, whereas in fact, auditors, as early as December 2020, had informed LivePerson of "potentially material weaknesses in the Company's internal controls," *id.* ¶ 124.

LivePerson's 2022 Form 10-K also disclosed that the Company, like WildHealth, had been "provid[ing] other products and services related to COVID-19 testing and accompanying software," which were now also the subject of regulatory review. *Id.* ¶ 201. The AC alleges that the Form 10-K falsely attributed the Company's underperformance to its having divested from low-quality revenue sources. *See id.* ¶ 204. In fact, the AC alleges, WildHealth's continued poor performance, LivePerson's manipulated revenue metrics, and its ineffective internal controls were responsible for the poor performance. *Id.*

### 4.    2023–24 Financial Disclosures

In LivePerson's SEC filings, press releases, and earnings calls between March 16, 2023 and February 28, 2024, the Company assured investors of its profitable restructuring and WildHealth's growth, while "blaming revenue declines on the exit from the non-core business lines." *See id.* ¶¶ 206–39. LivePerson also revised other financial metrics, including its average revenue per user ("ARPU") metric, stating that such would "provide a more consistent and meaningful measure . . . which is consistent with the revenue base for calculating [NRR]." *Id.* ¶ 227; *see id.* ¶¶ 228, 234. According to CW-2, LivePerson's decisions to alter its metrics were actually intended to mask attrition rates and declining revenues. *Id.* ¶ 74.

On February 28, 2024, LivePerson filed a Form 8-K and issued a press release, announcing its Q4 2023 and FY 2023 financial results. *Id.* ¶ 240. The guidance revealed a revenue outlook for 2024 at $100 million below expectations. *Id.* It attributed the worsened outlook to customer attrition issues and corporate instability. *Id.* It also reported that WildHealth had underperformed by several million and would accordingly be sold. *Id.* On the

earnings call that day, Collins stated that, "[c]onsidering the divestiture and wind-down of noncore business lines over the last year and the multi-quarter rebuild we have just embarked on, we recognize the need for additional specificity on key performance indicators and revenue segmentation to better measure our progress." *Id.* ¶ 242.

### E.    Starboard's Second Proxy Contest and Litigation

On May 5, 2023, Starboard sent a public letter to LivePerson's shareholders, stating that it intended "to nominate a slate of directors for election at the 2023 annual meeting," and criticizing LoCascio for LivePerson's performance. *Id.* ¶ 120.  On July 12, 2023, LivePerson, in a press release, informed investors that LoCascio would step down as chief executive and board chair, effective December 31, 2023, and that Jill Layfield, the board's lead independent director, *id.* ¶ 99, would serve as interim chief executive until the Company appointed a successor, *id.* ¶ 132.  On July 24, 2023, Starboard withdrew its proxy contest. *Id.* ¶ 120.

On August 7, 2023, LivePerson filed an exhibit, entitled "Further Agreement Concerning [LoCascio's] Transition," to its Form 8-K. *Id.* ¶ 133.  It reported that LoCascio would cease his roles "effective immediately," and instead serve as a special advisor to the board until the end of his contractual term. *Id.*

On February 12, 2024, Starboard filed a complaint in Delaware's Court of Chancery, *see supra* note 4, seeking damages purportedly caused by defendants' fraud and breach of fiduciary duty, *see* AC ¶ 121.  It alleged that defendants had manipulated LivePerson's financials to stave off its first proxy contest.  AC ¶ 121.  The *Starboard* litigation is ongoing. *See Starboard Value LP v. LivePerson, Inc.*, C.A. No. 2024-0103-JTL, 2024 WL 658827 (Del. Ch. Feb. 12, 2024).

### F.    2026 Convertible Senior Notes

In December 2020, in a private placement, LivePerson issued $517.5 million in aggregate principal amount of 0% convertible senior notes due 2026 ("2026 Notes").  AC ¶ 128.  A senior

convertible note is a debt security that can be converted into a predefined amount of the issuer's common stock. *Id.* Companies often issue senior convertible notes to raise funds, but they risk equity dilution and financial loss, particularly if the stock price falls below the conversion price. *Id.* LivePerson's SEC filings stated that the 2026 Notes would not pay regular interest payments, but would need to be refinanced on or before their maturity in 2026. *Id.* The AC alleges, based on statements by CW-2, that, between 2022 and 2023, LivePerson had had multiple opportunities to refinance the 2026 Notes, but that Collins instructed the Board not to do so until LivePerson's stock price increased. *Id.* ¶ 130. It pleads that, contrary to its public statements, LivePerson had not strengthened its balance sheet, which instead had deteriorated, and that the Company would have to refinance the 2026 Notes subject to material dilution. *Id.* ¶ 207.

### G.  Procedural History of This Litigation

On December 1, 2023, plaintiff Damri filed this putative federal securities class action on behalf of all persons who bought shares of LivePerson between May 10, 2022 and March 16, 2023. Dkt. 1. On January 30, 2024, Damri moved for appointment as lead plaintiff and approval of his chosen counsel as class counsel. Dkts. 7–10. On February 8, 2024, defendants opposed Damri's appointment. Dkt. 14. On February 15, 2024, Damri replied. Dkt. 18. On March 22, 2024, the Court granted Damri's motion. Dkt. 21.

On March 25, 2024, the parties jointly proposed a schedule for an amended complaint and a motion to dismiss. Dkt. 23. On May 31, 2024, plaintiff, after an extension, filed the AC, which extended the Class Period to February 28, 2024. Dkt. 27. On August 1, 2024, the defendants filed a motion to dismiss, Dkt. 30, a memorandum in support, Dkt. 32 ("Defs. Mem."), and a declaration with annexed exhibits, Dkt. 31. On September 30, 2024, plaintiff filed an opposition, Dkt. 35 ("Pl. Opp."), and a declaration with annexed exhibits, Dkt. 36. On October 31, 2024, defendants replied. Dkt. 39 ("Defs. Reply"). On January 14, 2025, the Court

heard argument on the motion to dismiss. Dkt. 46 ("Tr."). The next day, as directed, the parties

submitted letters with supplemental case authority. Dkts. 44–45.

## II.    Applicable Legal Standards

### A.    Standards for Resolving a Motion to Dismiss Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough

facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly

dismissed where, as a matter of law, "the allegations in a complaint, however true, could not

raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff

must meet to survive a motion to dismiss." *ATSI Commc'ns*, 493 F.3d at 99; *see also Tellabs,

Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007).

First, a complaint alleging securities fraud must meet the requirements of Rule 9(b). *See

ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196

(2d Cir. 2009) ("ECA"). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state

with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

"Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI

Commc'ns*, 493 F.3d at 99.

Second, such a complaint must comply with the pleading requirements of the Private

Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b). *See ECA*, 553 F.3d at 196.

In particular, where a plaintiff's claims depend upon allegations that the defendant has made an

untrue statement of material fact or that the defendant omitted a material fact necessary to make

a statement not misleading, the plaintiff "shall specify each statement alleged to have been

misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C.

§ 78u–4(b)(1).  Thus, to plead a claim of securities fraud, plaintiffs "must do more than say that

the statements . . . were false and misleading; they must demonstrate with specificity why and

how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  In addition, the plaintiff

"shall, with respect to each act or omission . . . state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind." 15 U.S.C.

§ 78u–4(b)(2).

### B.    Standards Governing Exchange Act Claims

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection

with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance

in contravention of such rules and regulations as the Commission may prescribe." *Id.* § 78j(b).

The SEC's implementing rule, Rule 10b-5, provides that it is unlawful "[t]o make any untrue

statement of a material fact or to omit to state a material fact necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading."

17 C.F.R. § 240.10b–5.  To state a claim under § 10(b), a complaint must adequately plead "(1) a

material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between

the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives,*

*Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (citation omitted).

Section 20 of the Exchange Act extends liability to persons who "control" entities alleged

to have violated Section 10(b). 15 U.S.C. § 78t(a).  To state a claim under § 20(a), "a plaintiff

must show (1) a primary violation by the controlled person, (2) control of the primary violator by

the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in

the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750

F.3d 227, 236 (2d Cir. 2014) (citation omitted).  If a complaint has not adequately alleged a

primary violation, *i.e.*, a viable claim under another provision of the Exchange Act, then the §

20(a) claims must be dismissed.  *See id.*

**III.    Discussion**

Plaintiff brings claims under § 10(b) of the Exchange Act and Rule 10b-5 against all

defendants, and claims under § 20(a) of the Exchange Act against the Officer Defendants.  In

connection with his § 10(b) claims, plaintiff also alleges a violation of Item 303 of SEC

Regulation S–K ("Item 303"), 17 C.F.R. § 299.303.  *See Macquarie Infrastructure Corp. v.*

*Moab Partners, L. P.*, 601 U.S. 257, 265 (2024).

Plaintiff's claims allege seven categories of misstatements or omissions by LivePerson:

(1) manipulated revenue metrics and guidance, (2) false justifications for altering key metrics,

(3) false justifications for combating revenue declines, (4) false statements concerning effective

internal controls, (5) false statements concerning WildHealth's performance, (6) omissions

concerning LivePerson's Medicare ventures, and (7) omissions concerning the 2026 Notes

refinancing.

Defendants argue that the § 10(b) claims fail as to each category because the AC does not

plead an actionable misstatement or omission, scienter, and loss causation.  They argue that the

§ 20(a) claims fail because the AC has not pled either a primary § 10(b) violation or the culpable

participation of the Officer Defendants.

The Court below analyzes the seven categories in turn.[8]  However, at the threshold, the

Court takes up a methodological point germane to each theory of fraud.  The AC's claims as to

---

[8] The Court's discussion does not enumerate each instance of an allegedly actionable statement
but instead uses representative examples.  The declarations of Samuel M. Light and Tamar A.

each category rely heavily, if not exclusively, on CWs, including, centrally, the Starboard CW, whom plaintiff's counsel admit they have not met or interacted with and whose cited statements here are instead drawn from the complaint in the Delaware corporate governance litigation brought by separate counsel. *See, e.g.*, AC ¶¶ 67–79; Tr. at 39–41, 60–62. The Court considers at the outset the implications of this sourcing for the AC's claims.

### A.    CWs

As noted, the PSLRA requires that the complaint specify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *ATSI Commc'ns*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(1)). And "[w]hen a securities fraud claim is premised on the defendant's predicate violations of law[,] . . . the facts of that underlying violation must be pled with particularity." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021); *see, e.g.*, *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 463 (2d Cir. 2019) (to plead securities fraud, plaintiffs required to provide particularized facts about the underlying conspiracy). "Until and unless [the underlying violation is alleged with particularity], [the] complaint [will] not me[e]t the burden of explaining what rendered the statements materially false or misleading." *Gamm*, 944 F.3d at 463.

Here, the sources on which the AC overwhelmingly relies in attempting to satisfy these pleading obligations are problematic in two respects.

First, the AC heavily relies on the allegations of the Starboard CW. *See, e.g.*, AC ¶¶ 25, 78, 105–06, 109, 111. Those allegations, however, were made in a complaint in a separate

---

Weinrib and the accompanying exhibits contain most of the challenged statements, which are otherwise reproduced in full in the AC.

lawsuit—the Delaware litigation brought by Starboard. *See, e.g., id.* ¶ 105 (citing Starboard

Compl. ¶ 74). And plaintiff's counsel here admit that they have never met or interacted with the

Starboard CW. *See* Tr. at 39–41, 60–62. In reproducing these allegations, the AC thus heavily

relies on allegations by an anonymous source with whom counsel has not met and cannot

identify. To be sure, a CW need not be identified for his or her statements to be credited on a

motion to dismiss. But, as the Second Circuit has emphasized, such a source must be "described

in the complaint with sufficient particularity to support the probability that a person in the

position occupied by the source would possess the information alleged." *Emps.' Ret. Sys. of

Gov't of the V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting *Novak v. Kasaks*, 216

F.3d 300, 314 (2d Cir. 2000)). This Court has synthesized the case law regarding attributions to

CWs as follows:

> [I]n evaluating facts attributed to unidentified sources, courts have coalesced
> around certain inquiries: (1) whether the source is described with specificity so as
> to make clear that he or she was in position to know the facts attributed to them;
> (2) whether the confidential source "situate[d] in time relevant occurrences," for
> otherwise, such occurrences may not "establish that the [issuer's] challenged
> statements were knowingly false when made"; (3) whether the confidential source's
> factual allegations are pled with sufficient particularity; and (4) whether the facts
> attributed to the confidential source are corroborated, as otherwise, such statements
> are apt to be disregarded.

*In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023) (citing *Long Miao v.

Fanhua, Inc.*, 442 F. Supp. 3d 774, 799–800 (S.D.N.Y. 2020)). To state the obvious, those

standards are especially hard to meet where counsel is relying on secondhand reports of

allegations made by an unidentified person. As Judge Kaplan has put the point: "The unfairness

of permitting a plaintiff in a separate action to rely blindly at the pleading stage primarily on

confidential witness statements from another case to meet its pleading burden is patent." *In re

Lehman Bros. Sec. & Erisa Litig.*, No. 10 Civ. 6637, 2013 WL 3989066, at *4 (S.D.N.Y. July 31,

2013) (discussing Rule 11's requirement that counsel certify all submitted "factual contentions have evidentiary support").

Second, even as to the CWs with whom plaintiff's counsel here has interacted and whose identities are known to counsel, the statements attributed to such persons are largely generic and conclusory and heavily consist of secondhand information as to which there is no allegation of personal knowledge by the CW. With the exception of CW-1, an FP&A analyst, no CW is alleged to have had direct involvement in revenue forecasting. *See* AC ¶ 68. Only two CWs "reported directly" to an Officer Defendant—one before the Class Period, *id.* ¶ 46, and the other at some unspecified time, *id.* ¶ 44. And no CW, apart from the problematic Starboard CW, is alleged to have been in a position to have "possess[ed] the information alleged," *Blanford*, 794 F.3d at 305 (quoting *Novak*, 216 F.3d at 314), let alone with sufficient particularity "to indicate a high likelihood that they actually knew facts underlying their allegations," *Long Miao*, 442 F. Supp. 3d at 803 (citation omitted) (declining to credit statements from CWs described as occupying "a financial role"). Nor does any CW identify with specificity any public financial statement that was purportedly misstated or later corrected. The AC is also blurry as to the time periods during which the CWs ostensibly gained the information reported. Only two CWs are alleged to have worked at LivePerson during specific months of the Class Period. *See* AC ¶¶ 42, 47. The tenures at LivePerson of the remaining CWs are either undisclosed or vague. *See id.* ¶¶ 43–46.

The following are representative examples of statements attributed to CWs on which the AC relies in claiming false and misleading statements or omissions by defendants concerning LivePerson's performance, compliance, and disclosures:

- CW-1, an FP&A analyst at LivePerson until September 2022, *id.* ¶ 42, stated that "after the Vice President of Finance presented CW1's revenue forecast numbers to Defendant Collins, the numbers were manipulated by increasing revenue projections with revenue for projects that the Company had not yet finalized to make the numbers 'more palatable to investors,'" *id.* ¶ 68.

- CW-2, a senior finance employee "during the Class Period," *id.* ¶ 43, stated that LivePerson consistently disclosed unreliable guidance due to a lack of effective internal controls, *id.* ¶ 70. CW2 stated that "putting together the guidance prior to each earnings release was a 'fire drill' and that Defendants did not finalize the numbers until the last minute." *Id.* ¶ 70.

- CW-3, a senior finance executive, *id.* ¶ 44, "stated that LivePerson also used proceeds from the 2026 Notes to pursue non-core ventures that were not accretive, i.e., they did not result in any increase in LivePerson's earnings per share, but instead were dilutive," *id.* ¶ 129.

- CW-4, an accountant "from 2020 to 2022," *id.* ¶ 45, "described learning in 2021 that [] LivePerson's auditors had warned LivePerson during the 2020 audit that it had found material weaknesses in the Company's internal controls,"[9] *id.* ¶ 105.

- CW-5, a senior finance employee who worked at LivePerson before the Class Period, *id.* ¶ 46, stated "that because the finance team had relatively junior people staffed, Defendant LoCascio would bully them into putting the numbers into the

---

[9] Defendants separately note that CW-4's alleged statements appear inconsistent. Defs. Mem. at 20 ("the AC is inconsistent as to whether [auditors revealed] an actual or just a potential issue"); *see* AC ¶ 124 ("CW4 attested that . . . [in] December 2020, auditors had warned Defendants regarding *potentially* material weaknesses in the Company's internal controls." (emphasis added)).

model that he wanted to see, whether or not they reflected the reality and even

when members of the finance team told Defendant LoCascio the numbers he

wanted were not achievable," *id.* ¶ 79.

- "The 'Starboard CW,' cited in the Starboard Complaint, was a senior executive
. . . who reported to the Head of Sales until August 2022," *id.* ¶ 47, and "attended

a conference call during which senior executives including Defendant Collins

acknowledged that for Q2 2022, LivePerson would need to cut guidance due to

the double booking of revenue from acquired businesses," *id.* ¶ 78.

These excerpts exemplify multiple methodological shortcomings that have led courts to

view attributions to CWs with caution and care.

First, the AC does not contain any "independent [well-pled] factual allegations" that

"corroborate [the] confidential source[s's] statements." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d

573, 590 (S.D.N.Y. 2011) (citation omitted). For example, the AC alleges that CW-1's account

concerning double-booked revenue in Q1 2022 corroborates that of the Starboard CW. *See* AC

¶¶ 76–77; *see also* Tr. at 47 (Q: "By whom was [the Starboard] CW corroborated insofar as that

CW alleges falsified guidance?" A: "Specific to the double counting, solely Confidential

Witness 1."). That is incorrect. CW-1 is quoted as stating generally that "LivePerson double

booked revenue from non-core ventures including WildHealth in Q1 2022," *id.* ¶ 77, but as

plaintiff's counsel conceded at argument, the allegations attributed to CW-1 concerned guidance,

not reported financials such as revenue, Tr. at 45–46 ("The first quarter 2022 results are alleged

to be misleading not because of the actuals, but because revenues from noncore ventures,

including WildHealth, were double-counted when putting together the full year guidance.").

CW-1's secondhand account separately is problematic in that CW-1 declares that LivePerson's

"numbers were manipulated" because they changed "after the Vice President of Finance presented CW1's revenue forecast numbers to Defendant Collins." *Id.* ¶ 68. But CW-1 is not alleged to have personally participated in any meeting with any Officer Defendant. Nor does CW-1 identify specifically which revenue numbers were purportedly manipulated. *See id.* The AC's conclusory claim that CW-1's account corroborated that of the Starboard CW is thus speculative and unsubstantiated.

Second, the CWs' positions and responsibilities are not described with sufficient detail to "indicate a high likelihood that they actually knew facts underlying their allegations." *Glaser*, 772 F. Supp. 2d at 590. Of the six former-employee CWs, the AC supplies job titles only for CW-1, an FP&A analyst, *id.* ¶ 42, and CW-4, an accountant, *id.* ¶ 45. As to job responsibilities, the AC states only that CW-1's "duties included putting together LivePerson's quarterly forecasts" and reported these to the vice president of finance who in turn reported to Collins. *Id.* ¶ 42. Of the remaining four CWs, the AC alleges only that three worked "in finance," *id.* ¶¶ 43–44, 46, and that the Starboard CW "reported to the Head of Sales," *id.* ¶ 47. These sparse allegations leave largely murky the CWs' positions and duties. They do not permit, other than by speculation, the conclusion "that they actually knew facts underlying their allegations." *Glazer*, 772 F. Supp. 2d at 590.

Third, most statements attributed to the CWs are not anchored in time. Apart from CW-1, the AC does not specify the CWs' period or length of employment. *Compare* AC ¶¶ 42–47, *with Blanford*, 794 F.3d at 307 ("[T]he Complaint specifies each witness's position, length of employment, and job responsibilities."), and *In re Blue Apron Holdings, Inc. Sec. Litig.*, No. 17 Civ. 4846, 2020 WL 1950783, at *7 (E.D.N.Y. Apr. 22, 2020) (same). Of the two CWs who are alleged to have worked at LivePerson during certain times of the Class Period,

they did so for only a couple of months. AC ¶¶ 42, 47 (CW-1, three months; Starboard CW, four). The employment periods of the other four CWs are pled vaguely, at best. *See id.* ¶¶ 43–46 (CW-2 worked "during the Class Period"; CW-4 worked "from 2020 to 2022"; CW-5 worked "in 2021"; and no employment dates are pled for CW-3). That omission is problematic. For example, with respect to the AC's allegations as to LivePerson's internal controls, there is no reason to assume that CW-4's knowledge of "potentially material weaknesses" as of a 2020 audit would have any bearing on whether LivePerson had control deficiencies affecting its WildHealth subsidiary as of February 2023, *id.* ¶¶ 124, 180, well after CW-4 left the company, *id.* ¶ 45.

Fourth, the statements attributed to the CWs are general in nature and, with limited exceptions, devoid of details lending themselves to corroboration. *Compare* AC ¶ 71 ("As CW2 explained, 'there was a lot of smoke and mirrors happening at the executive level whose goal was to make the results look less bad and keep investors from really understanding what was going on.'"), *with Blanford,* 794 F.3d at 307 (multiple witnesses described buildup of expiring inventory in specific terms, and specific orders where inventory was temporarily loaded onto trucks before audits). The missing details include specifics as to what LivePerson allegedly misstated or omitted. *See, e.g., Long Miao,* 442 F. Supp. 3d at 800 n.21 (collecting cases); *Schiro v. Cemex, S.A.B. de. C.V.,* 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019) (CWs' allegations "too vague, speculative, and conclusory" to be credited); *In re Sierra Wireless, Inc. Sec. Litig.,* 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007) (discounting CW's statements, even where role specified, where witness "merely parrots the conclusory allegations contained in the complaint").

Fifth, as plaintiff's counsel admit, they have not confirmed any attributions that the Starboard Complaint makes to the Starboard CW. And that complaint cannot be assumed to have tested or curated facts with neutral rigor, as it was filed by an activist investor in the service

of a proxy contest (one of two it mounted) to oust LivePerson's management.  Tr. at 40; *see
Long Miao*, 442 F. Supp. 3d at 803–04 (refusing to credit uncorroborated secondhand accounts
amassed by short seller); *see also In re Lehman Bros.*, 2013 WL 3989066, at *4 ("Allowing
counsel to rely on confidential witness statements recounted" in a separate document whose
authors had "significant motive and opportunity . . . to misuse or mischaracterize confidential
witness statements" "would provide the Court little assurance that the factual contentions have
any evidentiary support.").  Such motivated but uncorroborated allegations by the Starboard CW
sit, at best, uneasily alongside the requirements of Rule 11.  *See In re Millennial Media, Inc. Sec.
Litig.*, No. 14 Civ. 7923 (PAE), 2015 WL 3443918, at *11 (S.D.N.Y. May 29, 2015); *In re
Lehman Bros.*, 2013 WL 3989066, at *4.  Plaintiff tries to distinguish the secondhand allegations
in the AC from those disregarded in *Long Miao* on the grounds that plaintiff's counsel here tried
to corroborate those statements.  But counsel here was unable to do so, and admitted at argument
that they had not even discussed the Starboard CW with Starboard, choosing instead to "rel[y]
upon the descriptions that were provided in the Starboard complaint." Tr. at 40.  The
secondhand and uncorroborated attributions to the Starboard CW are unworthy of much weight.

The AC thus suffers from an overarching methodological deficiency—heavy reliance on
statements from CWs that are problematic on multiple grounds.  That shortcoming informs the
following analysis of the categories of allegedly actionable statements and omissions.

### B.     Alleged Misstatements and Omissions

The Court now addresses the seven categories of alleged misstatements or omissions
alleged in the AC.  Each suffers from fatal inadequacies.  Each relies on problematic CWs.  And
each fails to allege a well-pled material misstatement or omission.  As to five categories, the
AC's theory of a false or misleading statement or omission is unsubstantiated by the facts pled
and cognizable materials.  These are categories (2) alleging false justifications for altering key

25

metrics, (3) alleging false justifications for combating revenue declines, (4) alleging false statements concerning effective internal controls, (5) alleging false statements concerning WildHealth's performance, and (7) alleging omissions concerning the 2026 Notes refinancing. As to two categories, the AC pursues an omission theory where there was no affirmative duty to disclose. These are categories (6) alleging omissions concerning LivePerson's Medicare ventures and (7). As to two categories, the AC's theory largely is based on inactionable puffery. These are categories (1) alleging manipulated revenue guidance and (5). As to four categories— (1), (2), (4) and (6)—the allegedly actionable statements and omissions are immaterial. And as to two categories—(3) and (5)—the AC's theory rests on impermissible allegations of fraud by hindsight. The Court addresses the categories in turn.

### 1.    Legal Standards Concerning Falsity

To survive a motion to dismiss, a complaint must adequately plead "that the defendant made a statement that was 'misleading as to a material fact.'" *Matrixx Initiatives*, 563 U.S. at 38 (emphasis omitted) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Id.* at 44; *see also Basic*, 485 U.S. at 239 n.17. "Disclosure of . . . information is not required . . . simply because it may be relevant or of interest to a reasonable investor." *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002). An omission of information not affirmatively required to be disclosed is, instead, actionable only when disclosure of such information is "necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b–5(b)); *see also Macquarie Infrastructure*, 601 U.S. at 264 ("Rule 10b–5(b) does not proscribe pure omissions. The Rule prohibits omitting material facts necessary to make the 'statements made . . . not misleading.'")

The materiality requirement, meanwhile, "is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic*, 485 U.S. at 231–32). As the Supreme Court has explained, a lower materiality standard—such as defining a "material fact" as any "fact which a reasonable shareholder might consider important"—would lead corporations to "bury the shareholders in an avalanche of trivial information[,] a result that is hardly conducive to informed decisionmaking." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976). The "materiality hurdle" is, therefore, "a meaningful pleading obstacle." *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013). However, because of the fact-intensive nature of the materiality inquiry, the Court may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA*, 553 F.3d at 197 (citation omitted).

Still, some statements are "too general to cause a reasonable investor to rely upon them" and thus inactionable under the securities laws as "puffery." *Id.* at 206. For example. "[g]eneral expressions of corporate optimism are 'too indefinite to be actionable under the securities laws.'" *Boca Raton Firefighters & Police Pension Fund v. Bahas*, 506 F. App'x 32, 38 (2d Cir. 2012) (quoting *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 108 (2d Cir. 1998)).

2.      **Application**

a.      *Statements Regarding Manipulated Revenue Guidance*

The AC alleges that LivePerson manipulated guidance[10] by double-booking revenue from non-core ventures, like WildHealth, and including anticipated business, and these departures from proper accounting were enabled by the Company's ineffective internal controls. *See* AC ¶¶ 10, 25, 76–78; Pl. Opp. at 18–21. It alleges that LivePerson manipulated guidance to convince investors that it was meeting its revenue guidance and to stave off Starboard's proxy contest. *See* AC ¶¶ 76–78.

In support, the AC alleges, for example, that in LivePerson's May 9, 2022 press release announcing its Q1 2022 results, LoCascio stated that the Company had "exceeded the top end of [its] guidance." *Id.* ¶ 140. That same day, Collins, on an earnings call, stated that the Company had "overperformed on revenue," *id.* ¶ 142, and advised investors that the expected growth for the next quarter was based on "hard comparables . . . . and sequential improvement from Q1 to Q2 that's roughly in line with past sequential improvement," *id.* ¶ 143. The next day, LivePerson filed its Form 10-Q, which reported the same revenue guidance shared during the May 9, 2022 earnings call and press release. *Id.* ¶ 146. The AC alleges that these statements were false and misleading because defendants had (1) "manipulated revenues in the Q1 2022

---

[10] Although the AC (and plaintiff's opposition) imply that such misstatements concerned LivePerson's actual reported metrics, plaintiff's counsel, at argument, clarified that the AC's claims of misstatements solely concerned forecasts and guidance. *Compare* AC ¶ 145 ("The foregoing statements regarding Q1 2022 revenue performance and guidance were false and misleading[.]"), *and* Pl. Opp. at 19 ("In touting revenue for 1Q 2022, . . . . Defendants did not reveal that they had inflated revenue and guidance[.]"), *with* Tr. at 46 (Q: "Is there any part of your complaint that alleges, [during Q1 2022], that any actual performance numbers, as opposed to forecasts or guidance, were inaccurate at any time?" A: "No, your honor."). The AC does not allege that any of LivePerson's actual reported financials were false or inaccurate. *See, e.g.*, Pl. Opp. at 21 n.8 ("The AC does not allege that the metrics were false, but rather the justifications provided for the alteration of the metrics."). The discussion here of such alleged misstatements thus solely concerns LivePerson's forward-looking guidance.

disclosures by double booking revenues from acquired businesses including WildHealth," (2) "purposefully manipulated guidance prior to disclosure by, *inter alia*, including revenue for projects that had not yet closed," and (3) "disseminated unreliable guidance though knowing LivePerson did not have processes or procedures in place to ensure the accuracy of information." *Id.* ¶ 145.

Salient here, the AC's claims of manipulated guidance are based entirely on alleged statement by CWs, *see id.* ¶¶ 25, 67–79—including the problematic Starboard CW. *See* Tr. at 40. These vaguely put allegations attributed to unidentified sources fall well short of plausibly pleading actionable misstatements. When a securities fraud claim is premised on a defendant's false and misleading statements, a plaintiff "must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174; *see Plumber & Steamfitters*, 11 F.4th at 99; *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570–71 (S.D.N.Y. 2014). Defendants argue, however, that the AC here "provides no details about how this alleged double-booking occurred, who was responsible, how much money was involved, how it survived an independent audit, or if and how it materially impacted LivePerson's financial statements, all of which are essential to pleading adequately under Rule 9(b) and the PSLRA." Defs. Mem. at 18. That critique is on the mark.

Beyond the problematic statements attributed to the Starboard CW and CW-1's non-specific allegation that Collins was "involve[d] in the discussions regarding the double-booked revenue along with other members of the finance team," AC ¶ 77, the AC lacks any factual claims attributed to a person with even asserted firsthand knowledge of the subjects at hand: double-booked revenue, the improper inclusion of anticipated business, or (as discussed *infra*) ineffective internal controls. *Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 198 (S.D.N.Y. 2020) (to plead with particularity, complaint must allege "who, what, when, where,

and how" of improper transaction). The AC does not specifically allege which revenues were double-booked; how, if at all, those revenues were double-booked; which revenue was attributable to anticipated business; how, if at all, the inclusion of anticipated revenue violated reporting requirements; which anticipated business ultimately fell through; how concretely or when LivePerson's internal controls were deficient; which, if any, reported financials were rendered inaccurate; or how two independent law firms, hired by independent members of the board's audit committee, failed to identify such material deficiencies, *see* Tr. at 34–35. Nor does the AC attribute to any CW a firsthand account of any Officer Defendant's involvement in the asserted improprieties, apart from their general practice of attending meetings at which corporate financials were generally discussed. *See e.g.*, AC ¶¶ 122, 170; *see also* Tr. at 69 (plaintiff's counsel, at argument, relying on AC's allegation that CW-2 "was present at weekly finance and FP&A meetings with the defendants where these matters were discussed"); *Long Miao*, 442 F. Supp. 3d at 799 ("'[S]tatements of CWs that cannot situate in time relevant occurrences are sometimes disregarded because they cannot establish that the challenged statements were knowingly false when made."). And the fact of a company's lowering of earlier guidance does not support that its earlier forecasts were unreasonable, fraudulent, or manipulated at the time made. *See In re Lululemon*, 14 F. Supp. 3d at 571.

Many of the purported misstatements in this area alleged by the AC are also inactionable as puffery. For example, the AC alleges that defendants misled investors when LoCascio "touted a 'strong start to the year . . . announced on [LivePerson's] Q1 [2022] earnings call," AC ¶ 151, and when LivePerson's May 9, 2023 press release stated the Company was "well positioned to deliver on [its] profitability goals in 2023 and beyond," *id.* ¶ 206. These are paradigmatic "optimistic statement[s] that [are] so vague, broad, and non-specific that a reasonable investor

would not rely on [them]." *In re Nokia Corp. Sec. Litig.*, No. 19 Civ. 3509, 2021 WL 1199030, at *17 (S.D.N.Y. Mar. 29, 2021) (citation omitted); *see also Robeco Cap. Growth Funds SICAV – Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 540 (S.D.N.Y. 2023) (general, optimistic statements such as "we think 2022 is going to be a fantastic year," and "we see continued momentum in [the] foreseeable future" were "textbook cases" of inactionable corporate puffery); *Schaffer v. Horizon Pharma PLC*, No. 16 Civ. 1763, 2018 WL 481883, at *9 (S.D.N.Y. Jan. 18, 2018) (statements that defendant-company was "on track" and had a "unique commercial business model" were inactionable puffery).

These assembled lapses render non-viable the AC's claims as to manipulated guidance. *See, e.g.*, *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 811 (2d Cir. 1996) ("optimistic" statements about margins and expectations of good performance were puffery); *In re DraftKings*, 650 F. Supp. 3d at 158 (dismissing for failure to plead with particularity where complaint's allegations were "too loose, general and hazy" to plead actionable misstatement); *Schiro*, 438 F. Supp. 3d at 198; *Glaser*, 772 F. Supp. 2d at 591 ("[C]onclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient.").

### b. Statements Regarding Justifications for Altered Key Metrics

The AC, relying on attributions to CW-2, next alleges that LivePerson announced false justifications for altering key metrics, such as NRR and ARPU, and omitted the Conversational Cloud metric, all to obscure the Company's deteriorating performance. *See* AC ¶¶ 71–74. The AC notes that, on the March 15, 2023 earnings call, Collins stated that LivePerson would henceforth calculate NRR based on recurring as opposed to total revenue because the Company "th[ought] investors and analysts would benefit more from" such data. *Id.* ¶ 192. However, the AC alleges that, according to CW-2, "the true motivation behind the alteration of the NRR,

ARPU, and other metrics was to keep investors in the dark regarding the accelerating rate of customer attrition and declining revenues." *Id.* ¶ 74. According to CW-2, the AC alleges, LivePerson made this change because Officer Defendants "had complete control over how the Company presented earnings to investors and directed the alteration of the foregoing metrics." *Id.* ¶ 75.

These allegations fail to make out a viable § 10-b claim for several, independent reasons.

First, the AC does not plausibly plead a misstatement or omission. The AC pleads that LivePerson publicly and contemporaneously disclosed its decision to change metrics. *See* AC ¶¶ 191–92. And, as plaintiff concedes, the AC does not allege that LivePerson ever inaccurately tabulated any of the announced metrics it used. *See* Pl. Opp. at 21 n.8; Tr. at 46. Nor does the AC allege, other than conclusorily, that Collins's statement that the Company believed investors and analysts would benefit more from the new metrics inaccurately reported the Company's beliefs. *See* AC ¶¶ 193, 227–29, 234–35. And, to the extent the AC faults defendants for not breaking out the Conversational Cloud metric, it does not allege that the Company was under an affirmative legal obligation to do so. *See id.* ¶ 71 ("CW2 stated that the Company had always provided a 'conversational cloud conversations' metric, but stopped providing that metric in Q4 2022, because according to CW2, including that metric would have shown investors declining volumes on the platform[.]"). Even assuming such information would have been material, Section 10(b) and Rule 10b–5 "do not create an affirmative duty to disclose any and all material information," *Matrixx Initiatives*, 563 U.S. at 44, and "no such duty arises 'merely because a reasonable investor would very much like to know' that information," *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016) (citation omitted). CW-2's vague claim that the decision

not to use that metric was a "smoke and mirrors" ploy by defendants, *see* AC ¶ 71, does not make the Company's justification for alternative metrics actionable.

Second, the AC does not plausibly plead materiality. Other than conclusory statements by CW-2, the AC lacks allegations why the change from the total revenue metric to the recurring revenue metric would have been material to investors. *See, e.g.*, *Peifa Xu v. Gridsum Holding Inc.*, No. 18 Civ. 3655, 2020 WL 1508748, at *9 (S.D.N.Y. Mar. 30, 2020) (finding alleged misstatement immaterial where "plaintiffs have not provided the Court with any reason why these changed line items . . . altered the total mix of information available" (citation omitted)); *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 262 (S.D.N.Y. 2019) (same).

The AC thus does not plead an actionable misstatement or omission concerning the metrics used by LivePerson or its justifications for altering them. *See, e.g.*, *Saskatchewan Healthcare Employee's Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 379 (S.D.N.Y. 2024) ("The fact that the Company later voluntarily disclosed more detailed information regarding the activity levels . . . does not support the conclusion that its prior statements—which did not contain that level of detail—violated the Securities Act."); *Yaroni v. Pintec Tech. Holdings Ltd.*, 600 F. Supp. 3d 385, 401–02 (S.D.N.Y. 2022) (no actionable misstatement where shift of metric would have been immaterial to an investor); *Barilli*, 389 F. Supp. 3d at 262 (dismissing where disclosure of "alleged reasoning for abandoning [defendant's] previous model" would not have "significantly altered the total mix of relevant information available to an investor").

     *c.*    *Statements Regarding Declines in Revenue*

The AC next alleges that LivePerson's statements that declines in its revenue had been caused by "P&L optimizations" and "ramping [up its] sales force" were materially false or misleading because the unaddressed "root causes" of the Company's deteriorating financial

condition in fact were customer attrition, down-selling, soft sales, and soft bookings. *See, e.g.*, AC ¶¶ 157–58. The AC pleads that LivePerson was not "optimiz[ing]" its P&L and that the statements at issue masked its worsening prospects. *Id.* ¶ 158. For much the same reasons as above, the AC does not plead an actionable misstatement or omission as to the Company's declines in revenue.

First, contrary to plaintiff's depiction, these statements, read in fair context, do not purport to "address[] the root causes of the Company's deteriorating financial condition," *id.*, and they do not represent that the Company had taken all necessary steps to fully "staunch [its] financial decline," Pl. Opp. at 24; *see also* AC ¶ 110. The statements instead address LivePerson's "short term" attempts to "execute on [its] profitable growth plan, *including* reduction in costs and intentional elimination of low margin revenue[.]" AC ¶ 157 (emphasis added). The AC does not plead, much less with specificity, that LivePerson's discussion of this subject was made false or misleading by the lack of a reference to the causes of the downturn in LivePerson's fortunes (assuming *arguendo* such were well pled). *See* AC ¶ 160; Pl. Opp. at 24–25. For example, Collins, in an August 8, 2022 earnings call, stated that LivePerson's plan to optimize P&L included reducing COVID-19 testing and converting GainShare revenue, which would allow the Company to focus on its "most strategic and scalable sources of revenue growth, such as automation and messaging." AC ¶¶ 159–60. In the same earnings call, defendants also discussed management changes, resource allocation, WildHealth's performance, and the Starboard Settlement Agreement. *See id.* ¶¶ 159–60, 163, 165. Read in context, the statement does not convey that LivePerson was reciting a complete list of the challenges it was facing, as opposed to addressing certain "short term" considerations. *See id.* ¶¶ 157–65; *see also, e.g.*, *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 770 (S.D.N.Y. 2019) (declining to consider

statements "in a vacuum" and looking, instead, to "remarks surrounding the purportedly false or misleading statements").

Second, assuming defendants' forward-looking predictions that LivePerson would start generating positive cash flow as a result of its short-term measures were potentially actionable, the AC does not adequately plead falsity at the time these statements were made. "[L]iability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.'" *Tongue v. Sanofi*, 816 F.3d 199, 209–10 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Labs. Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015)). However, "[i]t is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004). "The Second Circuit has firmly rejected this 'fraud by hindsight' approach." *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) (collecting cases). Here, the AC does not offer specific facts to the effect that defendants did not believe their optimistic predictions when made. *See, e.g., Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 577 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) ("[E]ven if [defendant's] statement were treated as potentially actionable, [plaintiff] does not plausibly allege that this statement, at the time made, was untrue."); *In re Lululemon*, 14 F. Supp. 3d at 571 ("[W]ithout *contemporaneous* falsity, there can be no fraud") (emphasis in original)).

Third, LivePerson's high-level statements that it was eliminating non-core consumer services to optimize its P&L did not give rise to a duty to disclose other infirmities. *See* AC ¶¶ 157–58. Again, a duty to disclose does not "arise[] 'merely because a reasonable investor

would very much like to know' [certain] information." *In re Vivendi, S.A.*, 838 F.3d at 239

(citation omitted). LivePerson's statements disclosing its P&L optimization "'did nothing more

than' accurately 'characterize . . . statistical facts.'" *Marcu v. Cheetah Mobile Inc.*, No. 18 Civ.

11184, 2020 WL 4016645, at *5 (S.D.N.Y. July 16, 2020) (quoting *In re Sanofi*, 155 F. Supp. 3d

386, 404 (S.D.N.Y. 2016)). Rather, LivePerson merely "report[ed] the facts that some of the

reported revenue and income" were impacted by certain business decisions, *Marcu*, 2020 WL

4016645, at *5, and the AC does not allege that these statements were inaccurate, *see* AC

¶¶ 160–61; Pl. Opp. at 25. Accurately reported financial statements do not become misleading

merely for failure to enumerate all possible contributing factors.

Plaintiff counters that, by "identifying steps [defendants] purportedly took to fix the P&L

and by identifying those same steps as reasons for reduced guidance," LivePerson "triggered a

duty to tell the whole truth and reveal root causes for the declines [it] had not remediated." Pl.

Opp. at 24. Plaintiff relies for this proposition on this Court's decision in *In re Braskem S.A.*

*Sec. Litig.*, 246 F. Supp. 3d 731 (S.D.N.Y. 2017). Pl. Opp. at 24–25. *Braskem* is, however,

distinct. The issuer there had listed "various benign factors" that resulted in favorable prices for

business materials. *In re Braskem*, 246 F. Supp. 3d at 758–59. Although these were "not

literally false," this Court held, Braskem's omission of "the—or at least an—elephant in the

room," namely that the favorable purchase price had resulted from a large-scale bribery scheme,

was an actionable half-truth. *Id.* at 759–60. Nothing of the sort is pled here. The AC does not

plausibly allege that during the Class Period, LivePerson attributed its decreased guidance solely

to P&L optimization or that it represented that such steps had resolved its financial problems.

*See* AC ¶¶ 157–60. Nor did LivePerson's accurate statements falsely tout a "legitimate

competitive advantage or specifically deny[] wrongdoing." *Marcu*, 2020 WL 4016645, at *5.

36

Unlike in *Braskem*, there is no allegation in the AC of undisclosed unlawful conduct that pumped up LivePerson's reported finances.

Accordingly, the Court grants the motion to dismiss, to the extent that the AC's theory of § 10(b) liability is based on the statements concerning LivePerson's declines in revenue. *See, e.g.*, *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F. Supp. 3d 273, 289 (E.D.N.Y. 2023), *aff'd sub nom. Bos. Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, No. 23-940-CV, 2024 WL 4023842 (2d Cir. Sept. 3, 2024) (no actionable omission where defendants "did not put the source of their growth . . . at issue"); *In re DraftKings*, 650 F. Supp. 3d at 172 (no actionable omission where accurate disclosure "did not oblige [defendant] to address different subjects"); *Marcu*, 2020 WL 4016645, at *5.

#### d.    Statements Regarding Internal Controls

The AC also challenges defendants' statements about the effectiveness of LivePerson's internal controls over financial reporting. *See* AC ¶¶ 148–50, 168–70. The challenged statements centrally include that management concluded that these controls were effective through September 30, 2022. *Id.* ¶ 177. It challenges statements in the Company's annual and quarterly reports that "no changes" in its "internal control over financial reporting" during the most recently completed fiscal quarter had "materially affected, or are reasonably likely to materially affect, [its] internal control over financial reporting," *id.*; and certifications by the Officer Defendants about the design and effectiveness of the internal controls over financial reporting, *see id.* ¶ 178. On one occasion, on March 26, 2023, in its 2022 Form 10-K, LivePerson reported, based on an evaluation of its "disclosure controls and procedures," internal control deficiencies solely as to WildHealth, which together "constitute[d] a material weakness" as of December 31, 2022, *see* AC ¶ 199; *see also* Tr. 25, 66–67. Plaintiff alleges that such deficiencies were endemic and that the Company's repeated denials of such were material

falsehoods. *See* AC ¶¶ 9, 20, 200, 204; *see also* Tr. at 67 (synopsizing AC as alleging "that the internal control deficiencies went beyond just the WildHealth piece of it").

For two reasons, defendants' statements regarding internal controls are not actionable under § 10(b).

First, the AC lacks factual allegations supporting the inference that there were other material control weakness at the Company other than the one it disclosed as to WildHealth in March 2023. The AC's allegations to the effect that other such control deficiencies existed are based on CW-2 and CW-4, *see, e.g.*, *id.* ¶¶ 124, 179, and on LivePerson's March 2023 disclosure with respect to WildHealth, *id.* ¶ 199. CW-2 is quoted as stating that LivePerson "consistently disclosed unreliable guidance due to a lack of effective internal controls," in part because putting together the forecasts "was a 'fire drill'" and that "the Company had no processes or procedures in place to ensure the accuracy of information input into the various systems, including Salesforce," *id.* ¶ 70. CW-4 is quoted as stating that, at some point in 2021, he learned that in "December 2020, auditors had warned Defendants regarding potentially material weaknesses in the Company's internal controls," *id.* ¶ 124. But these allegations lack particularity. The AC does not "allege specific facts concerning the purportedly deficient internal controls, including how they were deficient, when and why." *Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430, 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012). The AC instead attempts to leverage LivePerson's admission as to WildHealth to claim longstanding company-wide deficiencies. *See* AC ¶ 211 ("Defendants disseminated unreliable guidance throughout 2022 and 2023 though knowing LivePerson did not have processes or procedures in place to ensure the accuracy of information input into various systems[.]"); *id.* ¶ 199 ("The control deficiencies, which in aggregate constitute a material weakness, were identified in connection with the Company's

previously disclosed review of certain transactions related to its subsidiary WildHealth, which was acquired in February 2022[.]"). But LivePerson's disclosure was limited to the distinct WildHealth subsidiary that it had acquired. *Id.* ¶ 199. The AC does not explain why it is reasonable to infer that a deficiency affecting that idiosyncratic and newly acquired business unit was characteristic of LivePerson as a whole. And the AC does not identify which processes outside WildHealth were deficient or why. *See id.* ¶¶ 125–26. The AC also inconsistently alludes to an auditor's report, in December 2020, conflating *potential* and *actual* material weaknesses in LivePerson's internal controls, but that report predated the acquisition of WildHealth by more than two years. *See id.* ¶¶ 105, 124. And the AC does not source the basis of knowledge for the two CWs' statements about the purported deficiencies outside WildHealth. *See id.* ¶¶ 70, 124. Absent corroborative allegations, an unsourced rumor reported by an unidentified witness does not satisfy the PSLRA.

Second, the statements do not put the defendants on notice, at the time of any of their challenged statements denying internal control deficiencies, that those statements were false. That alone makes them inactionable. *See, e.g., Afr. v. Jianpu Tech. Inc.*, No. 21 Civ. 1419, 2022 WL 4537973, at *6 (S.D.N.Y. Sept. 28, 2022) (no actionable misstatement as to internal controls where plaintiff does not allege contemporaneous falsity); *In re Braskem*, 246 F. Supp. 3d at 757 (same); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 379 (S.D.N.Y. 2004) ("Plaintiff alleges neither facts showing that the descriptions of the processes were false or misleading at the time they were included in the public statements, nor facts showing that the processes were not followed."), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006).

39

Accordingly, this category of ostensible misstatements is not actionable. *See, e.g.,*
*Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 414 (S.D.N.Y. 2018), *aff'd*, 757 F.
App'x 35 (2d Cir. 2018) (no misstatement as to effective controls where complaint was pled "in
a perfunctory fashion" and did not describe defendant's "internal control processes, let alone
how these were misleadingly described"); *In re Braskem*, 246 F. Supp. 3d at 757 (similar); *In re*
*PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015), *aff'd* (Mar. 21, 2016)
(similar); *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, No. 10 Civ. 2835,
2011 WL 4357368, at *22 (S.D.N.Y. Sept. 19, 2011) (dismissing conclusory allegation of lack of
internal controls).

> e.    *Statements Regarding WildHealth's Performance*

The AC also alleges that defendants made a series of misstatements concerning
WildHealth's performance and projected growth. *See, e.g.*, AC ¶¶ 163–64, 171–73. The
premise of these claims is that defendants knew undisclosed negative facts about WildHealth's
performance, which suffered in part due to capital cuts and layoffs they had instituted, yet
reported errant performance data and inaccurately touted WildHealth's anticipated growth. *See*
*id.* ¶¶ 163–64, 171–73, 195–96. In moving to dismiss, defendants argue that the AC lacks
concrete factual allegations supporting that the statements about WildHealth's performance were
false or that management did not believe these positive forecasts. Defs. Mem. at 17–18; Defs.
Reply at 10–11.

Defendants are correct. The AC broadly claims that statements by defendants were
allegedly false and misleading, *see, e.g.*, AC ¶¶ 195–96, 208–09, 214–17, but a viable pleading
must do more than simply declare such, *Rombach*, 355 F.3d at 174. And the AC falls well short
of pleading facts making defendants' statements about WildHealth's performance or expected
growth false or misleading at the time made. *See In re Lululemon*, 14 F. Supp. 3d at 571.

For example, the AC alleges that defendants misled investors as to WildHealth's profitability in an August 8, 2022 earnings call, when Collins stated that, "related to our Wild Health acquisition, the group is performing very well and is ahead of their revenue plan," AC ¶ 163, and in a November 7, 2022 press release, where the Company stated it "expect[ed] continued strong performance by WildHealth," *id.* ¶ 171. The AC alleges that these statements were misleading because at the time, WildHealth was massively losing money and did not have realistic growth prospects given capital cuts and layoffs. *Id.* ¶¶ 164, 173; *cf.* Pl. Opp. at 27. In briefing, plaintiff implies that because LivePerson did not break out the revenue and loss attributed to WildHealth, it must be that the Company was concealing poor performance numbers for that segment. Pl. Opp. at 26–29. But that inference does not follow. The Company's aggregated method of reporting results, and the performance problems at WildHealth that were later disclosed, do not support that the Company's reported financials were false or that its optimistic forecasts insincere or baseless when made. *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 177 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016) (financial statements merit deference "on the appropriate level of disclosure," and "correcting errors simply does not suggest that the initial disclosures were made with fraudulent intent"); *In re Vivendi, S.A.*, 838 F.3d at 239. And the statements attributed to CWs about WildHealth's performance, although broadly critical of the acquisition and its fit, do not support such a claim. *See* AC ¶ 59 ("According to CW2, from the time of the acquisition, WildHealth did not generate enough revenue to justify the acquisition cost."); *id.* ¶ 77 (CW-1 stated "WildHealth was a problem child in Q1 and Q2 of 2022").

The heart of the AC's claims as to WildHealth is that—given LivePerson's February 2024 disclosures of its disappointing Q4 2023 and FY 2023 results—defendants must have

earlier been misleading the public in not disclosing WildHealth's poor performance and in voicing optimism about the future performance of that segment. *See id.* ¶¶ 22–23, 180–85, 194–98; *see also* Pl. Opp. at 28; Tr. at 55–56. But those are classic hindsight allegations unaccompanied by concrete allegations supporting that the challenges statements were false when made. *See Novak*, 216 F.3d at 309; *In re Ferroglobe PLC Sec. Litig.*, No. 19 Civ. 629, 2020 WL 6585715, at *6 (S.D.N.Y. Nov. 10, 2020) ("Plaintiffs are not permitted, however, to proceed with allegations of 'fraud by hindsight,' in which statements are proven false on the basis of subsequent information."). And tellingly, at argument, plaintiff's counsel conceded that the AC is devoid of any allegation that any information regarding the company's actual financial performance was false or later corrected. *See* Tr. at 46.

And the AC does not adduce support for its remaining allegation about WildHealth: that defendants in real time disbelieved their expressions of positivity about that unit. Defendants' statements tended to list anticipated improvement in the WildHealth business as a reason for positive overall guidance. *See, e.g.*, AC ¶ 171 ("As for guidance, we expect continued strong performance by WildHealth and elevated professional services in the fourth quarter. Considering those expectations, coupled with more upsells and early renewals in the third quarter than previously expected, we are raising revenue guidance for the full year."); *id.* ¶ 172 ("The upside relative to prior guidance was primarily driven by WildHealth['s] continued overperformance[,] and by the accelerated timing of upsells and professional services deliverables."). And insofar as WildHealth represented only 1% of the Company's assets and 2% of its total revenue for 2022, the Company's optimistic statements about its overall prospects cannot be attributed to its statements about WildHealth. *See* 3/16/23 Form 10-K at 118; *see also* 3/15/23 Earnings Call Tr. at 23 (WildHealth is "a small base compared to [LivePerson's] size").

42

In challenging defendants' statements about WildHealth, the AC appears to treat defendants' forecasts of growth in WildHealth's revenues as tantamount to forecasts about WildHealth's earnings. *See, e.g.*, AC ¶¶ 172–73, 214–17. That conflation is unsound. The statements by LivePerson at issue forecast the doubling of WildHealth's *core revenues* or *business*, *see, e.g.*, *id.* ¶¶ 195, 205, 208, 214, 223. They do not concern its earnings, despite plaintiff's contrary casting. *See* Pl. Opp. at 27. In fact, the Company's statements distinguished between revenues and earnings. *See, e.g.*, 3/15/23 Earnings Call Tr. at 30 ("[T]he WildHealth business does burn a little bit of cash because of its growth rate. So we are funding for growth, not overfunding."). And the guidance statements the AC challenges as purportedly falsely touting WildHealth's performance, *see, e.g.*, AC ¶¶ 171–72, 194–95, 205, did not concern its anticipated earnings. The Company did not specifically address WildHealth's earnings, which it instead reported in aggregated form along with the other components of its Business Segment, consistent with GAAP and SEC regulations. *See* Defs. Mem. at 26 (citing 17 C.F.R. § 229; ASC 280-10-50-11). That WildHealth later proved unprofitable or later experienced a brief suspension in Medicare reimbursements does not support that defendants' forecasts about its revenue growth were false when made, or that WildHealth "had no realistic prospects for meaningful growth." Pl. Opp. at 27. The AC is devoid of allegations impeaching any of the Company's forward-looking statements about WildHealth.

Also problematic, a number of the positive statements about WildHealth that the AC attacks are non-actionable puffery. These include defendants' statements that they "th[ought] in the future, [they'd] see some pretty massive returns with [WildHealth]," AC ¶ 216, or that "for WildHealth, we continue to expect strong growth from its core business," *id.* ¶ 221. *See Robeco Cap. Growth Funds SICAV*, 665 F. Supp. 3d at 540. Such statements are "too general to cause a

reasonable investor to rely upon them," and do not plausibly allege securities fraud. *Okla. Law Enf't Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, No. 18 Civ. 3021, 2020 WL 127546, at *7 (S.D.N.Y. Jan. 10, 2020) (quoting *ECA*, 553 F.3d at 206); *see, e.g.*, *San Leandro*, 75 F.3d at 811; *Rein v. Dutch Bros, Inc.*, No. 23 Civ. 1794 (PAE), 2024 WL 3105004, at *19 (S.D.N.Y. June 24, 2024) (collecting cases).

The AC thus also fails to allege any actionable statements or omissions concerning WildHealth's performance. *See, e.g.*, *Novak*, 216 F.3d at 315 ("statements containing simple economic projections, expressions of optimism, and other puffery are insufficient"); *In re Kirkland Lake Gold Ltd. Sec. Litig.*, No. 20 Civ. 4953, 2021 WL 4482151, at *6 (S.D.N.Y. Sept. 30, 2021) (no fraud where subsequent losses conflicted with prior estimates absent evidence that predictions were false when made); *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 225–26 (S.D.N.Y. 2020) (same).

### f.     *Omissions Regarding Medicare Ventures*

The AC also alleges that LivePerson actionably delayed disclosing WildHealth's foray into the Medicare program and its resulting suspension. *See e.g.*, AC ¶¶ 7, 180–87; Pl. Opp. at 29–31. Plaintiff argues that by waiting to disclose until March 2023 that WildHealth participated in the Medicare program, that it had been temporarily suspended from that program in November 2022, *see* AC ¶ 182, and that it had terminated its COVID-19-related operations in Q3 2022, *see id.* ¶¶ 110, 159, 201, the Company concealed its deteriorating financial condition from investors, Pl. Opp. at 29–31. Defendants dispute that they had an earlier obligation to disclose the events relating to Medicare, and that it was justifiable for them first to do so in March 2023, once it became clear to them that the suspension would affect Q4 2022 revenue and thus was material. Defs. Mem. at 27. They explain that, before that point, with WildHealth's Medicare reimbursements suspended pending further governmental review, disclosure was

unnecessary, as the investigation had the capacity to conclude without a finding of wrongdoing and with the lifting of the suspension, as in fact later occurred. *Id.* (citing 3/16/23 Form 10-K at 61). Defendants thus argue that there was no duty to disclose until the point at which the suspension materially impacted the Company's financial results. *Id.* at 6, 27–28.

Although the Court cannot consider defendants' factual representations outside the AC and the materials it incorporates, defendants' broader point is correct that LivePerson did not have any duty to disclose the Medicare suspension earlier or differently. LivePerson disclosed the suspension in the SEC filing for the quarter immediately after its received notice of the suspension—some four months after the suspension. AC ¶ 182. Plaintiffs have not identified any legal basis that required LivePerson to disclose the Medicare suspension immediately (or earlier). "[A]llegations that defendants should have . . . made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak*, 216 F.3d at 309; *see also In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469–70 (S.D.N.Y. 2006). And, absent a freestanding disclosure duty, "[p]ure omissions are not actionable under Rule 10b-5(b)," *Macquarie Infrastructure*, 601 U.S. at 260.[11]

The AC thus does not adequately plead an actionable omission under § 10(b) based on the timing of LivePerson's Medicare disclosure. *See, e.g.*, *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 312–13 (S.D.N.Y. 2021) (dismissing claim of delayed disclosure); *Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*, No. 16 Civ. 3068, 2017 WL 4082482,

---

[11] There is also a substantial question whether the suspension, which caused a deferral of $2 million from Medicare reimbursements, less than 0.5% of the revenue of LivePerson's Business Segment, *see* 3/16/23 Form 10-K at 61, worked a material impact on LivePerson's financial statements, *see Matrixx Initiatives*, 563 U.S. at 38. Because there was no duty of earlier disclosure, the Court need not resolve whether the AC's claim faulting the timing of the disclosure separately fails to plead materiality.

at *10 (S.D.N.Y. Aug. 24, 2017), *aff'd sub nom. Police & Fire Ret. Sys. of City of Detroit v. La Quinta Holdings, Inc.*, 735 F. App'x 11 (2d Cir. 2018) ("Defendants disclosed the financial impact caused by the disruption in . . . the quarter immediately following when the disruption allegedly occurred. . . . [which] is sufficient to bar any claim of securities fraud.").

### g. *Omissions Regarding the 2026 Notes Refinancing*

In a final basis for a § 10(b) claim—and one seemingly unrelated to the others—the AC faults LivePerson for not disclosing its decision to defer refinancing its 2026 Notes. *See* AC ¶¶ 12, 128–31. The AC notes that, on May 9, 2023, LivePerson disclosed improvements to its balance sheet, including the retiring $157.5 million of its $230 million 2024 convertible notes ("2024 Notes") at a discount, *id.* ¶ 206, but did not address that it had forgone refinancing opportunities for its 2026 Notes, *id.* ¶ 207; *see* Pl. Opp. at 33–34. Plaintiff argues that, because LivePerson spoke to the strength of its balance sheet, it was obliged to disclose at the same time that it had forgone opportunities to refinance the outstanding 2026 Notes at rates that in retrospect presented as attractive. Pl. Opp. at 33–34. For several reasons, that claim—whether cast as alleging a material omission, a misleading statement, or half-truth—is not viable.

First, the statements by LivePerson that plaintiff cites as triggering a duty to speak do not purport to address "the relevance of outstanding convertible notes," as plaintiff claims. Pl. Opp. at 33. Instead, they list ways in which LivePerson "completed one of the largest restructuring plans in the Company's history," which included divestitures, winding down non-core businesses, and, relevant here, retiring a substantial portion of its 2024 Notes. AC ¶ 206. The AC does not coherently plead why LivePerson was obliged in that discussion to address its having forgone refinancing opportunities for the 2026 Notes. The lack of comment on that point did not make the Company's disclosure of its repurchase of 2024 Notes false or misleading. These topics are distinct. LivePerson's statements about its "restructuring plan[]," including its

attempt to "strengthen the balance sheet by retiring" a portion of the 2024 Notes, did not require it to canvass all balance-sheet-relevant options with respect to other notes. *Id.* Nor could the AC plead that LivePerson failed to disclose the risks of refinancing its Notes. *See, e.g.*, 3/16/23 Form 10-K at 93–97 (detailing 2024 and 2026 Notes). And the AC does not allege any other corporate statement from which arose a duty of LivePerson to disclose that it had forgone refinancing opportunities for its 2026 Notes.

Second, beyond noting generally that refinancing rates rose after some point when LivePerson forewent an opportunity to refinance the 2026 Notes, the AC is opaque as to details. It leaves unstated the specific refinancing opportunities that LivePerson purportedly ignored, instead generally alleging that LivePerson missed "multiple opportunities to refinance [the 2026 Notes] in 2022 [and] in 2023," which is not enough. AC ¶ 207. The non-particular nature of these allegations would make this claim non-actionable even had the AC viably alleged that a duty to disclose arose from other Company statements. *See In re DraftKings*, 650 F. Supp. 3d at 172; *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 632 (S.D.N.Y. 2005).

Third, LivePerson did not have a freestanding duty to disclose that it had chosen not to avail itself of refinancing opportunities. Absent a statutory or regulatory disclosure duty—and plaintiff here does not identify one—a failure to disclose is actionable only where disclosure "was necessary to prevent the corporation's *other* statements from being misleading." *In re Braskem*, 246 F. Supp. 3d at 752 (emphasis in original); *see also Macquarie Infrastructure*, 601 U.S. at 263–64.

At base, this claim attempts to "stretch allegations of, at most, corporate mismanagement into actionable federal securities fraud," which "is not the law." *In re Lululemon*, 14 F. Supp. 3d at 562. The allegations as to this point by CW-2 and CW-3 do not alter this reality. They claim

that defendants used the proceeds from the 2026 Notes to pursue unprofitable ventures, *see* AC ¶ 129, and the Company should have appreciated that, if its financial condition deteriorated, it would not likely have as good refinancing opportunities later with respect to the 2026 Notes, *see id.* ¶ 130. But "fundamental disagreements with Defendants' business judgments . . . are not actionable under Section 10(b) and Rule 10b-5." *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 246–48 (S.D.N.Y. 2020) (citation omitted); *see also Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) ("Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement." (citation omitted)).

Accordingly, this final theory of § 10(b) liability fails, too.

## C.    Scienter

The AC separately fails to adequately plead scienter. "[A] plaintiff can establish scienter for purposes of a securities-fraud claim by alleging facts showing 'either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness.'" *Marcu*, 2020 WL 4016645, at *7 (quoting *ECA*, 553 F.3d at 198). "[T]o qualify as 'strong,' an 'inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (quoting *Tellabs*, 551 U.S. at 308). "Securities-fraud claims based on recklessness, however, must 'specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements.'" *Marcu*, 2020 WL 4016645, at *6 (quoting *Novak*, 216 F.3d at 308).

### 1.    Motive and Opportunity

"To raise a strong inference of scienter through 'motive and opportunity,' a plaintiff must allege that the defendant corporation or its officers 'benefitted in some concrete and personal

way from the purported fraud.'" *Koplyay v. Cirrus Logic, Inc.*, No. 13 Civ. 790, 2013 WL 6233908, at *5 (S.D.N.Y. Dec. 2, 2013) (quoting *Novak*, 216 F.3d at 307–08). The AC pursues two principal theories of improper motive. It alleges that Officer Defendants aimed to (1) stave off Starboard's proxy contest and inflate LivePerson's stock price to successfully refinance the 2026 Notes, *see* AC ¶¶ 254, 258, and (2) increase their compensation, including through stock sales, *see id.* ¶¶ 135–38, 260. For multiple reasons, the facts pled do not raise a strong inference of scienter for either theory.

First, as the Second Circuit has recognized often, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Rotunno v. Wood*, No. 22-502-CV, 2022 WL 14997930, at *2 (2d Cir. Oct. 27, 2022) (citation omitted); *see Malik v. Network 1 Fin. Sec., Inc.*, No. 20-2948-CV, 2022 WL 453439, at *3 (2d Cir. Feb. 15, 2022) (no scienter where allegations concern goals "possessed by virtually all corporate insiders" (citation omitted)). Although personal financial gain may favor a scienter inference, *see Tellabs, Inc.*, 551 U.S. at 325, "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable," "the desire to keep stock prices high to increase officer compensation," *ECA*, 553 F.3d at 198, and the desire "to protect their executive positions and compensation," *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001), are insufficient. This doctrine defeats the AC's allegations of improper motive, because these motives—to increase corporate profitability and officer compensation—are quintessentially generally applicable ones. *See, e.g., Rotunno*, 2022 WL 14997930, at *2 (affirming dismissal on scienter grounds where complaint asserted general motive of combating "activist shareholder pressure . . . in order to improve the company's stock performance); *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb*

49

*Co.*, 28 F.4th 343, 355 (2d Cir. 2022) (no scienter based on defendants' motive to "keep the price of stock high while selling their own shares at a profit"); *ECA*, 553 F.3d at 200 ("Earning profits for the shareholders is the essence of the duty of loyalty[.]").

Second, the Officer Defendants' stock sales do not raise a strong inference of scienter. "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 419 (S.D.N.Y. 2020) (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74–75 (2d Cir. 2001)).

Here, although the volume of shares sold was significant, the selling defendants each retained far more shares than they sold. For example, Collins, in 2022, acquired 183,333 shares of stock, disposed of 26,653 shares, and held 196,713 shares; and in 2023, he acquired 313,026 shares, disposed of 24,840 shares, and held 484,899 shares. *See* AC ¶ 135; Collins Form 4s; Defs. Mem. at 35–36. And LoCascio, in 2022, acquired 23,412 shares and sold 29,742 shares, and, throughout the Class Period, held approximately 390,000 shares. *See* AC ¶¶ 136–37; LoCascio Form 4s; Defs. Mem. at 35–36; *see, e.g., In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 763 (S.D.N.Y. 2018) ("[T]he decisive question in assessing whether an insider's sales are indicative of scienter is how many shares the insider sold during the class period relative to the total number of shares that he or she *could have* sold. Such a number appropriately captures not only the fact of sales, but also the extent to which the insider availed himself or herself of, or forwent, the opportunity to turn a profit before disclosure of concealed bad news." (emphasis in original)). Notably, Collins's shareholdings increased during the class period, while LoCascio's roughly remained the same. *See* Collins Form 4s; LoCascio Form 4s;

Defs. Mem. at 36; *see also Evoqua Water Techs.*, 450 F. Supp. 3d at 420. And many of the stock

sales were automatic, made to cover the Officer Defendants' tax liabilities upon acquisition of

shares upon vesting of options. *See* Collins Form 4s; LoCascio Form 4s; Defs. Mem. at 35; *In re*

*Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) ("[T]he documents

reflecting the Individual Defendants' trading in BMS stock during the Class Period show a

consistent pattern of trading undertaken primarily to make payments required for the exercise of

stock options or to pay taxes."); *Ressler v. Liz Claiborne Inc.*, 75 F. Supp. 2d 43, 59–60

(S.D.N.Y. 1999) (stock sales to meet tax obligations not indicative of fraud).

    The facts pled thus do not support an inference of scienter via motive. *See, e.g.*, *In re*

*DraftKings*, 650 F. Supp. 3d at 175 (motive not pled where defendants retained more shares than

they sold); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 291 (S.D.N.Y. 2006) ("[T]he

dispositive factor is that other insiders, including the other two individual defendants, did not sell

during the putative class period," where two defendants had sold less than 20% of their

individual holdings.); *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 570 (S.D.N.Y.

2007) (motive not adequately pled where only one individual defendant sold 20% of stock).

### 2.    Circumstantial Evidence of Misbehavior or Recklessness

    Where a complaint lacks well-pled allegations of motive, it bears a "'correspondingly

greater' burden in alleging conscious misbehavior or recklessness." *In re Aratana*, 315 F. Supp.

3d at 765 (quoting *ECA*, 553 F.3d at 198–99). It can plead conscious misbehavior or

recklessness by adequately alleging that defendants "knew facts or had access to information

suggesting that their public statements were not accurate," *Novak*, 216 F.3d at 311, but "[w]here

plaintiffs contend defendants had access to contrary facts, they must specifically identify the

reports or statements containing this information," *id.* at 309. For example, "[w]ith respect to

sales data and reports, pleadings are sufficiently specific where the plaintiffs have alleged who

prepared the reports, how frequently they were prepared, and who reviewed them." *Koplyay*, 2013 WL 6233908, at *7.

In attempting to plead that the Officer Defendants' knew undisclosed facts that made their disclosures false, plaintiff notes or claims that (1) these defendants had senior positions and "control" over LivePerson's business decisions and reported financials, *see* Pl. Opp. at 35–39; AC ¶¶ 249–58; (2) these defendants gave misleading responses to analyst questions, *see* Pl. Opp. at 39–40; *see, e.g.*, AC ¶ 223, (3) LivePerson reduced its guidance, *see* Pl. Opp. at 40; *see, e.g.*, AC ¶¶ 157–58; (4) LoCascio resigned as chief executive and board chair, *see* Pl. Opp. 40–41; AC ¶¶ 132–33, 259; and (5) the timing of LivePerson's financial disclosures coincided with Starboard's first proxy contest, *see* Pl. Opp. at 41; AC ¶¶ 93–104.

These facts do not come close to supporting an inference of scienter. The first category merely describes the quotidian fact that high-ranking executives with the titles of those here tend to have substantial responsibilities with respect to company finances. The second, alleging materially misleading replies in response to analysts, is based on the conclusory statements from CWs addressed above that must be set aside. *See In re Aratana*, 315 F. Supp. 3d at 765 (no inference of scienter where complaint's allegations to this effect were conclusory). And it is "well established that a defendant's position does not, without more, support a conclusion that the defendant had access to information contradicting an alleged misrepresentation." *Marcu*, 2020 WL 4016645, at *7; *see, e.g., Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) ("[T]o establish an inference of scienter, Plaintiff must do more than allege that the Individual Defendants had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions."). And, as discussed, the AC does not plausibly plead that the statements attributed to the Officer Defendants were false when

made, let alone knowingly false. *See In re Lululemon*, 14 F. Supp. 3d at 571; *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d at 378 ("[F]or a statement to be false or misleading, a plaintiff must allege that the speaker was aware of adverse information at the time he spoke.").

As to the third category, courts regularly reject claims of scienter based on hindsight claims of fraud. *See In re Plug Power, Inc. Sec. Litig.*, No. 21 Civ. 2004, 2022 WL 4631892, at *17 (S.D.N.Y. Sept. 29, 2022) (collecting cases). That outcome is all the more warranted here because—unlike in many other cases—none of LivePerson's reported financials, as opposed to its forward-looking guidance, were later found inaccurate or restated. *See In re Kandi Techs. Grp., Inc. Sec. Litig.*, No. 17 Civ. 1944, 2019 WL 4918649, at *6 (S.D.N.Y. Oct. 4, 2019) ("[C]ourts have only found evidence of recklessness when the restatements had some impact on income."); *Plumbers & Pipefitters Loc. Union No. 719 Pension Tr. Fund v. Conseco Inc.*, No. 9 Civ. 6966, 2011 WL 1198712, at *22 (S.D.N.Y. Mar. 30, 2011) (scienter not pled where company "restate[d] several prior periods' financial results") (collecting cases).

As to the fourth category, the AC does not tie LoCascio's "ouster" to any asserted basis for its claims of securities fraud. On the contrary, as pled, the ouster derives from the second proxy contest, brought by Starboard, which sought a change in management. AC ¶ 120. These events do not give rise to an inference of fraud—or fraudulent intent. As this Court has recognized, terminations or resignations of corporate executives, without more, do not support an inference of scienter. *In re Hebron Tech. Co., Ltd. Sec. Litig.*, No. 20 Civ. 4420 (PAE), 2021 WL 4341500, at *23 (S.D.N.Y. Sept. 22, 2021). Instead, "a complaint must allege facts that link a resignation to the alleged fraud." *Id.* (collecting cases). Here, the AC lacks allegations that tie LoCascio's resignation to a claimed fraud or show circumstantial evidence of wrongdoing, such as clawed back compensation. *See, e.g., id.*; *In re Salix Pharms., Ltd.*, No. 14 Civ. 8925, 2016

WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016). The pleadings merely suggest a quotidian proxy fight to change management, which terminated after Starboard secured LoCascio's removal. *See* AC ¶ 120 ("On May 5, 2023, Starboard sent a public letter . . . again criticizing Defendant LoCascio . . . . Starboard withdrew its proxy contest on July 24, 2023, twelve days after LivePerson announced Defendant LoCascio's ouster.").

As to the final category, the sequence of events undermines the AC's allegations of scienter. Plaintiff argues that LivePerson issued misleading financial results at strategic times to combat Starboard's first proxy contest. Pl. Opp. at 41. In fact, as defendants note, LivePerson's financial results for 2022 and 2023 issued exactly one year apart, AC ¶¶ 140, 142, 206, 212 (May 9, 2022 and May 9, 2023 for Q1); *id.* ¶¶ 157, 159, 219, 222 (August 8, 2022 and August 8, 2023 for Q2), and the Company's Q2 disclosures have likewise been filed at the same time since 2020, *see* Defs. Reply at 15 (referencing 8/4/20 Press Release, 8/3/21 Press Release, and 8/8/22 Press Release). The objective facts thus do not support plaintiff's claim of one-off timing with fraudulent intent. *See San Leandro*, 75 F.3d at 812; *In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 834 n.6 (S.D.N.Y. 2017).

Nor does the AC plead scienter by other means. There is no concrete allegation either "(1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the [allegedly false or misleading] statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (citation omitted)). The AC's claims that Officer Defendants knew of the asserted misstatements and omissions are, as noted, based on uncorroborated, generalized, and otherwise problematic citations to CWs, who do not specify reports or statements putting any defendant on

54

notice of an asserted impropriety. *Compare* AC ¶ 60 ("According to CW2, these issues were discussed during weekly meeting with the finance team held via Google Meet which Defendant Collins and the FP&A team attended."), *with Okla. Firefighters*, 300 F. Supp. 3d at 577 (reports that "did not identify difficulties . . . as of the time of th[e] statement," "let alone difficulties known to the speaker," failed to set forth "particular facts" that would render defendants' positive statements actionable), *and Town of Davie Police Officers Ret. Sys. v. City of N. Mia. Beach Police Officers' & Firefighters' Ret. Plan*, No. 21-909-CV, 2021 WL 5142702, at *2 (2d Cir. Nov. 5, 2021) (scienter not alleged where AC failed to plead with specificity materials or statements at meetings "that contained incriminating information"). *See also In re Draftkings*, 650 F. Supp. 3d at 178 (collecting cases).

The AC therefore does not plead facts giving rise to a strong inference of scienter. *See, e.g., Rein*, 2024 WL 3105004, at *25 (dismissing where "complaint's naked declaration" did not "adequately allege scienter circumstantially"); *In re Draftkings*, 650 F. Supp. 3d at 178.

## D.    Item 303 Violation

The AC separately alleges that defendants violated § 10(b) by failing to disclose eight categories of information which it claims Item 303 required them to disclose: (1) the harm caused by the diversion of resources away from LivePerson's core operations to pursue non-accretive non-core ventures like WildHealth; (2) increasing rates of customer attrition; (3) increasing rates of customer down selling; (4) decreasing volume of conversational cloud conversations; (5) worsening sales and bookings; (6) quarterly manipulation of revenue guidance throughout 2022 and 2023 that masked the severity of LivePerson's financial decline; (7) materially deficient internal controls that failed to prevent manipulation of revenue guidance and other metrics; and (8) WildHealth's disappointing growth and massive losses due in part to capital constraints and layoffs instituted by LivePerson. AC ¶ 139.

Item 303 "imposes a disclosure duty where a trend, demand, commitment, event or uncertainty is both (1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations." *Rubinstein v. Credit Suisse Grp. AG*, 457 F. Supp. 3d 289, 300 (S.D.N.Y. 2020) (quoting *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012)) (citation omitted); *see* 17 C.F.R. § 229.303(a)(1). The failure to make a required Item 303 disclosure is "an omission that can serve as the basis for a Section 10(b) securities fraud claim . . . only if it satisfies the materiality requirements outlined in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and if all the other requirements to sustain an action under Section 10(b) are fulfilled." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015) (affirming dismissal where complaint failed to plead scienter).

Substantially for the reasons reviewed above, the AC does not viably allege breaches of LivePerson's Item 303 disclosure obligations. That claim turns on the same ill-pled premise as the AC's deficiently pled claims of material misrepresentations and omissions: that LivePerson was obliged to disclose its ostensibly deteriorating business prospects. *See* AC ¶ 139; Pl. Opp. at 34–35; *see also In re DraftKings*, 650 F. Supp. 3d at 180 (dismissing redundant Item 303 claims based on deficient securities claims); *Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 612 (S.D.N.Y. 2022) (same); *Schaffer*, 2018 WL 481883, at *14 (same). Because the AC does not adequately allege that LivePerson fraudulently misled investors as to its financial decline during the Class Period, it necessarily does not plead a failure to disclose the related risks. And the AC does not allege an independent basis for its claim of noncompliance with Item 303 (*e.g.*, an anticipated regulatory or legislative change that presented a reasonably likely and significant effect on the company's financial condition or operations). *See, e.g., Macquarie Infrastructure*,

601 U.S. at 263 (Item 303 violation plausibly pled where "representations . . . state the truth only

so far as it goes, while omitting critical qualifying information" (citation omitted)).

The AC also does not plead the requisite state of mind for an Item 303 violation: that

LivePerson knew of a material risk or uncertainty presented by the Company's worsening

financial condition. *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) ("The

plain language of Item 303 confirms our previous assumption that it requires the registrant's

actual knowledge of the relevant trend or uncertainty."); *In re Noah Educ. Holdings, Ltd. Sec.

Litig.*, No. 8 Civ. 9203, 2010 WL 1372709, at *6 (S.D.N.Y. Mar. 31, 2010) ("Knowledge of a

trend is an essential element triggering disclosure under Item 303."). The AC makes only the

general allegation that "[d]efendants had an affirmative, independent duty to disclose" the eight

enumerated trends, AC ¶ 139, but it does not plead "*actual* knowledge of an existing trend,

event, or risk," as required to allege a violation of Section 303, *Rubinstein*, 457 F. Supp. 3d at

300–01 (collecting cases) (emphasis in original) (rejecting allegations of Item 303 violations

based on claim that defendant could be "presumed to have known" of a risk); *see In re HEXO*,

524 F. Supp. 3d at 302–03 (same).

### E.    Section 20(a) Claims

The AC also brings claims against the Officer Defendants under § 20(a) of the Exchange

Act. *See AC* ¶¶ 280–85. But to state a claim under § 20(a), a plaintiff must adequately allege "a

primary violation by the controlled person." *Carpenters Pension Tr. Fund*, 750 F.3d at 236

(citation omitted). Because the AC has not done so, its § 20(a) claims necessarily fail. *Gregory*,

297 F. Supp. 3d at 418 (dismissing § 20(a) claim based on failure to adequately allege primary

violation); *Lopez v. Ctpartners Exec. Search, Inc.*, 173 F. Supp. 3d 12, 42 (S.D.N.Y. 2016)

(same); *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 25 (S.D.N.Y. 2016) (same).

## IV. Leave to Replead

Plaintiff seeks, in the alternative, leave to again amend the AC, pursuant to Federal Rule of Civil Procedure 15(a). Pl. Mem. at 45. The Court denies such leave. On February 16, 2024, the parties stipulated that plaintiff's deadline to amend the complaint would be 60 days after the Court granted his motion to serve as lead counsel. Dkt. 20. On March 22, 2024, the Court granted that motion, Dkt. 21, making his deadline to amend his complaint May 21, 2024, Dkt. 24. The Court accordingly ordered the parties "to file a joint letter proposing a schedule for the filing of an amended complaint and any motion to dismiss." Dkt. 21 at 10. On March 25, 2024, the parties did so, stipulating that "Plaintiff shall file the amended complaint on or before Tuesday, May 21, 2024," and, if defendants moved to dismiss, that plaintiff would file his "response . . . on or before Friday, September 20, 2024." Dkt. 23. On May 31, 2024, after an extension, *see* Dkt. 26, plaintiff filed the AC, Dkt. 27. Two joint stipulations and scheduling orders provided plaintiff with an opportunity to "respon[d]" to defendants' motion to dismiss, Dkts. 24, 26, which could have taken the form of an amendment of (or a motion for leave to amend) the AC. Plaintiff did not do so.

Plaintiff has already amended the complaint once and has forgone an additional opportunity to do so, per the parties' jointly proposed schedules. "As in other cases denying such leave, [plaintiff] has 'already had one opportunity to plead fraud with greater specificity.'" *Hunt v. Alamo*, No. 23 Civ. 9151 (PAE), 2024 WL 532176, at *4 (S.D.N.Y. Feb. 9, 2024) (quoting *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986)); *see id.* (collecting cases). And he has not identified new factual allegations—for example, a solid factual basis on which to allege inaccurate or manipulated reported financials—that would cure the formidable pleading deficiencies reviewed here, or explained how further investigation or diligence would rectify these deficiencies. *See* Pl. Opp. at 45; *Metz v. U.S. Life Ins. Co. in City of N.Y.*, 662 F.3d 600,

603 (2d Cir. 2011) (upholding dismissal with prejudice where plaintiff "sought leave to amend only in the final sentence of her opposition" without "advanc[ing] new factual allegations that she would make if granted leave to amend").

"Where the problems with a claim are 'substantive' rather than the result of an 'inadequately or inartfully pleaded' complaint, an opportunity to replead would be 'futile' and 'should be denied.'" *Long Miao*, 442 F. Supp. 3d at 808 (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)). For the reasons discussed, the deficiencies of the AC's claims are substantive, and further amendment would be futile. The Court thus denies the request to amend. *See, e.g.*, *Garnett*, 2022 WL 4632323, at 29 n.26 (collecting cases); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 549 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) (declining leave to amend where "there [wa]s no realistic prospect of rehabilitating plaintiffs' federal claims").

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss. The dismissal is with prejudice. The Court denies defendants' motion to strike as moot.

The Clerk of Court is respectfully directed to terminate the motions pending at Dockets 32, 54, and 58, and to close this case.

SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: March 19, 2025
New York, New York