**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NOAM DAMRI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LIVEPERSON, INC., ROB LOCASCIO, and JOHN COLLINS,<br><br>Defendants. | **Case No. 1:23-cv-10517-PAE**<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS


NATURE OF THE ACTION ..... 1
JURISDICTION AND VENUE ..... 14
PARTIES ..... 14
Former Employee Witnesses ..... 16
SUBSTANTIVE ALLEGATIONS ..... 18
Background ..... 18
Defendants Manipulate LivePerson's Financial Disclosures ..... 20
Defendants Manipulate FY 2022 Guidance to Defeat Starboard's Proxy Contest ..... 28
Defendants Mislead Investors Regarding the Key Metric Alterations ..... 40
LivePerson's Disastrous Acquisition of WildHealth ..... 42
LivePerson's Internal Control Deficiencies ..... 47
LivePerson Ousts Defendant LoCascio ..... 49
Defendants' Compensation and Board Insider Sales ..... 50
Defendants Violated Their Duty to Disclose Pursuant to Regulation S-K ..... 52
Materially False and Misleading Statements Issued During the Class Period ..... 52
The Truth Begins to Emerge While Defendants Continue to Mislead Investors ..... 64
The Truth is Revealed ..... 81
POST CLASS PERIOD EVENTS ..... 83
SCIENTER ALLEGATIONS ..... 83
PLAINTIFF'S CLASS ACTION ALLEGATIONS ..... 87
COUNT I ..... 90
COUNT II ..... 93
PRAYER FOR RELIEF ..... 94
DEMAND FOR TRIAL BY JURY ..... 94

Lead Plaintiff Noam Damri ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding LivePerson, Inc. ("LivePerson" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired LivePerson securities between May 9, 2022 and February 28, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. LivePerson, which was founded in 1995 and went public via an initial public offering ("IPO") on the NASDAQ Stock Market ("NASDAQ") in April 2000, has purported to deliver mobile and online messaging solutions to its customers through Conversational Artificial Intelligence since 1998. Conversational Artificial Intelligence refers to technologies that enable

machines to understand, process, and respond to human language generally, including chatbots and virtual assistants that can perform tasks or provide information based on voice or text inputs.

3. LivePerson's core operation is its "Conversational Cloud," which enables customers to interact with chat bots, or automated internet chat robots, across "each of a brand's primary digital channels, including mobile apps, mobile and desktop web browsers, SMS, social media, and third-party consumer messaging platforms." This service is supposed to allow human agents to manage customer correspondence in a more streamlined and efficient manner, by giving customers solutions more quickly via chat text as opposed to making them wait on hold on a phone call. LivePerson's Conversational Cloud also purports to "ingest traditional emails and convert them into messaging conversations, or embed messaging conversations directly into web advertisements, rather than redirect consumers to static website landing pages."

4. Throughout the Class Period, Defendants purposefully manipulated LivePerson's revenue guidance, approved the dissemination of falsified financial disclosures due to materially deficient internal controls, altered metrics including Net Revenue Retention and Average Revenue Per User to mask increasing customer attrition rates, soft sales, and soft bookings, without divulging the true motivation behind the alteration to investors, and touted the performance of a non-core venture that in fact contributed millions in losses.

5. During the Class Period, unbeknownst to investors, Defendants: (i) double-counted booked revenue from non-core ventures in full-year ("FY") 2022 revenue guidance in LivePerson's first quarter 2022 ("Q1 2022") disclosures, which artificially inflated FY 2022 guidance by approximately $12 million; (ii) further inflated FY 2022 guidance by approximately $40 million in Q1 2022 disclosures by incorporating "expected" bookings revenue they knew they likely could not generate, to stave off an active proxy contest and hide LivePerson's deteriorating

financial condition; (iii) falsely attributed the material reduction to FY 2022 guidance announced the following quarter (*after* Defendants had successfully negotiated an end to the proxy contest) ***one hundred percent*** to other factors, without revealing their prior purposeful inflation or the increasing rates of customer attrition, down selling or soft sales; (iv) falsely assured investors that they needn't worry about the deleterious results announced in Q2 2022 because Defendants had *already* taken steps to optimize the profit and loss statement ("P&L") though they had not, and could not materially improve the P&L without addressing *inter alia* increasing rates of customer attrition, down-selling, and soft sales; (v) provided false justifications for altering the Net Revenue Retention ("NRR") and Annual Revenue Per User ("ARPU") metrics, to hide that they implemented the alterations to mask LivePerson's declining revenues and accelerating customer attrition; (vi) falsely touted the financial performance of non-core venture WildHealth, Inc. ("WildHealth"), while masking its millions in annual losses and hiding that Medicare intended to suspend millions in reimbursements to WildHealth under its Medicare Demonstration Program; and (vii) succeeded in disseminating falsified financial disclosures due to deficient internal controls they repeatedly told investors were effective.

6. In early 2022, Starboard Value LP (together with its affiliates, "Starboard"), one of LivePerson's largest shareholders, commenced a proxy contest to replace four directors on the seven-member LivePerson Board, citing the Company's deteriorating financial performance, widespread corporate culture problems—evidenced by, among other things, excessive turnover at senior management positions such as CFO—and issues with corporate governance, including the "unchecked power" of Defendants LoCascio, LivePerson's CEO and Board Chair. To stave off the proxy contest *and* to prevent investors from detecting the Company's deteriorating financial condition, Defendants artificially inflated guidance for FY 2022 by approximately $50 million so

they could reaffirm previously stated guidance when issuing LivePerson's Q1 2022 financial disclosures.

7. Specifically, when preparing to update FY 2022 guidance in connection with the Q1 2022 earnings report, the latest internal forecast that Defendants received reflected that bookings revenue would fall far short of what they needed to maintain revenue guidance for FY 2022. The sales organization communicated to Defendants LoCascio and Collins in March 2022 that due to recently implemented business changes—including reductions in marketing spending and the abandonment of an initiative to hire additional sales representatives— they projected bookings for 2022 to be ~$80 million less than previously projected.

8. Defendants therefore instructed sales leaders to find ways to bridge the widening gap between FY 2022 guidance and the best internal forecast. At Defendants' behest, the sales leaders compiled a list of aspirational "opportunities" in March 2022 that they presented to Defendants, though they and Defendants knew it would be virtually impossible to derive any material amount of revenue from these aspirational opportunities in the timeframe necessary to maintain FY 2022 revenue guidance in the Q1 2022 earnings announcement. *Id.*

9. On April 12, 2022, the sales organization provided its latest and best forecast for yearly bookings to LivePerson's Head of Financial Planning and Analysis ("FP&A") for the purpose of, *inter alia*, the upcoming FY 2022 revenue guidance announcement. *Id.,* ¶64. The sales organization projected $89.9 million in bookings revenue, with noted risk to that figure because it assumed the generation of additional bookings revenue from the aspirational "Pow" exercise. *Id.*; RJN, Ex.3 (Defendants' Answer to Starboard AC), ¶64. The FP&A team determined that even using that risky aspirational number, the total revenue projection would fall below the low end of

existing guidance, which Defendants instructed was "not an option" given the ongoing proxy fight with Starboard. *Id.*

10. Defendant Collins worked directly with the Head of FP&A to ensure that the model used to project FY 2022 revenue guidance would incorporate a much higher figure for bookings revenue than the best estimate the sales organization had provided, which would cause the model to reflect a total revenue projection exactly at the midpoint of existing guidance. *Id.,* ¶65. Specifically, Defendants manipulated the model to include bookings revenue of $129.5 million, ***nearly $40 million more than the already-risky projection that the sales organization had compiled for 2022***. *Id.*; RJN, Ex.3, ¶65. Defendants knew that $129.5 million in projected bookings revenue for FY 2022 far exceeded their own internal forecast, and knew or should have known LivePerson could not generate anywhere near that amount of bookings revenue in 2022. *Id.* Defendants thus falsely and materially inflated the FY 2022 guidance to avoid having to announce reduced guidance and reveal LivePerson's deteriorating financial position. As explained *infra,* Defendants used the inflated guidance numbers to negotiate an end to Starboard's proxy contest in advance of the Q2 2022 earnings release.

11. FY 2022 revenue guidance, as disclosed in Q1 2022, was also inflated with approximately $12 million in double-counted bookings revenue from non-core ventures including WildHealth, which Defendants knew about, but did not disclose, no later than July 13, 2022—before LivePerson disseminated Q2 2022 financial results.

12. Nevertheless, after inducing Starboard to settle its proxy contest based on the Q1 2022 financial disclosures, Defendants then materially *reduced* FY 2022 guidance the following quarter. Defendants, however, never revealed that the reduction followed their purposeful *inflation* of guidance the prior quarter by tens of millions of dollars. Instead, Collins reassured investors

that the reduction was 100% attributable to steps the Company had purportedly taken to optimize the P&L and reverse the financial deterioration.

13. Specifically, beginning in Q2 2022, Defendants told investors that to combat the decline they "proactively" undertook to clean up the Company's P&L by divesting the Company of non-core "low quality revenue" sources identified as GainShare labor (described below) and COVID-19 testing. However, Defendants did not reveal that the root causes of the Company's steady deterioration had nothing to do with GainShare labor or COVID-19 testing. Indeed, unbeknownst to investors, the root causes of LivePerson's revenue declines included substantial diversion of resources away from LivePerson's core operation to pursue non-accretive non-core ventures like WildHealth, increasing rates of customer attrition, increasing rates of down-selling, decreasing conversational cloud conversation volume on LivePerson's platform, soft sales, and soft bookings. None of the purported steps Defendants claimed to have taken, addressed these key contributors to the Company's degeneration.

14. Defendants' machinations extended beyond their purposeful and egregious inflation of FY 2022 guidance in their ongoing effort to obfuscate the Company's decline. Both before and during the Class Period, Defendants diverted focus and significant Company resources away from its core operation to pursue non-core ventures that were not accretive, and which contributed substantial losses to LivePerson's P&L.

15. For example, in February 2022, the Company acquired non-core venture WildHealth, a precision medicine service which purportedly "leverages advanced machine learning to combine DNA analysis, biometrics, microbiome testing and phenotypic data to provide people with a blueprint for truly optimized health and a maximized health span." Wildhealth contributed *millions* in annual losses to LivePerson's P&L. However, investors remained in the

dark regarding WildHealth's poor performance throughout the Class Period because: (i) Defendants contemporaneously assured investors that WildHealth exhibited *strong* performance and promised that WildHealth would double its core revenue in 2023; and (ii) investors had no means of discovering otherwise given the manner in which Defendants reported revenues at the time.

16. Specifically, LivePerson was organized into two operating segments: the business segment, comprising the core operation, and the consumer segment, which included the non-core ventures like WildHealth. During the Class Period, Defendants identified the amount of revenue attributable to the business segment and to the consumer segment generally, but did not provide specificity on key performance indicators, revenue segmentation, and the non-core components of LivePerson's P&L.

17. Given the lack of segmentation and transparency in LivePerson's financial disclosures, Defendants successfully disseminated their false narrative and hid WildHealth's losses from the market.

18. Moreover, Defendants further hid that *their own actions* directly contributed to WildHealth's deleterious financial performance. As LivePerson's financial condition deteriorated, Defendants personally instituted capital cuts and layoffs at WildHealth that significantly constrained WildHealth's ability to grow. In other words, Defendants did not have a reasonable basis for stating that WildHealth had, or would, exhibit strong growth. Millions in verifiable losses do not constitute strong performance or growth.

19. Amidst LivePerson's overall financial turmoil, Defendants instructed WildHealth to find and pursue additional revenue streams. Toward that end, WildHealth provided services under a Medicare demonstration program related to COVID-19 testing that involved "free" at

home testing kits. Regulators heavily scrutinized companies purporting to provide COVID-19 testing services for Medicare reimbursement due to strict requirements and rampant fraud. Nevertheless, Defendants did not reveal WildHealth's foray into the Medicare demonstration program nor did they reveal the attendant risks.

20. Unbeknownst to investors, in November 2022 WildHealth received notice that Medicare had suspended reimbursements for services WildHealth rendered under the Medicare demonstration program pending further review. Applicable regulations (set forth *infra*) required Medicare to notify WildHealth regarding the impending suspension and provide an opportunity for rebuttal. In other words, WildHealth had to have known *months prior* to November 2022 that Medicare intended to suspend reimbursements. Defendants knew that millions in withheld monies meant millions more in quarterly losses for WildHealth and created a significant risk that LivePerson would miss guidance for the quarter (a risk that ultimately materialized). Nevertheless, Defendants repeatedly represented to investors that they "expect[ed] continued strong performance by WildHealth."

21. The truth began to come to light on February 28, 2023, before market hours, when LivePerson issued a Notification of Late Filing on Form 12b-25 regarding its Annual Report on Form 10-K for the year ended December 31, 2022 (the "2022 10-K"). Among other things, the notification revealed that, as a result of LivePerson's acquisition of WildHealth, "the Company requires more time to perform additional review and testing of revenue recognition with respect to a recently discontinued WildHealth program, for which Medicare reimbursement is suspended pending further governmental review, and to complete its in-process review of internal controls and procedures."

22. On this news, LivePerson's share price fell $1.69 per share, or 14.31%, to close at $10.12 per share on February 28, 2023.

23. Approximately one week later, on March 6, 2023 before market hours, the Company issued a current report on Form 8-K which disclosed that "the referenced review of WildHealth revenue is anticipated to affect fourth quarter 2022 revenue attributable to WildHealth's participation in a Medicare demonstration program, due to suspension in November 2022 of Medicare reimbursements under the program and pending further governmental review."

24. On this news, LivePerson's share price fell $0.78 per share, or 6.8%, to close at $10.69 per share on March 7, 2023.

25. Then, on March 15, 2023, after market hours, the Company issued a press release announcing its Q4 2022 financial results on Form 8-K, which provided that "[t]otal revenue was $122.5 million for the fourth quarter of 2022, a decrease of 1% as compared to the same period last year" and "[w]ithin total revenue, business operations revenue for the fourth quarter of 2022 decreased 1% from the comparable prior-year period to $113.0 million, and revenue from consumer operations decreased 3% from the comparable prior-year period to $9.4 million." In the press release, Defendants blamed LivePerson's revenue declines on their execution of the plan to "exit non-core lines of business," which did not include WildHealth.

26. The press release also revealed that Medicare's suspension of reimbursements to WildHealth in November 2022 caused the Company to miss revenue guidance for the quarter.

27. During the earnings call held the same day, Defendants continued to blame the disappointing results on non-core distractions and their execution of the plan to exit non-core revenue streams, but promised investors that: 1) going forward the Company would be "more transparent about our revenues," 2) by exiting non-core the Company had *already* "materially

improved the P&L," and 3) stated as "facts" that the Company would begin generating positive margins and positive cash flow the following quarter. Additionally, the Company disclosed that going forward it would calculate NRR using recurring revenues instead of total revenues, claiming it would provide a more accurate depiction of the Company's financial condition. Defendants also promised that WildHealth's core revenue "will double this year."

28. Finally, on March 16, 2023, before market hours, the Company filed the 2022 10-K with the SEC. The 2022 10-K revealed that "due to certain control deficiencies which aggregated to a material weakness in the Company's internal control over financial reporting as further described below, our disclosure controls and procedures were not effective as of December 31, 2022" and "[t]he control deficiencies, which in aggregate constitute a material weakness, were identified in connection with the Company's previously disclosed review of certain transactions related to its subsidiary WildHealth."

29. On this news, LivePerson's share price fell $5.64 per share, or 57.73%, to close at $4.13 per share on March 16, 2023, damaging investors.

30. Despite the revelations regarding the regulatory scrutiny surrounding LivePerson and WildHealth's COVID-19 related activities, the lack of transparency in prior financial disclosures regarding non-core revenues, the diversion of focus away from the Company's core operation, the alteration of the NRR metric, and the material internal control deficiencies, Defendants' statements in the March 15, 2023 press release, on the earnings call that same day, and in the 2022 10-K regarding the causes of the Company's revenue decline and the steps undertaken to fix the P&L, expected growth from WildHealth, revenue guidance, and the reasons for altering the NRR metric were false and misleading because: (i) root causes of the Company's financial deterioration included customer attrition, down-selling, poor sales force execution, soft

bookings, and a decline in conversational cloud conversations volume; (ii) as a result of LivePerson's rapidly deteriorating financial condition, LivePerson instituted capital cuts and layoffs at WildHealth which constrained its growth; (iii) Defendants had altered NRR and other metrics to keep investors in the dark regarding the accelerating rate of customer attrition and declining revenues; and (iv) Defendants had disseminated and continued to disseminate falsified financial disclosures enabled by materially deficient internal controls.

31. Following the March 2023 disclosures, Defendants continued to issue misleading statements that obfuscated the increasing severity of the Company's financial deterioration and misrepresenting WildHealth's growth.

32. On July 12, 2023, the Company announced that Defendant LoCascio would depart his role as LivePerson's Chief Executive Officer ("CEO"), effective December 31, 2023 at the end of the term of his contract, which would not be renewed. On August 8, 2023, the Company revealed that Defendant LoCascio's ouster had been accelerated and that he had in fact stepped down as CEO and as a Company director effective August 7, 2023, with admonitions from the Board *not to "violate any lawful written directive from the Board."*

33. On February 7, 2024, ***seven months after withdrawing its second proxy contest on July 24, 2023*** (in the wake of Defendant LoCascio's ouster), Starboard filed an action against LivePerson, Defendant LoCascio and Defendant Collins (publicly filed on February 12, 2024) in the Court of Chancery of the State of Delaware ("Starboard Action") alleging based on evidence, that included Starboard's firsthand knowledge as well as detailed statements from an unsolicited high level confidential witness from LivePerson called the Starboard CW (later identified as Jerry Haywood, as explained below), demonstrating that Defendants engaged in fraudulent conduct "to improperly entrench the Board of a public company, maintain their influence over the Company

and, ultimately, save their jobs." Verified Complaint for Breach of Fiduciary Duty, ¶1, *Starboard Value LP v. LivePerson, Inc.*, C.A. No. 2024-0103-JTL (Del. Ch. Feb. 12, 2024). Specifically, the Starboard Complaint alleged that Defendants manipulated LivePerson's financial results for the first quarter of 2022 to "preserve its financial outlook for 2022" so they could stave off Starboard's proxy contest which would have substantially reconstituted the LivePerson Board. In addition to Mr. Haywood, who details how Defendants manipulated revenue guidance for FY 2022 with double-counted bookings revenue and millions in additional bookings revenue they had no reasonable basis to expect would materialize, other CWs confirm that Defendants manipulated revenue guidance and other metrics throughout the Class Period to conceal the severity of LivePerson's financial woes.

34. On February 28, 2024 after market close, three weeks after Starboard filed the Starboard Complaint, LivePerson filed a Form 8-K attaching a press release announcing LivePerson's financial results for the fourth quarter and FY 2023. The Company held an earnings call with analysts the same day, during which Defendant Collins presented.

35. Therein, Defendants revealed for the first time that the revenue outlook for 2024 was $100 million below expectations as a result of customer attrition issues that had worsened over the prior twelve months. The Company further revealed that WildHealth had not in fact performed as promised, that its contribution to EBITDA was negative and that LivePerson was actively marketing a sale of the business. Defendants also revealed that despite their promises of transparency regarding non-core revenue in March 2023, they had not actually provided "specificity on key performance indicators and revenue segmentation."

36. Following these shocking revelations, LivePerson's share price fell $1.13, or approximately 47%, to close at $1.27 on February 29, 2024 on unusually heavy volume.

37. On May 1, 2025, the deposition transcript of Jerry Haywood, aka the Starboard CW, was filed in the Starboard Action. *See* Ex. 1 attached hereto ("Haywood Dep."). Thereafter, on May 5, 2025, Starboard filed a redacted[1] version of a Verified Amended Complaint for Breach of Fiduciary Duty ("Starboard AC"), attached hereto as Ex. 2[2], to include facts obtained from: (i) the Haywood Dep., (ii) the sworn deposition testimony of several other LivePerson witnesses[3], and (iii) documents produced by Defendants to Starboard in discovery.

38. Mr. Haywood's sworn testimony, described below, and the Starboard AC confirm that: (i) Defendant Collins admitted to a $50 million revenue gap in FY 2022 guidance; (ii) in March 2022 Defendants directed sales leaders to identify ways to generate additional bookings to "bridge the gap" between actual expected bookings/revenue and previously disseminated revenue guidance; (iii) in April 2022 Defendants manipulated the model used to generate FY guidance to include approximately $40 million in bookings revenue they had no reasonable expectation of generating so that the model would generate a guidance number at the midpoint of previously stated guidance for FY 2022; (iv) Defendant Collins admitted that LivePerson double counted bookings revenue in FY 2022 guidance; (v) the double-counted bookings revenue inflated FY 2022 guidance by approximately $12 million; and (vi) Defendants knew about the double counting of bookings revenue in FY 2022 guidance no later than July 13, 2022.

---

[1] However, Defendants' Answer to the Starboard AC, filed on May 20, 2025 ("Starboard Answer"), attached hereto as Ex. 3, sets forth the allegations unredacted.

[2] All ¶_ references are to the Starboard AC, unless otherwise indicated.

[3] Including, *inter alia*, LivePerson Board member Jill Layfield, Board member Kevin Lavan, VP of Finance Michael Gruet, and Defendant Collins. The foregoing transcripts were not filed publicly, and are unavailable to Plaintiff in this action, but are referenced in the Haywood Dep.

39. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

40. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

41. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

42. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). LivePerson is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

43. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

44. Plaintiff, as set forth in the certification previously filed with this Court (ECF No. 10-3), acquired LivePerson securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

45. Defendant LivePerson is a Delaware corporation with principal executive offices located at 530 7th Avenue, Floor M1, New York, New York, 10018. LivePerson's securities trade

in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "LPSN".

46. Defendant Rob LoCascio ("LoCascio") has served as the Company's Founder and Chief Executive Officer at all relevant times.

47. Defendant John Collins ("Collins") has served as the Company's Chief Financial Officer at all relevant times.

48. Defendants LoCascio and Collins are referred to herein collectively as the "Individual Defendants."

49. The Individual Defendants possessed the power and authority to control the contents of LivePerson's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of LivePerson's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. They each signed the Forms 10-Q and Forms 10-K alleged to be misleading herein. Because of their positions with LivePerson, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

50. LivePerson and the Individual Defendants are collectively referred to herein as "Defendants."

**Former Employee Witnesses[4]**

51. Confidential Witness ("CW") 1 worked as a financial planning and analysis ("FP&A") analyst for LivePerson from June 2021 to September 2022. Most recently, CW1 reported to Vice President ("VP") of Finance Jessica Locke, who reported directly to Defendant Collins, and VP of Finance Mike Gruet. Defendant Collins reported to Defendant LoCascio. CW1's duties included putting together LivePerson's quarterly forecasts and working with the U.S., European, and Asian Pacific revenue teams, which involved discussing revenue targets, goals, deals pending closing in Salesforce and putting together financial packages.

52. CW2 worked as a senior level employee in finance for the entirety of the Class Period and had direct reporting lines to Defendants LoCascio and Collins. In that role, CW2 directly participated in the revenue forecasting process and attended weekly meetings with Defendants during which CW2 witnessed their manipulations of revenue guidance firsthand.

53. CW3 worked as a senior level executive in finance and in that role reported to the CFO, including Defendant Collins.

54. CW4 worked as a senior level employee in finance in 2021 and reported directly to Defendant Collins.

[4] Certain of the confidential witnesses, including CW2, CW3, and CW4, held job titles and responsibilities unique to them, which, if identified herein would equate to revealing the CWs' name. These CWs requested that this Amended Complaint include a general description of their position, rather than specific job title and dates of employment, given a fear of identification and retaliation. *See Cohen v. Kitov Pharm. Holdings, Ltd.*, 2018 U.S. Dist. LEXIS 45676, at *25 (S.D.N.Y. Mar. 20, 2018) (crediting CW allegations though the complaint generically described them as "former consultants of Kitov with knowledge of the clinical trial results" because "any more detailed description in this case likely would reveal the identity of the source"). Nevertheless, the information provided herein regarding each CWs role at LivePerson sufficiently establishes a basis for their knowledge of the facts contained in statements attributed to them. **To the extent the Court requires additional descriptive information to credit the statements attributed to any CW, Plaintiffs will provide a document containing such information for *in camera review.***

55. CW5 worked as the Revenue Operations Analytics Manager at LivePerson from January 2022 to May 2023, and reported to the Vice President of GTM Finance and Operations, who reported to Defendant LoCascio. In that role, CW5 was in charge of internal sales reporting for the pipeline, which were used for guidance.

56. CW6 was the Senior Vice President of Global Revenue Operations from April 2022 to March 2023, and reported to the EVP of Global Revenue Recognition, who reported to Defendant LoCascio. As SVP of Global Revenue Operations, CW6 provided the sales booking numbers for guidance.

57. Jerry Haywood, f/k/a the "Starboard CW," cited in the Starboard Complaint and Starboard AC, was the Senior Vice President of LivePerson's operations in the Europe, Middle East and Africa Regions from April 2020 through October 2022, and reported to the Head of Sales. As part of his responsibilities, Mr. Haywood provided estimates of expected bookings for his department to the finance team as part of the forecasting and guidance process. Mr. Haywood provided sworn testimony in the Starboard Action confirming that he personally attended a conference call with LivePerson Board members wherein Defendant Collins admitted to a $50 million revenue gap in FY 2022 guidance and identified a double counting of bookings revenue as a cause for that gap. Mr. Haywood also testified to his firsthand knowledge of an effort undertaken at Defendants' direction prior to Q2 2022 to compile bookings estimates as part of the forecasting and guidance process, to bridge the massive gap between management's target and the sales leaders' "bottom-up" analysis, i.e. the bookings they *actually* expected to generate, with bookings estimates they knew they likely could not achieve.

## SUBSTANTIVE ALLEGATIONS

### Background

58. LivePerson, founded in 1995 and public as of 2000, is a software company that provides a cloud-based platform called the Conversational Cloud to deliver mobile and online messaging solutions through Conversational Artificial Intelligence ("Conversational AI"). Conversational AI refers to technologies that enable machines to understand, process, and respond to human language generally, including chatbots and virtual assistants that can perform tasks or provide information based on voice or text inputs.

59. LivePerson's Conversational Cloud enables businesses to message their customers through various digital channels (*e.g.*, SMS, WhatsApp, Facebook Messenger, etc.) using a single console interface. Specifically, LivePerson's Conversational AI platform enables what the Company calls "the tango" of humans, LivePerson bots, third-party bots, and Large Language Models ("LLMs")[5], whereby human agents act as bot managers, overseeing AI-powered conversations and then step into the flow when a personal touch is needed. According to LivePerson, the platform is meant to help agents become ultra-efficient, leveraging the AI engine to serve up relevant content, define next-best actions and take over repetitive transactional work so that the agent can focus on relationship building. LivePerson's suite of software products also includes analytics and reporting, and proactive targeting.

60. For certain of LivePerson's larger customers, it provides call center labor through an arrangement with vendors, using a model called Gainshare, in which LivePerson passes the fee it incurs with the labor provider and its fee for the hosted services through to its customers in the

---

[5] Large language models are AI systems capable of understanding and generating human language by processing vast amounts of text data.

form of a fixed fee for each order placed via its online engagement solutions. For these Gainshare arrangements, LivePerson acts as a principal in a transaction if it controls the specified goods or services before they are transferred to the customer.

61. During the Class Period, the Company was organized into two operating segments. The business segment, comprising LivePerson's core operation, purportedly enables brands to leverage the Conversational Cloud's sophisticated intelligence engine to connect with consumers through an integrated suite of mobile and online business messaging technologies. The consumer segment, initially purchased in 2007 and which also includes LivePerson's non-core ventures (unrelated to its core operation), purportedly facilitated online transactions between experts and users seeking information and knowledge for a fee via mobile and online messaging.

62. When reporting revenues during the Class Period, the Company broke out which revenue it attributed to the business segment and which revenue it attributed to the consumer segment generally but did not provide specificity on key performance indicators and revenue segmentation, and specifically the non-core components of the Company's profit and loss statement. As explained below, Defendants' lack of transparency purposefully obfuscated the massive losses the Company incurred from non-core ventures.

63. LivePerson's losses have grown rapidly from $0.42 a share in 2018 to $3.03 a share in 2023. However, in the direct midst of that timeframe, LivePerson experienced rapid growth with the onset of the COVID19 pandemic, which accelerated the trend to mobile messaging and required businesses to quickly improve virtual customer engagement. Consumers shifted to online channels for both work and commerce and LivePerson's offerings helped enterprise customers engage with the higher traffic of website visitors. LivePerson shares reached an all-time high of

$72.23 in February 2021 as a result and organic revenues increased between 29% and 38% each quarter from Q2 2020 through Q1 2021.

64. Expecting that this shift in consumer behavior would continue, LivePerson stated in its SEC filings that post pandemic it would focus on its core products and the integration of the Conversational Cloud into all messaging applications and continue to develop Conversational AI, including by hiring top AI scientists and engineers. However, as the pandemic ended, LivePerson's revenue steadily declined as a result of soft bookings, soft sales, increased customer attrition, increased customer down-selling and losses from certain non-core ventures. As set forth *infra*, throughout the Class Period, Defendants LoCascio and Collins not only purposefully obfuscated non-core ventures losses when issuing the Company's quarterly and annual financial disclosures but also knowingly and/or recklessly issued unreliable revenue guidance and manipulated reported metrics to mask the severity of the Company's financial deterioration.

65. According to CW2, Defendant LoCascio was very involved with both the day-to-day operations at LivePerson and the earnings process. He held regular meetings with the Head of Sales, the Board, and with Defendant Collins via Google Meet. CW2 also made clear that Defendant Collins held regular weekly meetings with the FP&A team and the Head of Accounting during which Defendant Collins reviewed the Company's finances. As explained above, along with CW2, CW1 was also a member of the FP&A team during the Class Period.

**Defendants Manipulate LivePerson's Financial Disclosures**

66. As corroborated by the statements of multiple CWs, the sworn testimony of Mr. Haywood, and the allegations in the Starboard AC which are based on documentary evidence produced in discovery, Defendants LoCascio and Collins directly manipulated LivePerson's

revenue guidance for FY 2022 to mask the severity of LivePerson's financial deterioration and to stave off Starboard's active proxy contest.

67. Based on documentary evidence that Starboard obtained from LivePerson during discovery[6], Starboard alleged in the Starboard AC that Defendants deliberately inflated LivePerson's revenue guidance to make it appear that LivePerson remained on track to meet revenue forecasts for FY 2022, though it was not. ¶3. Specifically, when preparing to update FY 2022 guidance in connection with the Q1 2022 earnings report, Defendants realized they could not achieve their publicly stated guidance range because their latest internal forecast revealed that bookings revenue would fall far short of what they needed to maintain revenue guidance for FY 2022. *Id.* Specifically, the sales organization communicated to Defendants LoCascio and Collins in March 2022 that due to recently implemented business changes—including reductions in marketing spending and the abandonment of an initiative to hire additional sales representatives—they projected bookings for 2022 to be approximately $80 million less than previously projected. ¶62.

68. Under the threat of a proxy contest initiated by one of LivePerson's largest shareholders, Starboard (described *infra*), Defendants initiated a "Pow Pow" exercise for sales leaders to identify ways to generate additional projected bookings revenue. ¶63. The sales leaders, pressured to demonstrate their strongest effort to bridge the widening gap between FY 2022 guidance (the top-down target) and the best internal forecast (the bottom-up forecast), compiled a list of aspirational "opportunities" in March 2022 that they presented to Defendants, though they

[6] Due to the PSLRA discovery stay in effect in this action, Plaintiff could not seek production of the documents upon which the Starboard allegations are based. Further, Starboard's counsel has confirmed that due to confidentiality obligations, Starboard's counsel is not at liberty to share documentary evidence produced by LivePerson with Plaintiff's counsel in this action.

and Defendants knew it would be virtually impossible to derive any material amount of revenue from these "opportunities" in the timeframe necessary to maintain FY 2022 revenue guidance in the Q1 2022 earnings announcement. *Id.*

69. Mr. Haywood was one of those sales leaders; his role in the forecasting and guidance process was to provide estimates of bookings to finance for his department. Ex. A, 90:13-25; 91:2-7. As explained below, Mr. Haywood directly communicated with other sales leaders regarding their bookings forecasts.

70. At Mr. Haywood's deposition, Starboard's counsel introduced a document Defendants produced in discovery, labeled Plaintiffs' Exhibit 112, titled "Q2 Bookings Gap to Plan Analysis." In response to questions regarding this exhibit, Mr. Haywood testified that all sales team leaders, including Mr. Haywood, Adam Canter, Tom Karrat, and Ian Kinsella, questioned the 2022 forecasts because there was a "significant gap" between the "top down" guidance target that Defendants set and the "bottom up" target that sales leaders determined was possible to achieve. For Mr. Haywood's department alone that gap, i.e. the difference between what the EMEA team reasonably expected to generate in revenue and the top-down target provided by management, equated to $8 million. Ex. A, 80:20-25; 81:2-7, 12-17. Defendants instructed sales leaders like Mr. Haywood to come up with a way to "bridge the gap" with "urgency." *Id.,* 82:16-25; 83:2-3, 24-25; 84:2-7. Specifically, Mr. Haywood testified that he was told there was increased urgency for the sales leaders to improve bookings "to improve the way the business looks to ensure that we're able to defeat Starboard." *Id.,* 113:16-22. Plaintiffs' Exhibit 112 reflected Mr. Haywood's response to that instruction, and stated "Below is the path to achieving $5.5 [million] of incremental bookings through 4 growth levers outlined below." *Id.,* 84:9-16. Mr. Haywood testified that the "percentage possibility of achievement" for this $5.5 million in bookings was

"10%," in other words "uncertain" and "very unlikely." *Id.,* 84:17-25; 85:2, 11-18. Mr. Haywood made clear that other sales leaders conducted similar analyses, that he directly spoke to those sales leaders, and that their projected bookings for the "bridge the gap" exercise were "similarly [] unlikely" and, in fact, "virtually impossible" —as Defendants LoCascio and Collins well knew. *Id.,* 85:19-25; 86:2-25; 87-2-14; 103:6-109:18. Mr. Haywood further confirmed that the "plans weren't successful" and bookings in fact went down in Q2 2022. *Id.,* 90:2-7.

71. On April 12, 2022, the sales organization provided its latest and best forecast for yearly bookings to LivePerson's Head of FP&A to use for the FY 2022 guidance calculation. *Id.,* ¶64. The sales organization projected $89.9 million in bookings revenue, with noted risk to that figure because it assumed the generation of additional bookings revenue from the aspirational "Pow" exercise. *Id.*; Ex.3 , ¶64. The FP&A team determined that even using that risky aspirational number, the total revenue projection would fall below the low end of existing guidance for FY 2022, which Defendants instructed was "not an option" given the ongoing proxy fight with Starboard. *Id.*

72. Defendant Collins worked directly with the Head of FP&A to ensure that the model used to project FY 2022 revenue guidance would incorporate a much higher figure for bookings revenue than the best estimate the sales organization had provided, which would cause the model to reflect a total revenue projection exactly at the midpoint of existing guidance. *Id.,* ¶65. Specifically, Defendants manipulated the model to include bookings revenue of ***$129.5 million, nearly $40 million more than the already-risky projection that the sales organization had compiled for 2022***. *Id.*; RJN, Ex.3, ¶65. Defendants knew that $129.5 million in projected bookings revenue for FY 2022 far exceeded their own internal forecast, and knew or should have known LivePerson could not generate anywhere near that amount of bookings revenue in 2022.

*Id.* Defendants thus falsely and materially inflated FY 2022 guidance to avoid having to announce reduced guidance in Q1 2022 and reveal LivePerson's deteriorating financial condition. As explained *infra,* Defendants used the inflated guidance numbers to negotiate an end to Starboard's proxy contest in advance of the Q2 2022 earnings release.

73. CW1 corroborated that Defendants manipulated the guidance numbers. CW1 described putting together quarterly forecasts based on hard data gleaned from working with the global and U.S. revenue teams and based on communications with the sales department regarding bookings of business reflected in Salesforce (a customer relationship management software system). However, according to CW1, after the Vice President of Finance presented CW1's revenue forecast numbers to Defendant Collins, Defendant Collins would manipulate the numbers by increasing revenue projections with baseless bookings revenue for projects that the Company had not yet finalized to make the numbers "more palatable to investors"—precisely as Mr. Haywood described.

74. For example, CW1 explained that there are seven stages that projects go through in Salesforce, including stage 4- the proposal, stage 5- negotiation and commitment, and stage 6- signing the contract. CW1 stated that forecasted revenue should only include projects that have reached stage 6. Yet, according to CW1, to increase the revenue forecasts, revenue was rolled forward for new projects that had not yet reached Stage 6 and would include expected revenue for existing clients that had not yet renewed their contracts. CW5 confirmed that for forecasting purposes they used projects in the pipeline that were only at Stage 3 or Stage 4, even though the Company's pipeline was "not quality" and LivePerson was therefore "unable" to convert projects in the pipeline into sales. CW5 made clear that Defendants LoCascio and Collins knew about the problems with the pipeline because they held a weekly pipeline meeting. Additionally, CW5 stated

that they created a dashboard so that Defendants LoCascio and Collins could see comprehensive details regarding the projects in the pipeline each week.

75. CW1 explained that including baseless bookings revenue for projects in the pipeline that they had not—and likely would not—execute, improperly inflated guidance. This inflation, as well as increasing rates of customer attribution, caused LivePerson to miss revenue targets. CW6 additionally corroborated that deals in the pipeline did not support the Company's forecasts in 2022, and characterized LivePerson's forecasting process as "loose and undocumented." CW6 made clear that deals in the pipeline should only be included in forecasts when they hit Stage 6, particularly because LivePerson only converted approximately twenty percent of what it had in the pipeline to sales. CW6 also confirmed that, during the time of CW6's employment at LivePerson, customer attrition continued to increase and in fact was "above average." Moreover, CW6 stated that there was a "lot of pressure to drive a higher booking/revenue plan" even though the current plan was "not achievable." None of the foregoing was disclosed to investors.

76. Further confirming the inaccuracy of the Company's reported guidance numbers, CW2 described how LivePerson consistently disclosed unreliable guidance due to a lack of effective internal controls. Specifically, CW2 explained that putting together the guidance prior to each earnings release was a "fire drill" and that Defendants did not finalize the numbers until the last minute. According to CW2, the guidance numbers Defendants disclosed each quarter were not reliable because the Company had no processes or procedures in place to ensure the accuracy of information input into the various systems, including Salesforce, that management used to figure out guidance, or to ensure that these various systems communicated with one another. CW2 made clear that Defendants LoCascio and Collins attended regular meetings with the FP&A department during which they discussed these issues, including the fact that salespeople often input inaccurate

information into Salesforce. CW2 also confirmed that Defendants Collins and LoCascio had the final say in the last week of the earnings process each quarter and determined the guidance number the Company would disclose in order to fit the message they wanted to send to shareholders.

77. In addition to the inflation of yearly guidance with false bookings estimates, Mr. Haywood testified, and the Starboard AC alleges based on that testimony and documents LivePerson produced in discovery, that Defendants double counted bookings revenue from acquired businesses including WildHealth, unjustifiably inflating the FY 2022 revenue guidance by approximately $12 million. Specifically, Mr. Haywood logged on to a conference call on which sales leaders were going to review Q1 2022 bookings numbers. However, the previous conference call, which included the LivePerson Board, Defendant LoCascio and Defendant Collins—which Mr. Haywood was not meant to attend—had not yet ended. Ex. 1, 21:7-24. Mr. Haywood testified that when he joined the call, he heard Defendant Collins admit to a $50 million revenue gap in the FY 2022 guidance number released in the Q1 2022 disclosures. *Id.* Mr. Haywood was asked to immediately leave the Board call, and was subsequently instructed on a separate call that he was not to repeat what he had just heard Defendant Collins admit. *Id.* Mr. Haywood testified that Defendant Collins further admitted that a cause for that gap was that certain revenue had been double-counted. Indeed, at the Haywood Dep., defense counsel acknowledged that "other witnesses" admitted that revenue had been double counted in FY 2022 guidance. *Id.*, 25:6-19.

78. Indeed, the Haywood Dep. transcript reveals that testimony from the "other witnesses" substantiates that Defendants knew about the double counting of bookings revenue in FY 2022 guidance no later than July 2022. *Id.* Specifically, no later than July 13, 2022 (before LivePerson issued its Q2 2022 disclosures materially reducing guidance), Defendants LoCascio and Collins knew that ~$12 million in bookings revenue from non-core acquisitions (e.g.

WildHealth) had been double-counted in the internal financial model used to project FY 2022 guidance in the Q1 2022 earnings report. ¶¶72, 74. In other words, the model used to project revenues for FY 2022 included Q1 bookings they had not zeroed out and thus double-counted in FY 2022 revenue guidance. *Id.,* ¶72. Unbeknownst to investors, that revenue shortfall (in addition to the inflation described above) required Defendants to substantially reduce FY 2022 guidance when they announced Q2 2022 financial results.

79. CW1 further confirmed that LivePerson double counted bookings from non-core ventures including WildHealth in Q1 2022, and further states that "WildHealth was a problem child in Q1 and Q2 of 2022." CW1 also confirmed Defendant Collins' involvement in the discussions regarding the double counted bookings in the FY 2022 guidance number announced in Q1 2022 along with other members of the finance team.

80. According to the Starboard AC, based on documentary evidence produced in discovery, Defendants LoCascio and Collins knew about, but did not disclose, the double counting of booked revenue *before* inducing Starboard to sign a Settlement Agreement ending its proxy contest (described below).

81. Indeed, according to the Starboard AC, evidence produced in discovery revealed that Defendants did not care that bookings revenue had been double counted in the FY 2022 guidance number disseminated in Q1 2022 because of their plan to manipulate the model used to generate a guidance estimate for FY 2022 so it would hit the midpoint of previously disclosed guidance, and as such, regardless of the double counted bookings revenue, "the number was going to be the number because [Defendants] wanted to tie it down to existing guidance," i.e. they were "going to anchor to that revenue number no matter what." Starboard AC, ¶74.

82. As described below, had Starboard known that LivePerson's financial deterioration continued unabated, and that FY2022 guidance had been materially inflated with double counted bookings revenue and bookings revenue Defendants had no reasonable basis to expect, it undoubtedly would not have signed the Settlement Agreement on July 20, 2022, and would have continued its efforts to reconstitute the entrenched Board and oust Defendant LoCascio—an effort that could have succeeded had investors been privy to the Company's true financial condition.

**Defendants Manipulate FY 2022 Guidance to Defeat Starboard's Proxy Contest**

83. In an effort to convince investors that LivePerson's financials were not as bad as they seemed and to stave off a proxy contest Starboard initiated in February 2022 that would have substantially reconstituted the entrenched LivePerson Board and threatened Defendant LoCascio's role as CEO and Board Chair, Defendants manipulated LivePerson's reported guidance.

84. In February 2022, the same month that LivePerson completed the WildHealth acquisition, Starboard, one of LivePerson's largest shareholders with 9.7% of LivePerson's outstanding shares, commenced a proxy contest to replace four directors on the seven-member LivePerson Board, citing the Company's deteriorating financial performance, widespread corporate culture problems— highlighted by, among other things, excessive turnover at senior management positions such as CFO—and issues with corporate governance, including the "unchecked power" of Defendant LoCascio, who served as both CEO and Board Chair. Specifically, Starboard informed Defendants LoCascio and Collins that it intended to propose four new directors to stand for election at the 2022 stockholder meeting.

85. Then, on February 28, 2022, Starboard filed a Schedule 13D stating that on "February 25, 2022, Starboard V&O Fund (together with its affiliates, "Starboard") delivered a letter to LivePerson nominating a slate of four highly qualified director candidates for election to

the Board at LivePerson's 2022 annual meeting of stockholders. The day before the filing (and two days after the delivery of the letter), Defendant LoCascio called Starboard to request they rescind the nomination notice. Starboard declined.

86. Between March 1, 2022 and April 4, 2022, representatives of Starboard had a series of discussions with Company management and Board members concerning Company performance, governance, and Board composition. Starboard Complaint, ¶46. Following those discussions, on April 7, 2022, Starboard issued a public letter to the LivePerson Board explaining that it nominated four directors to address the Company's governance issues and improve performance, which had deteriorated in the aftermath of the COVID-19 pandemic. Specifically, Starboard's letter stated in part:

> As we are sure the Board recognizes and laments, the Company's performance has meaningfully deteriorated over the past year and is now far below its commitments to shareholders as well as industry standards for successful enterprise software companies.
>
> ***
>
> We estimate the Company's organic growth rate has declined from a pandemic peak of 38% in the first quarter of 2021 to just 18% in the fourth quarter of 2021. Even more worrisome, the Company's guidance indicates organic growth is now expected to drop to an estimated 11% in the first quarter of 2022. Notably, the Company's latest actual and future expected growth rates are below the pre-pandemic organic growth rate of 20% in the fourth quarter of 2019.
>
> ***
>
> Looking forward, the Company's 2022 guidance contemplates further deterioration in the financial model as operating expenses are guided to grow another $124 million as compared to 2021 while revenue grows by just $84 million. As a result, even if the Company achieves these revenue targets, Adjusted EBITDA will decrease by $39 million as compared to 2021. Notably, ***the Company's 2022 guidance does not*** include substantial stock-based compensation, capitalized product development expenses, or ***reflect the large, capitalized investments in early-stage M&A completed in 2021 and 2022 amounting to up to $440 million***.
>
> ***

> We would also note that the Company has preserved extremely poor corporate governance policies that are out of touch with current day best practices. We would note that the Board remains classified, maintains a combined chairperson and CEO, and does not have a lead independent director, amongst other critical governance shortfalls. It is crucial for the Board to evolve these practices towards best-in-class governance, especially in the light of the current challenges facing LivePerson.

87. The following day, on April 8, 2022, the Company responded publicly to Starboard's letter, touting its 2021 financial results, stating it was "executing on its strategic priorities and profitable growth plan," and promising to further update shareholders in its report on Q1 2022 financial results.

88. Moreover, according to CW2, LivePerson engaged Bank of America Securities to assist the Company in combatting Starboard.

89. Four days later, on April 12, 2022, Defendant LoCascio sent an email to Starboard stating that the Board disagreed with the level of Board change Starboard proposed in the April 7 letter. Starboard Complaint, ¶48.

90. On April 20, 2022, Starboard filed its preliminary proxy statement with the SEC in furtherance of its nomination of four director candidates to the Board, explaining that its proposed candidates were highly qualified with substantial relevant experience and that a reconstitution of the Board was necessary to bring accountability and objectivity to the Company's decision-making.

91. On May 2, 2022, Starboard filed an amended preliminary proxy statement, further detailing its concerns with Company management and governance, including that "the Company's underperformance has been enabled by insufficient oversight and severe lapses in corporate governance enabled by a long-tenured Board that we believe lacks relevant industry credentials and has no prior U.S. public company board experience." The proxy statement cited the

Company's rapid turnover in senior executive positions, Defendant LoCascio's consolidation of power as CEO and Board Chair, and the Board's lack of a lead independent director.

92. Moreover, Starboard objected to the fact that Board members had no prior experience on any other U.S. company board or meaningful enterprise software industry experience and yet had an average tenure of 13 years on the Board.

93. Starboard also expressed concerns with the Company's focus and allocation of capital to non-core businesses, including its investment of over a quarter of its enterprise value on acquisitions of businesses outside the Company's core competency—virtual messaging. Starboard specifically criticized the Company for the WildHealth acquisition.

94. On May 9, 2022, Starboard delivered an open letter to LivePerson shareholders, filed with the SEC, elaborating on its prior proxy filings, and identifying what it considered systemic problems at the Company, including a poor corporate culture that emphasized loyalty over performance and failed to make diversity of views or identities a priority. Starboard added that even the Company's directors did not appear to have confidence in its results, as they had been *steadily liquidating their holdings—selling almost $40 million in Company stock between 2020 and 2021— and had not purchased shares in the Company on the open market at any point over the prior three years*.

95. Starboard emphasized that to fix these issues, the shareholders should vote to elect the Starboard-nominated directors at the upcoming annual meeting, who were committed to providing oversight of, and instilling accountability in, the entrenched officers and directors of the Company.

96. As set forth below, the same day Starboard delivered its letter to shareholders, the Company announced earnings for Q1 2022. In a press release, Defendant LoCascio stated that the

Company had "exceeded the top end of [its] guidance" for Q1, with revenues of $130.2 million. The Company reaffirmed its revenue guidance of $544.8 million to $563.3 million for FY 2022 and raised its adjusted EBITDA guidance from negative to positive figures at $1 to $10 million. The Company filed a Form 10-Q for Q1 2022 on the following day, May 10, 2022, which reported the same revenue guidance. However, unbeknownst to investors, Defendants had manipulated the model used to generate the FY 2022 guidance number they included in Q1 2022 financial disclosures to convince investors that the Company could still meet revenue guidance for 2022 in order to stave off Starboard's proxy contest.

97. On May 13, 2022, in the wake of its misleadingly positive quarterly disclosures, LivePerson issued a vehement response to Starboard's May 9 letter. Indeed, Defendant LoCascio opened the letter by touting the purported "strong start to the year we just announced on our Q1 earnings call," and then proceeded to accuse Starboard of "mischaracterizations that absolutely do not reflect reality" with respect to LivePerson's corporate culture and management's commitment to performance. Defendant LoCascio claimed that Starboard had a reputation for "aggressive tactics" when seeking to elect director candidates.

98. On June 2, 2022, LivePerson responded to Starboard's letter accusing Starboard of "misrepresent[ing] the facts" and providing purely pretextual explanations for the delay in scheduling the annual meeting, including the baseless claim that the Company had to meet with Starboard's director nominees before putting them on the ballot.

99. Throughout June 2022, the Company, the Board, and Starboard engaged in various discussions aimed at resolving Starboard's proxy contest, but the Company never revealed that it had misstated its revenue guidance following Q1 2022, so Starboard remained under the false impression that the Company's performance had started to improve. ¶70.

100. On July 1, 2022, the Company filed a preliminary proxy statement in connection with the 2022 annual meeting, including a proposal to re-elect three existing Board members. The proxy noted that shareholder votes would be "especially important" because of Starboard's intent to nominate its own slate of directors and stated that the Board "does not endorse any of Starboard's nominees." The Company also filed a notice that the annual shareholder meeting would be held more than 30 days after the anniversary of the prior year's meeting, without specifying the date on which it would occur.

101. Negotiations between Starboard and the Company culminated in the Settlement Agreement, dated July 20, 2022, in which the parties resolved Starboard's proxy contest by LivePerson agreeing to, among other things, expand the Board to nine members, add one independent director appointed by Starboard (subject to Company approval), add a second independent director approved by Starboard from a list of candidates provided by the Company, and replace a director who would depart prior to the annual meeting by selecting a third independent candidate approved by Starboard. Should any of these three new directors leave the Board before termination of the Settlement Agreement, LivePerson agreed that their replacements would be appointed using the same agreed-upon procedures. The Company also agreed to appoint one of the entrenched Board members—Jill Layfield ("Layfield")—as Lead Independent Director.

102. Starboard, in turn, agreed to withdraw its proxy contest and vote all of its shares in favor of the Board's slate of director nominees, and also agreed to standstill provisions that precluded it from, among other things, initiating a proxy contest before the earlier of (a) 15 days prior to the submission of shareholder nominations for the Company's 2023 annual meeting or (b) 100 days prior to the anniversary of the 2022 annual meeting (the "Standstill Period").

103. Critically, Starboard also agreed that its rights to appoint and/or approve Board appointees during the Standstill Period would be subject to its continued beneficial ownership of at least 3% of the Company's then-outstanding shares of common stock.

104. The Settlement Agreement was reached following direct conversations between Starboard representatives and LivePerson representatives, including Defendants LoCascio and Collins, ***during which Defendants told Starboard that no issues existed with the Company's business that could influence Starboard to back out of the agreement and continue pursuing its proxy contest***. ¶76. According to the Starboard AC, Starboard relied on Defendants' representations as to the integrity of the Q1 2022 results, which seemingly showed LivePerson's business improving, in determining to execute the Settlement Agreement. However, at the time they negotiated and executed the Settlement Agreement, Defendants knew that LivePerson's revenue guidance following Q1 2022 was overstated and that the Company was not on pace to hit its revenue targets for FY 2022 despite its claims to the contrary.

105. On July 21, 2022, LivePerson publicly filed the Settlement Agreement. That same day, LivePerson announced it would hold the annual shareholder meeting on August 4, 2022. As the Settlement Agreement required, Starboard voted all of its shares in favor of the Company's director nominees at the annual meeting.

106. CW2 stated that Defendants purposefully delayed both the issuance of the Q2 2022 results and the scheduling of the annual shareholder meeting until the Company had resolved the negotiations with Starboard and executed the Settlement Agreement. According to CW2, Defendants knew that once the disastrous Q2 2022 results came to light, Starboard would never have agreed to withdraw its proxy contest and sign the Settlement Agreement. Starboard confirmed as such. ¶83.

107. Two weeks after executing the Settlement Agreement, on or around August 1, 2022, Jerry Haywood reached out to Starboard unsolicited, and informed Starboard that LivePerson had double counted bookings revenue from acquired businesses including WildHealth and had thus unjustifiably inflated the Company's guidance for FY 2022 as announced in the Q1 2022 disclosures. ¶86. Mr. Haywood informed Starboard that he had attended a conference call during which senior executives including Defendant Collins discussed how for Q2 2022, LivePerson would need to cut guidance due to a $50 million revenue gap which included double counted bookings revenue from acquired businesses. ¶¶86-7.

108. As explained above, documents produced in discovery in the Starboard Action reveal that Defendants LoCascio and Collins knew no later than July 13, 2022 that FY 2022 guidance improperly included double counted bookings revenue. ¶¶72-3. In other words, Defendants LoCascio and Collins also knew that material deficiencies in the Company's internal controls had failed to prevent the dissemination of falsified guidance.

109. On August 8, 2022, Defendants announced its Q2 2022 results and reduced the FY 2022 guidance from $544.8-$563.3 to $507.1-$518.3, a 7-8% reduction. In its press release, LivePerson falsely attributed the reduction to "P&L optimizations" including reducing costs and intentionally eliminating low-margin revenue, and a "ramping sales force." In response to this news, LivePerson's stock price fell 22%, from $16.57 at the close on August 8, 2022 to $12.95 at the close on August 9, 2022.

110. On the August 8, 2022 earnings call, an analyst asked Defendant Collins to explain the guidance reduction. Further elaborating on the disclosures in the press release, Collins said that approximately half of the reduction was attributable to LivePerson's "proactive strategy to strengthen the P&L," including by eliminating the "lower quality revenue" associated with

LivePerson's consumer services business in favor of increased software revenue. According to Collins, the other half of the reduction was derived from a "continued ramp of our newly hired sales force" following a change in field leadership. In other words, Defendant Collins attributed the reduction ***100%*** to factors other than Defendants' inflation of FY 2022 guidance with double counted bookings revenue and tens of millions of dollars in bookings revenue they had no reasonable basis to expect.

111. Mr. Haywood confirmed to Starboard following the earnings call that the justification Defendant Collins provided was a complete fabrication and that he had "just listened to management lie to the shareholders of the Company." ¶90.

112. CW2 confirmed the Starboard CW's statements that Defendant Collins' statements were a complete fabrication. Specifically, Defendant Collins specified on the Q2 2022 earnings call that the lower quality revenue eliminated in order to "strengthen the P&L" consisted of "COVID-19 testing revenue" and "labor based piece in the GainShare portfolio," i.e., "agent labor that we supply to our customers via contractual arrangements…" However, according to CW2, the COVID-19 and GainShare labor pieces of LivePerson's business did not cause the declining revenue and guidance reduction ; rather the staggering reduction in guidance in Q2 2022 stemmed from terrible bookings, the sales force not executing, as well as customer attrition and down-selling (down-selling is where a customer chooses an alternative product at a lower price). Moreover, CW2 explained that these *actual* causes for the lowered guidance would have been happening already during Q1 2022. CW2 stated that, to conceal the true causes for the reduction and to make it seem like they had taken proactive steps to reverse the decline though they had not, Defendants opted to misleadingly represent that they were offloading low margin revenue sources to strengthen the P&L thus giving investors the misimpression that they were taking meaningful steps

to address the guidance disaster. In other words, as CW2 stated, Defendants "were able to hide how bad the revenue losses were by saying we're proactively getting rid of this GainShare labor revenue" and COVID-19 business.

113. Starboard considered the information that Mr. Haywood had provided to be material and non-public and thus refrained from trading out of its position. Starboard AC, ¶91. Instead, Starboard called Layfield, who arranged for a call between the Board's Audit Committee and Starboard representatives. *Id.*, ¶92.

114. On the call, which took place on August 18, 2022, Starboard demanded Defendant LoCascio's removal in addition to other management changes as a result of the Company's fraudulent forecasting and disclosures, which the Audit Committee refused to implement. *Id.*, ¶93. On August 22, 2022 the Audit Committee sent a letter to Starboard claiming it was reviewing the issues Starboard identified but specified no specific actions it had taken or planned to take to conduct the investigation. *Id.*, ¶94. Starboard stated that it asked Defendants LoCascio and Collins about the Mr. Haywood's allegations directly (though maintaining his anonymity at the time), but they refused to answer. *Id.*

115. Stonewalled and unable to trade, Starboard issued a formal books and records demand to LivePerson's general counsel on September 23, 2022 pursuant to 8 *Del. C.* § 220 to investigate potential wrongdoing, mismanagement, corporate waste, and breaches of fiduciary duties associated with the announcements of the Q1 2022 revenue, the preparation, affirmance, and subsequent revision of the FY 2022 guidance, and in connection with Starboard's proxy contest. *Id.*, ¶¶96-98.

116. In lieu of responding to the books and records demand, LivePerson informed Starboard that it had engaged an independent law firm to formally investigate the Starboard CW's

allegations, thus persuading Starboard to back off its demand. Starboard Complaint, ¶87. LivePerson did not disclose the investigation publicly. *Id.* CW2 confirmed that LivePerson in fact engaged an outside law firm to investigate as a result of Starboard's ire at having been duped to sign the Settlement Agreement.

117. The law firm that conducted that purported investigation was Williams & Connolly. At Mr. Haywood's deposition, counsel for both parties in the Starboard Action questions him regarding Defendants' Exhibit 64, the Williams & Connolly report. Mr. Haywood testified at his deposition that he told Williams & Connolly, as the Exhibit stated, that "…the May 2022 reaffirmance of guidance was based on unrealistic bookings targets, given the number of quota carriers (i.e., salespeople) the Company employed." Ex. 1, 86:3-23; 92:15-25; 93:2-25; 94:2-25; 95:2-25; 96:2-14 (Mr. Haywood testified under oath to the substantial gap between the "bottoms up" analysis and the unachievable bookings target Defendants incorporated into guidance). Mr. Haywood further confirmed under oath that he had told Williams & Connolly, as reflected in Exhibit 64, that he had been on "…a call on our about July 26, 2022 with Manlio Carrelli (EVP, Sales), the other regional Sales SVPs, and Mike Gruet from Finance, in which Gruet indicated that there was a [approximately] $50 [million] 'hole' (i.e., gap between the guidance and current forecasting) and that "a reason for the hole was a double-counting error." *Id.*, 69:4-18. Mr. Haywood clarified that it was on a conference call attended by Board members, including Defendants LoCascio and Collins that ***Mr. Collins admitted to a $50 million revenue hole and attributed a cause of that hole to a double counting of revenue***. *Id.,* 70:4-24.

118. On December 27, 2022, LivePerson announced that pursuant to the Settlement Agreement, it had appointed three new directors (two of whom Starboard had nominated during the proxy contest).

119. On February 27, 2023, after market close, Williams & Connolly informed Starboard's counsel that it had concluded its investigation without any material findings of "misconduct by management." ¶103. According to CW2, however, the law firm never fully completed its interviews of the finance employees for its investigation and ultimately, the Board quashed the contents of the law firm's report and took no action.

120. The very next morning at 8:00 AM on February 28, 2023, LivePerson filed a Form 8-K notifying the public of a delay in filing its Form 10-K for 2022 because "in view of the in-process integration of the Company's 2022 acquisition of WildHealth[,]" "the Company requires more time to perform additional review and testing of revenue recognition with respect to a recently discontinued WildHealth program . . . and to complete its in-process review of internal controls and procedures."

121. Two weeks later, on March 15, 2023, after the market close, LivePerson announced disastrous earnings for Q4 2022 and guidance for 2023 far below its guidance for 2022 at $395-410 million, which it attributed to "decreases in non-Core revenue expected beginning in the first quarter," including consumer services revenue, and "smaller-than-expected deal sizes in the fourth quarter relative to the third quarter of 2022, indicating friction in our sales cycle from the macroenvironment."

122. On this news, LivePerson's stock price plummeted by approximately 58%, from $9.77 per share at the close on March 15, 2023, to $4.13 per share at the close on March 16, 2023.

123. On May 5, 2023, Starboard sent a public letter to the Company's shareholders stating its intention to nominate a slate of directors for election at the 2023 annual meeting, and again criticizing Defendant LoCascio for his inability to meet performance targets, his undue focus on non-core ventures, his domination of the Board, and his lack of leadership. As set forth below,

Starboard withdrew its proxy contest on July 24, 2023, twelve days after LivePerson announced Defendant LoCascio's ouster.

124. On February 12, 2024, less than seven months after withdrawing its proxy contest, Starboard publicly filed the initial Starboard Complaint. Two weeks thereafter, Defendants released their earnings for Q4 and FY 2023, revealing for the first time *inter alia* the Company's spiraling customer attrition, as well as WildHealth's poor performance and its impending divestiture from the Company.

**Defendants Mislead Investors Regarding the Key Metric Alterations**

125. Defendants' purposeful manipulation of LivePerson's financial disclosures did not end with their material inflation of FY guidance.

126. Defendants Collins and LoCascio changed the method of calculation for key metrics to purposefully obscure the severity of LivePerson's deteriorating financial condition. While they disclosed the alterations, they provided false justifications for those alterations to investors. CW2 made clear that, "there was a lot of smoke and mirrors happening at the executive level whose goal was to make the results look less bad and keep investors from really understanding what was going on."

127. For example, according to CW2, Defendant LoCascio insisted on hiding customer attrition rates. Toward that end, CW2 explained that Defendant Collins altered the NRR and ARPU metrics to mask attrition rates. Before Q4 2022, Defendants calculated NRR using total revenue. However, after running various scenarios to determine how to present the NRR metric in the best possible light (e.g., by excluding customers based on revenue contribution of varying amounts or excluding retail customers), Defendants altered the calculation and began in Q4 2022 to use recurring revenue instead. While Defendants flagged the change in a footnote in the earnings

presentation, they did not reveal the true motivation behind the alteration. Specifically, on the Q4 2022 earnings call, Defendant Collins explained the altered NRR metric as follows:

> As for net revenue retention, consistent with our focus on the B2B core and recurring revenue growth in particular, and in light of the more than $70 million in non-core revenue that we do not expect to reoccur in 2023, we think investors and analysts would benefit more from net retention for recurring revenue than from net retention for total revenue.

128. Similarly, Defendant Collins altered the means by which they calculated ARPU beginning in Q2 2023, going from "average revenue per enterprise and midmarket customer over trailing twelve months" to "average recurring revenue per enterprise and midmarket customer over trailing twelve months." Defendant Collins claimed on the earnings call that they instituted the change to match the alteration in calculating NRR. Defendants also altered metrics including revenue by geography, by changing the definition of which customers they would include until they generated a result that investors would find palatable.

129. According to CW2, the true motivation behind the alteration of the NRR, ARPU, and other metrics was to keep investors in the dark regarding the accelerating rate of customer attrition and declining revenues. In other words, as CW2 stated, "we were trying to prevent [investors] from seeing the bad."

130. Additionally, CW2 stated that the Company had always provided a "conversational cloud conversations" metric, but stopped providing that metric in Q4 2022, because according to CW2, including that metric would have shown investors declining volumes on the platform, which Defendants wanted to obscure.

131. CW2 made clear that Defendants LoCascio and Collins had complete control over how the Company presented earnings to investors and directed the alteration of the foregoing metrics.

132. CW4 stated that Defendants' manipulations began even before the Class Period. CW4 believes that Defendants LoCascio and Collins "cherry picked" data points and disclosure metrics to disclose to investors to portray the Company in the best possible light regardless of consistency in reporting. CW4 stated that Defendant LoCascio was unwilling to provide information that possibly showed worsening trends in an effort to preserve the stock price. CW4 also stated a belief that Defendant LoCascio pushed the team on the forecasting process to ensure that the forecast showed either growth metrics or metrics in line with prior guidance ranges LivePerson provided in order to maintain guidance, despite the fact that the rollup from the operating team was not showing that forecasted performance. In particular, CW4 noted that both Defendant LoCascio and Defendant Collins "pushed the envelope" when forecasting revenues and included revenues beyond what was "actually flowing through" in an effort to preserve the stock price. CW4 explained that because the finance team had relatively junior people staffed, Defendant LoCascio would bully them into putting the numbers into the model that he wanted to see, whether or not they reflected the reality and even when members of the finance team told Defendant LoCascio the numbers he wanted were not achievable.

**<u>LivePerson's Disastrous Acquisition of WildHealth</u>**

133. According to CW4, Defendant LoCascio neglected LivePerson's core business by diverting significant Company resources to non-core ventures "that had nothing to do with LivePerson's core mission." As such, CW4 explained that even though LivePerson had the largest database of conversations that occurred via chat of an LLM model, and Defendant LoCascio had been training his artificial intelligence with that proprietary LLM, his "distractions" with non-core ventures shifted the Company's focus and resources away from artificial intelligence and resulted in lost clients and revenue when other artificial intelligence models began debuting in 2022. Such

non-core "pet projects," none of which succeeded, included an online banking platform called Bella, a retail marketplace, and WildHealth.

134. Specifically, in February 2022, the Company acquired WildHealth as well as certain variable interests that WildHealth had in four Professional Corporations ("PCs").[7] Entirely dissimilar to LivePerson's core operation, WildHealth is a precision medicine service which purportedly "leverages advanced machine learning to combine DNA analysis, biometrics, microbiome testing and phenotypic data to provide people with a blueprint for truly optimized health and a maximized health span." LivePerson acquired WildHealth for approximately $150.0 million, consisting of an upfront purchase price of $30.0 million in cash and common stock and a $120.0 million contingent earn-out component potentially payable over three years. As part of the purchase price, the Company issued 776,825 common shares that had a total fair value of $20.8 million based on the closing market price of $26.81 per share on the acquisition date of February 7, 2022. The purchase price allocation resulted in approximately $15.5 million of goodwill, $8.3 million of intangible assets and net liabilities assumed of $1.5 million. LivePerson

[7] According to LivePerson's SEC filings, the PCs are owned by a medical practitioner because certain state laws restrict the corporate practice of medicine and require medical practitioners to own such entities. WildHealth provides management and other services to the PCs in exchange for a management fee and provides financial support to the PCs through a revolving credit arrangement. WildHealth also has separate agreements with the equity holder of the PCs where it may acquire and assign such equity interests for certain PCs. The agreement entitles WildHealth to control rights sufficient to require the Company to consolidate the balance sheet and results of operations of the PCs as VIEs as it has the power to direct their most significant activities. The Company determined that the PCs are VIEs as WildHealth is the primary beneficiary of the PCs. Furthermore, as a direct result of zero initial equity contributions by the medical practitioner, the financial support WildHealth provides to the PCs (e.g., loans) and the powers granted to WildHealth through various agreements, the interests held by noncontrolling interest holders lack economic substance and do not provide the medical professional with the ability to participate in the residual profits or losses generated by the PCs. Therefore, the PC's are consolidated by WildHealth, and all income and expenses recognized by the PCs are allocated to LivePerson stockholders.

claimed that the goodwill was primarily attributed to synergies from future expected economic benefits, including enhanced revenue growth from expanded capabilities.

135. As a result of the WildHealth acquisition, LivePerson's cash, cash equivalents, and restricted cash decreased by $41.2 million, almost 8%, from the prior quarter.

136. At the time of the acquisition, WildHealth became part of LivePerson's consumer segment. Following the acquisition WildHealth CEO and Founder Matthew Dawson continued to run the business but because WildHealth's business differed significantly from LivePerson's core business, WildHealth was a separate reporting unit.

137. According to CW2, from the time of the acquisition, WildHealth did not generate enough revenue to justify the acquisition cost. However, CW2 explained that while WildHealth did not contribute meaningfully to LivePerson's total revenues, it did contribute substantial losses. Defendants succeeded in hiding WildHealth's losses because they never provided transparency into revenue segmentation, i.e., they never revealed the portion of revenues or losses attributable to WildHealth during the Class Period. CW2 explained that Defendants were purposefully opaque in not breaking out WildHealth's revenue and loss contribution in financial disclosures.

138. Nevertheless, as demonstrated *infra*, and despite knowing of WildHealth's significant losses, Defendants touted WildHealth's *strong* performance, "massive returns" (i.e. earnings)and forecasted 100% year over year growth for its core revenues in 2023. CW2 made clear, however, that Defendants knew WildHealth performed poorly and could not have reasonably expected WildHealth to exhibit the growth they promised in their 2022 or 2023 public statements because, as a result of LivePerson's rapidly deteriorating financial condition, Defendants instituted capital cuts and layoffs at WildHealth which, according to CW2, "tied their hands" and "hampered

their ability to grow." According to CW2, these issues were discussed during weekly meetings with the finance team held via Google Meet which Defendant Collins and the FP&A team attended.

139. Amidst the Company's financial turmoil which necessitated capital cuts and layoffs, Defendants instructed WildHealth to find and pursue additional revenue streams. According to CW2, this was also discussed during meetings with the finance team. Toward that end, WildHealth provided services under a Medicare demonstration program related to COVID-19 testing, that involved at home testing kits. Specifically, the over the counter ("OTC") COVID-19 test demonstration program was an initiative that began on April 4, 2022 which allowed Medicare beneficiaries to receive free OTC COVID-19 test kits from certain providers who were eligible to furnish and bill for the tests. The program enabled the eligible providers to receive Medicare reimbursement for shipping test kits directly to the homes of Medicare patients without needing an order from a physician. Eligible providers capable of providing ambulatory health care services were permitted to distribute to Medicare beneficiaries OTC COVID-19 tests that were approved, authorized, or cleared by the FDA. Medicare would not pay for more than eight OTC tests per month per Medicare beneficiary and providers could only distribute the OTC tests to Medicare beneficiaries who requested them. Providers were required to keep documentation showing a Medicare beneficiary's request for the tests. The Center for Medicare & Medicaid Services has the authority to request records and perform administrative audits related to claims submitted to Medicare to ensure that tests furnished by the provider under the program were in fact requested by patients.

140. Medicare and government regulators paid close heed to requests for reimbursement for at home testing kits due to rampant fraud. For example, the Federal Trade Commission

published a consumer alert on August 23, 2022, titled "Free COVID test scam targets people on Medicare." Free COVID test scam targets people on Medicare | Consumer Advice (ftc.gov):

> Scammers have been targeting Medicare recipients with a fake offer to get "free COVID tests." They're calling and running websites, online and television ads to try to convince people to give their Medicare information. But if you give them your information, they'll bill fraudulent charges to Medicare.
>
> We're hearing about many Medicare recipients who signed up for these free COVID tests and never got them. And what makes matters worse is that scammers could also bill for other products and services people didn't need — and didn't get.

141. Indeed, in November 2022, a professional corporation managed by WildHealth received notice that Medicare reimbursements for its services rendered under a Medicare demonstration program related to COVID-19 testing were suspended pending further review. Upon information and belief, Medicare informed WildHealth of the impending suspension pursuant to 42 C.F.R. § 405.372, which requires Medicare to "notify the provider or supplier of the intention to suspend payments, in whole or in part, and the reasons for making the suspension," i.e., before putting the suspension into effect, and "must give the provider or supplier an opportunity for rebuttal in accordance with § 405.374."

142. Though LivePerson received notification of the reimbursement suspension no later than November 2022 (and likely earlier), Defendants did not disclose the suspension until March 2023 despite knowing that the withheld amounts could have been used to offset two million dollars worth of WildHealth losses (approximately 20%) and would likely cause the Company to miss guidance the following (a risk that ultimately materialized).

143. The Company also belatedly disclosed in March 2023 that in addition to WildHealth, LivePerson had also been engaged in the delivery of products and services related to COVID-19 testing (though it had represented in previous filings that it had divested itself of all COVID-19 related operations), and that both WildHealth and LivePerson had been subsequently

subject to governmental inquiries from multiple regulators with respect to those COVID-19 related products and services, including inquiries by Medicare, the Department of Justice and the U.S. Food and Drug Administration.

144. While the Company ultimately received only $2 million in reimbursements a year later, the regulatory investigations caused the Company and WildHealth to immediately discontinue all products and services related to COVID-19.

**LivePerson's Internal Control Deficiencies**

145. Throughout the Class Period, LivePerson had materially deficient internal controls that failed to prevent the dissemination of falsified financial disclosures. Specifically, as detailed above, the internal controls in place in 2022 and 2023 did not prevent, *inter alia*: (i) the manipulation of FY 2022 guidance by double counting bookings revenue from non-core ventures including WildHealth, in the amount of approximately $12 million; (ii) the purposeful manipulation of FY 2022 revenue guidance by including $40 million in baseless bookings revenue that Defendants knew they likely could not generate; (iii) the dissemination of false statements regarding the reasons for reduced FY 2022 guidance and purported P&L optimizations; and (iv) the dissemination of false statements regarding WildHealth's performance.

146. Nevertheless, despite clear evidence demonstrating the material weakness in the Company's internal controls, Defendants knowingly and/or recklessly certified throughout the Class Period that LivePerson had effective internal controls in place.

147. Even when Defendants finally revealed the existence of a material weakness in LivePerson's internal control over financial report in a Form 10-K filed on March 16, 2023, they continued their opacity when explaining the nature of the deficiency:

> The control deficiencies, which in aggregate constitute a material weakness, were identified in connection with the Company's previously disclosed review of certain

> transactions related to its subsidiary WildHealth, which was acquired in February 2022, and primarily include a combination of ineffective operation of controls and inadequate controls related to: formal review, approval, and evaluation of non-core, complex transactions as well as engagement with government agencies; segregation of duties between accounting and contracting approval functions for non-core, complex transactions; and formal review, approval and evaluation of manual journal entries.

148. LivePerson's disclosure states that they *discovered* the material weakness when reviewing transactions related to WildHealth but did not *limit* the deficiencies to WildHealth. Defendants admitted that the material weakness pertained more broadly to "formal review, approval, and evaluation of non-core, complex transactions as well as engagement with government agencies; segregation of duties between accounting and contracting approval functions for non-core, complex transactions; and formal review, approval and evaluation of manual journal entries."

149. Rather than provide complete transparency, nowhere did the Company explain or identify the "certain transactions" or "complex transactions" at issue, how they relate to WildHealth, or precisely how the material weakness related to "engagement with government agencies; segregation of duties between accounting and contracting approval functions for non-core, complex transactions; and formal review, approval and evaluation of manual journal entries." However, broadly, the foregoing description encompasses every category of misstatement alleged herein.

150. Moreover, this disclosure continued to mislead investors by falsely representing that the internal control failures "did not result in any material misstatements to our previously issued financial statements," given misstated revenues in Q1 2022, inflated and unreliable revenue guidance throughout 2022 and 2023, and the inclusion of misleading metrics in earnings presentations including NRR, ARPU, and conversational cloud conversations.

**LivePerson Ousts Defendant LoCascio**

151. On July 12, 2023, LivePerson announced Defendant LoCascio's ouster. Specifically, via press release, the Company informed investors that the Company would not renew Defendant LoCascio's contract and that he will therefore "depart as Chief Executive Officer, effective December 31, 2023" and that Layfield would assume the role of interim CEO. The press release further revealed that Defendant LoCascio would concurrently resign his role as Board Chair. Twelve days later, on July 24, 2023, Starboard withdrew its notice of intent to nominate three persons for election to the LivePerson Board at the 2023 annual meeting.

152. However, a Letter Agreement dated August 7, 2023 between LivePerson and Defendant LoCascio, signed by Layfield with the subject "Further Agreement Concerning Your Transition," filed as Exhibit 10.1 to a Form 8-K filed with the SEC the following day, revealed that in fact Defendant LoCascio would cease his roles of CEO and Board Chair "*effective immediately*," and would solely serve as Special Advisor to the Board should it need "advice and transition assistance" until the completion of his Employment Agreement in December 2023. The Letter Agreement admonished Defendant LoCascio that:

> As you will continue to be an employee of the Company during the Term, you must comport yourself with the Company's policies during this time, must obey the Board's lawful directives, and may not engage in outside employment. Further, you agree that the end of the Term may be accelerated with immediate effect if, after the date hereof, you violate any lawful written directive from the Board concerning your conduct in relation to the Company and its affairs.

153. LivePerson filed the Letter Agreement *on the same day* as it filed its 10-Q for the second quarter of 2023. In the concurrently filed press release, Defendant Collins stated:

> "Consistent with the expectations we set last quarter, including the completion of the restructuring plan, the divestiture and wind down of non-core business lines, and the renewed focus on the B2B Core, we posted strong financial results in Q2."

**Defendants' Compensation and Board Insider Sales**

154. In 2022, Defendant Collins received $4,408,986 in total compensation from the Company. This included $506,250 in salary, $3,745,412 in stock awards, $118,336 in non-equity incentive plan compensation, and $38,988 in all other compensation. In March and April 2022, Defendant Collins disposed of 6,411 shares of LivePerson common stock at artificially inflated prices for proceeds of $154,930. Then, the Company repurchased approximately 19,830 shares of its common stock at artificially inflated prices from Defendant Collins between November 1, 2022 and November 30, 2022 for over $221,501. Moreover, on November 1, 2022, six days before disclosing financial results for Q3 2022, Defendant Collins sold 412 shares of LivePerson common stock for $10.79 per share for proceeds of an additional $4,445. For 2023, Defendant Collins received $2,479,319 in total compensation. This included $525,000 in salary, $1,450,059 in stock awards, $164,299 in non-equity incentive plan compensation, a $300,000 bonus, and $39,961 in all other compensation. In 2023, Defendant Collins sold or otherwise disposed of 24,840 shares of LivePerson common stock at artificially inflated prices for proceeds of $116,370. A majority of Defendant Collins' disposition occurred on July 31, 2023, one week before the Company released its financial results and held an earnings call for Q2 2023.

155. In 2022, Defendant LoCascio received $2,955,255 in total compensation from the Company. This included $611,820 in salary, $2,055,481 in stock awards, $260,024 in Non-Equity Incentive Plan Compensation, and $27,930 in all other compensation. From February 22, 2022 through April 11, 2022, Defendant LoCascio sold or otherwise disposed of 29,742 shares of LivePerson common stock at artificially inflated prices for proceeds of $722,360.

156. In 2023, Defendant LoCascio received $611,820 in salary and $28,953 in all other compensation. As noted above, Defendant LoCascio was ousted from his roles as CEO and Board

Chair at the Company effective August 7, 2023. Under the terms of a Separation and Release of Claims Agreement, Defendant LoCascio also received the following severance payments and benefits: (i) $917,700 of severance pay, representing 18 months of Mr. LoCascio's base salary, $611,800 of which was paid in the first quarter of 2024, and the remaining amount will be paid in 2025, (ii) a lump sum payment of $1,376,595 representing the agreed amount of bonus-related severance to which Defendant LoCascio was entitled under the terms of his employment agreement, (iii) payment of what would have been the employer portion of the premiums for the Company's group health insurance coverage to be put toward Defendant LoCascio's COBRA continuation payments for 18 months (or until he is eligible for coverage through another employer), and (iv) immediate vesting of any stock options and 34,075 time-based RSUs that would have vested during the two years following December 31, 2023. As provided for under the terms of his employment agreement, Defendant LoCascio was also entitled to retain any stock options that had vested prior to his separation date and those options would remain exercisable until December 31, 2025. However, as part of the Separation and Release of Claims Agreement, all of Defendant LoCascio's stock options, whether or not vested, were cancelled immediately, except for 80,000 vested stock options granted in May 2017, with an exercise price of $7.60, which remain exercisable by Defendant LoCascio until December 31, 2025.

157. Additionally, LivePerson's Board members sold almost $40 million in Company stock between 2020 and 2021—and have not purchased shares in the Company on the open market at any point over the past three years.

158. Defendants did not acquire ***any*** LivePerson securities during the Class Period through open market purchases, but rather received shares ***at no cost*** solely as part of their compensation.

**Defendants Violated Their Duty to Disclose Pursuant to Regulation S-K**

159. Pursuant to Item 303 of Regulation S-K, 17 C.F.R. § 229.303(ii), Defendants had an affirmative, independent duty to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." By failing to disclose: (1) the detriment caused by Defendants' diversion of resources away from LivePerson's core operation to pursue non-accretive non-core ventures like WildHealth; (2) increasing rates of customer attrition; (3) increasing rates of customer down selling; (4) decreasing volume of conversational cloud conversations; (5) worsening sales and bookings; (6) manipulation of FY 2022 guidance to mask the severity of LivePerson's financial decline; (7) materially deficient internal controls that failed to prevent manipulation of revenue guidance and other metrics; and (8) WildHealth's disappointing growth and massive losses due in part to capital constraints and layoffs instituted by LivePerson, Defendants failed to satisfy this duty. These omissions rendered Defendants' statements materially false and/or misleading in violation of Item 303 of Regulation S-K.

**Materially False and Misleading Statements Issued During the Class Period**

160. The Class Period begins on May 9, 2022 when the Company issued a press release attached to a Form 8-K announcing first quarter results for 2022. Therein, Defendant LoCascio stated that the Company had "exceeded the top end of [its] guidance" for Q1, with revenues of $130.2 million. The Company reaffirmed its revenue guidance of $544.8 million to $563.3 million for FY 2022 and raised its adjusted EBITDA guidance from negative to positive figures at $1 to $10 million.

161. The foregoing statements regarding the reaffirmance of FY 2022 guidance were false and misleading because Defendants had inflated FY 2022 guidance by approximately $50

million, including approximately $12 million in double counted bookings revenue and $40 million in baseless bookings revenue they did not reasonably expect to generate, in order to stave off Starboard's proxy contest and to mask the severity of the Company's deteriorating financial condition.

162. The same day, Defendants held an earnings call with analysts during which Defendants LoCascio and Collins presented. On the call Defendant Collins reiterated that the Company had "overperformed" by exceeding the top end of its guidance for Q1 and further reiterated its full year guidance as follows:

> Turning to full year guidance, while we overperformed on revenue in the first quarter, much of the overall performance was attributable to the timing of revenue between the first and second quarter. For this reason, we believe that the guidance range we provided last quarter still appropriately captures the business and market dynamics visible to us today. As a result, we are reaffirming the full year revenue guidance of $544.8 million to $563.3 million or 16% to 20% year-over-year growth.

163. Further, in response to an analyst question from Mason Marion for Samad regarding the implied 20% growth in total revenues for the second half of 2022 and asking about "the key assumptions and factors" that provide "confidence you can reaccelerate off the 12% you got it in Q2," Defendant Collins responds as follows:

> The 12% in the second quarter is really just a function of hard comparables where we had record year record growth in the second quarter of last year. Remember, we've had sequential improvement from Q1 to Q2 that's roughly in line with past sequential improvement. And considering the ramping Salesforce that we've discussed previously, along with other tailwinds that we discussed in the context of voice, we have clear line of sight today to accelerate from where we are in Q2.

164. Defendant Collins also attributed the Company's "overperformance" in the first quarter to shifting in deal closures, i.e., deals closing earlier than expected.

165. The foregoing statements regarding total revenues for the second half of 2022 were false and misleading because Defendants had inflated FY 2022 guidance by approximately $50 million, including approximately $12 million in double counted bookings revenue and $40 million

in baseless bookings revenue they did not reasonably expect to generate, in order to stave off Starboard's proxy contest and to mask the severity of the Company's deteriorating financial condition.

166. The Company filed a Form 10-Q for the first quarter of 2022 on the following day, May 10, 2022 after the market closed (the "Q1 2022 10-Q"), signed by Defendants LoCascio and Collins which reported the same revenue guidance Defendants had reported in the earnings release and on the earnings call.

167. The foregoing statements regarding the reaffirmance of FY 2022 guidance were false and misleading because Defendants had inflated FY 2022 guidance by approximately $50 million, including approximately $12 million in double counted bookings revenue and $40 million in baseless bookings revenue they did not reasonably expect to generate, in order to stave off Starboard's proxy contest and to mask the severity of the Company's deteriorating financial condition.

168. Moreover, the Q1 2022 10-Q did not identify any material weaknesses with the Company's internal controls, stating, in relevant part:

> **Item 4. Controls and Procedures**
>
> *Evaluation of Disclosure Controls and Procedures*
>
> ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of March 31, 2022*** to ensure that the information we are required to disclose in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.
>
> Changes in Internal Control Over Financial Reporting

> There were no changes in our internal control over financial reporting during the three months ended March 31, 2022 identified in connection with the evaluation thereof by our management, including the Chief Executive Officer and Chief Financial Officer, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.[8]

169. Appended to the Q1 2022 10-Q as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, certifying that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered this report," and further certifying that "the information contained in the [Q1 2022 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

170. The foregoing statements were false and misleading because LivePerson in fact had materially deficient internal controls that failed to prevent the dissemination of falsified financial disclosures. Specifically, as detailed above, the internal controls in place in 2022 and 2023 did not prevent: 1) the manipulation of FY 2022 guidance included in Q1 2022 disclosures by double counting booking revenue from non-core ventures including WildHealth in the amount of approximately $12 million; 2) the purposeful manipulation of revenue guidance for FY 2022 included in Q1 2022 disclosures by, *inter alia,* including projected revenue for projects that had not been finalized, (i.e., $40 million in baseless bookings revenue they had no reasonable basis to expect would materialize), to mask the severity of the Company's deteriorating financial condition; and 3) the knowing dissemination of unreliable guidance due to deficient internal controls, as described by CW2 and later revealed by Defendants.

---

[8] All emphases included herein are added unless otherwise noted.

171. On May 13, 2022, in the wake of its misleadingly positive quarterly disclosures, LivePerson issued a vehement response to Starboard's May 9, 2022 letter (described *supra*). Therein, Defendant LoCascio touted a "***strong start to the year we just announced on our Q1 earnings call***."

172. The foregoing statements regarding the financial disclosures released in Q1 2022 were false and misleading because Defendants had inflated FY 2022 guidance by approximately $50 million, including approximately $12 million in double counted bookings revenue and $40 million in baseless bookings revenue they did not reasonably expect to generate, in order to stave off Starboard's proxy contest and to mask the severity of the Company's deteriorating financial condition.

173. On June 2, 2022, Defendants filed another letter response to Starboard, which had accused LivePerson of purposefully delaying the annual shareholder meeting as a means of combating Starboard's proxy contest. In LivePerson's letter response, LivePerson accused Starboard of "misrepresent[ing] the facts" and provided purely pretextual explanations for the delay in scheduling the annual meeting, including the baseless claim that the Company had to meet with Starboard's director nominees before putting them on the ballot.

174. The foregoing statements were false and misleading because Defendants had, in fact, delayed scheduling LivePerson's annual shareholder meeting while they attempted to stave off Starboard's proxy contest, as set forth in detail above.

175. After LivePerson and Starboard negotiated and executed the Settlement Agreement resolving the proxy contest, LivePerson publicly filed the Settlement Agreement and announced it would hold the shareholder meeting on August 4, 2022.

176. The foregoing misled investors because Defendants failed to reveal that they fraudulently induced Starboard into executing the Settlement Agreement by manipulating the Q1 2022 financial disclosures, i.e. FY 2022 guidance, and had purposefully delayed the scheduling of the shareholder meeting until they had successfully staved off Starboard's proxy contest with the execution of the Settlement Agreement.

177. On August 8, 2022, the Company issued a press release attached to a Form 8-K announcing financial results for the second quarter of 2022 ("Q2 2022") which reported a revenue miss and substantially lowered guidance. Specifically, the press release stated:

> In the short term, due to the P&L optimizations we are undertaking as we execute on our profitable growth plan, including reduction in costs and intentional elimination of low margin revenue, and our ramping sales force, we are revising down our 2022 revenue guidance from $544.8 million - $563.3 million to $507.1 million - $518.3 million, or 8% to 10% growth year-over-year. The revenue guidance range for the third quarter is $120.5 million to $123.6 million, or 1.8% to 4.5% growth year-over-year.

178. The foregoing statements were false and misleading because Defendants failed to disclose: 1) the prior inflation of FY 2022 guidance with ~$12 million in double counted bookings revenue, which Defendants knew about no later than July 13, 2022; 2) Defendants' purposeful prior inflation of FY 2022 guidance with ~$40 million in baseless bookings revenue; 3) that deficient internal controls enabled their manipulation of the model used to generate FY 2022 guidance in the Q1 2022 financial disclosures; 4) the "low margin revenue," which Defendant Collins identified on the earnings call as COVID-19 testing and GainShare labor (non-core ventures), did not cause the declining revenue and guidance reduction and their elimination therefore did not, and would not, optimize the P&L; 5) the non-core ventures LivePerson did not eliminate, including WildHealth, contributed substantial losses to the Company, which Defendants masked by not breaking down which revenues and losses it attributed to WildHealth; 6) LivePerson had not addressed the root causes of the Company's deteriorating financial condition,

including customer attrition, down-selling, soft sales, and soft bookings, so the Company had not in fact proactively optimized its overall P&L; and 7) LivePerson's failure to divest itself of non-core ventures like WildHealth raised a risk that the Company would have to undergo a massive restructuring to refocus its resources back on its core software product.

179. The same day, the Company held an earnings call with analysts during which Defendants LoCascio and Collins presented. To mitigate the aftershock of the massively reduced guidance, consistent with the press release, Defendants stated on the earnings call that to execute on their long-term profitable growth strategy and to generate positive cash flow throughout 2023, they had "begun purposefully eliminating low quality sources of revenue." Defendant Collins explained that the elimination of low-quality sources of revenue, i.e., their "proactive strategy to strengthen the P&L," only included COVID-19 testing and GainShare revenue:

> First COVID-19 testing revenue would be minimal in the second quarter and would roll off of the P&L entirely going forward. Second, we converted over 90% of our gain share revenue from variable to recurrent secured, primarily by multi-year contracts that increased revenue, stability and transparency. Approximately half of this revenue is high margin revenue derived from scalable usage of the conversational cloud.
>
> The other half is low margin revenue derived from agent labor that we supply to our customers via contractual arrangements with BPO partners. Consistent with our goal to optimize the overall of the P&L. We have begun eliminating this labor based revenue from both our sales pipeline and existing customer agreements, which we expect to contribute to a temporary slowdown in revenue growth in the second half of 2022, while turning down growth, accretive revenue sources in Denver and easy decision.

180. Defendant Collins further stated that:

> This move will simplify the business model materially, expand our gross margin and enable us to focus management and resource allocation on our most strategic and scalable sources of revenue growth, such as automation and messaging.

181. The foregoing statements promising that by eliminating "lower quality revenue" the Company would sufficiently "simplify the business model" and "enable us to focus

management and resource allocation on our most strategic and scalable sources of revenue growth, such as automation and messaging," were false and misleading because: 1) the "lower quality revenue," i.e., from COVID-19 testing and GainShare labor, did not cause the declining revenue or the guidance reduction; 2) the non-core ventures LivePerson did not eliminate, including WildHealth, contributed substantial losses to the Company, which Defendants masked by not breaking down which revenues and losses it attributed to WildHealth, 3) LivePerson management did not enable itself to focus resources on automation and messaging because non-core ventures like WildHealth still diverted resources away from LivePerson's core operation; 4) LivePerson had not addressed the root causes of the Company's deteriorating financial condition, including customer attrition, down-selling, soft sales, and soft bookings, so the Company had not in fact proactively optimized its overall P&L; and as a result 5) LivePerson's failure to divest itself of non-core ventures like WildHealth raised a risk that the Company would have to undergo a massive restructuring to truly refocus its resources back on its core software product.

182. Moreover, by opting to represent that the Company was offloading COVID-19 testing as "lower quality" revenue, Defendants misled investors by failing to reveal that LivePerson and WildHealth continued to engage in the delivery of products and services related to COVID-19 testing, in a manner that raised a risk of regulatory scrutiny.

183. Additionally, on the earnings call, Defendant Collins represented that, "related to our Wild Health acquisition, the group is performing very well and is ahead of their revenue plan."

184. The foregoing statements were false and misleading because: 1) WildHealth had not in fact performed very well or ahead of its revenue plan, and in fact contributed substantial losses to LivePerson's bottom line; 2) LivePerson had constrained WildHealth from growing by instituting capital cuts and layoffs; 3) Defendants obfuscated WildHealth's poor performance by

not identifying in the P&L what portion of revenues and losses were attributable to WildHealth; and 4) WildHealth had been earning revenue by billing Medicare for at home testing kits under its demonstration program in a manner that raised a risk that WildHealth would face regulatory scrutiny and that Medicare would withhold reimbursements.

185. Further, when asked about the Settlement Agreement with Starboard, Defendant LoCascio stated:

> Yes, we obviously made an agreement with them and we are going to put a new board member on, and then they're going to put three people that we can select from. So we're going to put one of their people and we're going to start interviewing both people. So that's what we're going to do and then we had one of our board members retire.

186. The foregoing statements misled investors by not revealing that: 1) Defendants had manipulated the Q1 2022 financial disclosures to induce Starboard into entering the Settlement Agreement and abandoning its proxy contest; and 2) delayed filing the Q2 2022 results and scheduling the annual shareholder meeting until Starboard had signed the Settlement Agreement.

187. On August 9, 2022, after market hours, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2022 (the "Q2 2022 10-Q") reiterating the guidance numbers, which were false and misleading for the reasons stated above.

188. The Q2 2022 Report did not identify any material weaknesses with the Company's internal controls, stating, in relevant part:

> **Item 4. Controls and Procedures**
>
> *Evaluation of Disclosure Controls and Procedures*
>
> ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of June 30, 2022*** to ensure that the information we are required to disclose in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and

> Exchange Commission's rules and forms, and to ensure that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.
>
> *Changes in Internal Control Over Financial Reporting*
>
> There were no changes in our internal control over financial reporting during the three months ended June 30, 2022 identified in connection with the evaluation thereof by our management, including the Chief Executive Officer and Chief Financial Officer, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

189. Appended to the Q2 2022 10-Q as exhibits were signed certifications pursuant to SOX by the Individual Defendants, certifying that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered this report," and further certifying that "the information contained in the [Q2 2022 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

190. The foregoing statements were false and misleading because LivePerson in fact had materially deficient internal controls that failed to prevent the dissemination of falsified financial disclosures. Specifically, as detailed above, the internal controls in place in 2022 and 2023 did not prevent: 1) the inflation of FY 2022 guidance in the Q1 2022 financial disclosures with ~$12 million in double counted bookings revenue; 2) the purposeful manipulation of FY 2022 guidance in the Q1 2022 financial disclosures with ~$40 million in baseless bookings revenue; and 3) the dissemination of false and misleading statements regarding purported P&L optimizations and WildHealth.

191. On November 7, 2022, after market hours, the Company issued a press release attached to a Form 8-K announcing its Q3 2022 financial results, announcing that it had raised full

year guidance to $517-$521 million. The press release further touted strong performance from WildHealth and cited WildHealth as a factor in the raised guidance. Specifically, the press release stated in relevant part:

> ***As for guidance, we expect continued strong performance by WildHealth and elevated professional services in the fourth quarter. Considering those expectations, coupled with more upsells and early renewals in the third quarter than previously expected, we are raising revenue guidance for the full year***. We now expect revenue in a range of $517 million to $521 million, or 10% to 11% year over year growth, an improvement to the midpoint of approximately $6 million. For full year adjusted EBITDA, due to our current expectation for potential revenue upside and additional P&L optimizations, we are reaffirming our previous guidance range of $1 million to $10 million.

192. Similarly, on the earnings call held the same day, Defendant Collins represented that:

> The upside relative to prior guidance was primarily driven by WildHealth continued overperformance and by the accelerated timing of upsells and professional services deliverables.
>
> ***
>
> In terms of guidance, we expect continued outperformance by wild health and elevated professional services in the fourth quarter.

193. The foregoing statements regarding WildHealth's performance and LivePerson's guidance for the year were false and misleading because: 1) WildHealth had received notification from Medicare suspending reimbursements to WildHealth for COVID-19 testing activities; 2) WildHealth was also under investigation by the Department of Justice and FDA for its COVID-19 related activities; 3) Defendants had obfuscated that WildHealth had not in fact "overperformed" but rather contributed significant losses to LivePerson's bottom line and minimal revenue by not identifying what portion of revenues and losses were attributable to WildHealth; 4) Defendants did not have a reasonable basis for projecting WildHealth's would perform well enough in the fourth quarter to justify the raised guidance because capital cuts and layoffs meant that WildHealth

had insufficient resources with which to grow; and 5) Defendants had not in fact optimized the P&L, and thus "P&L optimizations" did not support an increase in guidance.

194. On the earnings call, Defendant LoCascio further represented that revenue from COVID-19 activities had "***rolled off the P&L in the first half of 2022***."

195. The foregoing statements misled investors because, in fact, both LivePerson and WildHealth continued to engage in the delivery of products and services related to COVID-19 testing, in a manner that had caused regulators including Medicare, the Department of Justice, and the FDA to investigate.

196. On November 8, 2022, after market hours, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2022 (the "Q3 2022 10-Q"), and reiterating the guidance numbers which were false and misleading for the reasons stated above.

197. Moreover, the Q3 2022 Report did not identify any material weaknesses with the Company's internal controls, stating, in relevant part:

> **Item 4. Controls and Procedures**
>
> *Evaluation of Disclosure Controls and Procedures*
> ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of September 30, 2022*** to ensure that the information we are required to disclose in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.
>
> *Changes in Internal Control Over Financial Reporting*
>
> There were no changes in our internal control over financial reporting during the three months ended September 30, 2022 identified in connection with the evaluation thereof by our management, including the Chief Executive Officer and

> Chief Financial Officer, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

198. Appended to the Q3 2022 10-Q as exhibits were signed certifications pursuant to Sections 302 of SOX by the Individual Defendants, certifying that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered this report," and further certifying that "the information contained in the [Q3 2022 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

199. The foregoing statements were false and misleading because LivePerson in fact had materially deficient internal controls that failed to prevent the dissemination of falsified financial disclosures. Specifically, as detailed above, the internal controls in place in 2022 and 2023 did not prevent: 1) the inflation of FY 2022 guidance in the Q1 2022 financial disclosures with ~$12 million in double counted bookings revenue; 2) the purposeful manipulation of FY 2022 guidance in the Q1 2022 financial disclosures with ~$40 million in baseless bookings revenue; and 3) the dissemination of false and misleading statements regarding purported P&L optimizations and WildHealth.

**<u>The Truth Begins to Emerge While Defendants Continue to Mislead Investors</u>**

200. On February 28, 2023, before market hours, LivePerson issued a Notification of Late Filing on Form 12b-25 regarding the 2022 10-K which revealed, in relevant part:

> The Company has determined that it is unable to file its Form 10-K within the prescribed time period provided by the applicable rules of the Securities and Exchange Commission without unreasonable effort and expense.
>
> ***In view of the in-process integration of the Company's 2022 acquisition of WildHealth, the Company requires more time to perform additional review and testing of revenue recognition with respect to a recently discontinued WildHealth***

> ***program, for which Medicare reimbursement is suspended pending further governmental review, and to complete its in-process review of internal controls and procedures.***
>
> The Company currently anticipates filing its Form 10-K for the year ended December 31, 2022 within the fifteen calendar day grace period provided by Rule 12b-25.

201. On this news, LivePerson's share price fell $1.69 per share, or 14.31%, to close at $10.12 per share on February 28, 2023.

202. Then on March 6, 2023, before market hours, the Company issued a current report on Form 8-K which stated, in relevant part:

> On February 28, 202[3], LivePerson, Inc. (the "Company") filed a Notification of Late Filing on Form 12b-25 stating it was unable to file its Form 10-K for the year ended December 31, 2022 within the prescribed time period without unreasonable effort or expense because it required additional time to complete a review of revenue associated with a recently discontinued program of its subsidiary Wild Health, and to complete its in-process review of internal controls and procedures.
>
> ***To provide additional clarity to investors, the Company notes that the referenced review of WildHealth revenue is anticipated to affect fourth quarter 2022 revenue attributable to WildHealth's participation in a Medicare demonstration program, due to suspension in November 2022 of Medicare reimbursements under the program and pending further governmental review.***

203. On this news, LivePerson's share price fell $0.78 per share, or 6.8%, to close at $10.69 per share on March 7, 2023.

204. Then, on March 15, 2023, after market hours, the Company issued a press release announcing its Q4 2022 financial results on Form 8-K. The press release announced that the Company missed guidance for Q4 2022 and announced disappointing guidance for FY 2023 of ~$422-436 million (representing a midpoint of -16.5%), of which ~$334-347 million constituted core business, and revealed that the Company's year over year decrease in revenue and adjusted EBITDA directly resulted from decreases in non-core revenue:

> Total revenue was $122.5 million for the fourth quarter of 2022, a decrease of 1% as compared to the same period last year ***as the company continues to execute on its plan to exit non-core lines of business***. Within total revenue, business operations revenue for the fourth quarter of 2022 decreased 1% from the comparable prior-year period to $113.0 million, and revenue from consumer operations decreased 3% from the comparable prior-year period to $9.4 million.
>
> ***
>
> The year over year decrease in revenue and the sequential decrease in adjusted EBITDA are ***both driven primarily by decreases in non-Core revenue*** expected beginning in the first quarter including decreasing Gainshare labor and variable revenue and decreasing professional services revenue from healthcare.

205. The foregoing statements regarding the Company's divestiture of non-core revenue were false and misleading because the Company failed to reveal that the non-core entity it continued to hold, WildHealth, did not and could not perform well because LivePerson had constrained WildHealth's growth by instituting capital cuts and layoffs, and that the Company's financial decline stemmed from other factors including increasing rates of customer attrition, down selling and soft sales.

206. Regarding the reimbursement suspension, the Company reiterated that Medicare had notified WildHealth in November 2022 that it was suspending reimbursements for services rendered under a "Medicare demonstration program" and that LivePerson therefore "elected to take a reserve for revenue associated with services delivered under the Program in the fourth quarter of 2022 for which payment has not yet been collected." The press release made the implications of this suspension clear:

> Had the Company recognized revenues associated with services delivered under the Program during the fourth quarter of fiscal 2022, ***our revenue would have been within the previous guidance ranges for the fourth quarter and full year***.

207. That same day, Defendants held an earnings call with analysts regarding the Q4 2022 results, revealing that Defendants had not previously provided adequate transparency into revenues from non-core ventures like WildHealth, that LivePerson's foray into non-core ventures

negatively impacted the Company's revenues and diverted focus and resources away from the Company's core B2B business which suffered as a result, and that the Company intended to sell off the consumer portion of its business. Specifically, regarding the focus on non-core ventures and lack of transparency surrounding revenues, Defendant LoCascio stated:

> And obviously, over the COVID time, there was a lot of things that happened to our company and others ***where we invested into areas. We went after different opportunities with our customers, but Q4 and Q1 is a place where there was a lot of noise, but we've all addressed and resolved those noises***. And now what we're going to do is, starting in Q2, we have a new company. We have a company that will generate, I think, strong earnings, cash flow, EBITDA, and from there, we'll go after this massive opportunity.
>
> The company as well as our shareholders will benefit, I think, from simplifying the business and ***being more transparent about our revenues***. And already and starting Q2, we'll do a couple of things, and John will go into them in a minute, but we're going to focus on the recurring revenue lines. We have about $340 million of recurring revenue. That's 80% of our total revenue. Now the growth rates in that are single to mid-single digits. But obviously, we've got the wind in our sales to bring that to another level. Obviously, we balanced out how do we get to a strong business model, generate cash with growth. But from there, we can grow now at a different level.
>
> We're also focused on achieving annualized EBITDA margins of 16% to 19% by year-end. ***We'll start generating positive margins, as I said, in Q2, and we'll also start generating positive cash flow in Q2, targeting 7% to 10% cash flow by year-end. <u>Those are facts</u>.***

208. The foregoing disclosures, while revealing Defendants' lack of transparency regarding non-core revenues and lack of focus on LivePerson's core operation, continued to misleading investors by stating as "fact" that the Company's financial condition would thereafter improve because in fact Defendants had not addressed other root causes of the Company's financial decline including customer attrition, down-selling, declining conversational cloud conversations, soft sales, and soft bookings.

209. Defendant Collins also represented that the Company had not been able to attain profitable growth previously as a result of its non-core ventures and had not provided investors with transparency into non-core revenues:

> We also wound down non-core business lines in order to enable profitable growth and sharpen our focus on LivePerson's B2B core software business, including the AI technology that powers it.
>
> ***
>
> In short, ***we've materially improved the P&L*** and reallocated resources to focus on the B2B core, establishing a solid foundation to execute on AI-led growth in the second quarter and beyond.
>
> With this overview of the B2B core P&L in mind, we think investors and analysts would benefit from additional transparency into our total company revenue stack, particularly the non-core components of the P&L that we began winding down last year. Beginning with total company revenue in 2022, of the $514.8 million that we recognized, again, over $70 million was non-core revenue that we do not expect to reoccur in 2023. Breaking that down, of over $50 million of the non-core revenue year-over-year revenue decrease, falls into 2 related categories: COVID-19 testing; and to a larger extent, professional services with a strategic partner in the diagnostics space. We now expect professional services, including a large software build, to complete ahead of schedule in the first quarter.
>
> ***
>
> ***To summarize the key points directly, we have materially improved the P&L and we are drawing a line at the first quarter, after which we expect the B2B core's performance to be transparent and its business drivers consistent with growing revenue by increasing the Conversational Cloud's share of enterprise to consumer engagement, especially AI-based engagement across both voice and master.***

210. However, the foregoing misled investors because Defendants had not "materially improved the P&L" and the Company's financial decline continued unabated due to increasing rates of customer attrition, down-selling, poor sales force execution, soft bookings, and declining conversational cloud conversation volumes which it continued to mask by altering key metrics, such as NRR. Indeed, Defendants have since conceded that they had not materially improved the P&L at that time because the optimization steps they claimed to have taken "proved insufficient

to turn around the Company's financial performance." *See* Brief for Defendants-Appellees at 43, *Damri v. LivePerson, Inc.*, No. 25-964 (2d Cir. Oct. 28. 2025).

211. The earnings presentation accompanying the earnings call contained a slide with the altered NRR metric, which though below the Company's target range would have been far worse had it been calculated using total revenue rather than recurring revenue:




212. Explaining the alteration in how the Company would calculate NRR going forward, Defendant Collins represented on the earnings call that:

> As for net revenue retention, consistent with our focus on the B2B core and recurring revenue growth in particular, and in light of the more than $70 million in non-core revenue that we do not expect to reoccur in 2023, we think investors and analysts would benefit more from net retention for recurring revenue than from net retention for total revenue.

213. The foregoing statements misled investors because the true motivation behind the alteration of the NRR and other metrics was to keep investors in the dark regarding the accelerating rate of customer attrition and declining revenues. Regarding the elimination of the conversational cloud conversations metric, Defendants said nothing at all. They did not alert investors to the

elimination, nor did they divulge that they eliminated the metric to avoid revealing that the conversational cloud conversation volumes were deteriorating.

214. Regarding Medicare's suspension of reimbursements to WildHealth, Defendant Collins reiterated that had it not been for the withheld reimbursements, LivePerson would have met revenue guidance for the quarter:

> However, in view of the inherent uncertainty as to the timing and amount of further reimbursement, we have elected to take the most conservative position by not recognizing revenue for which reimbursement has not yet been collected. I'll also note that the services under this program were subsequently discontinued, consistent with the focus on exiting non-core activities. ***But for this event, revenue would have been within our guidance range for both the fourth quarter and the full year of 2022***.
>
> ***
>
> But for the WildHealth revenue reserve and this decision to change the method of settlement for the 2022 employee bonus, adjusted EBITDA would have also been within our guidance range for both the fourth quarter and the full year of 2022.

215. However, to reassure investors and downplay the significance of the Medicare reimbursement issue, Defendant LoCascio made clear that:

> And the other thing is, although ***WildHealth's*** coming off a small base, its core business, like the stuff Matt showed you, ***will double this year in growth rates***.

216. The foregoing statements were false and misleading because Defendants did not have a reasonable basis for promising that WildHealth's core business would double in 2023 given that LivePerson had constrained WildHealth's growth with capital cuts and layoffs.

217. Moreover, in response to an analyst question regarding how the Company plans to "contain the distraction…to ensure you can execute on core," Defendant LoCascio responded:

> Yes, we -- I think that's what we try to get across, we're done with the distractions. So starting in Q2, we have a clean P&L. Basically, we have our core business. We've got our health care business and that's what we're going to live and die on. So we're focused on it. We had to do a lot of things over the last year to prepare for this. But starting Q2, we have focused only on those areas.

218. The foregoing statements were false and misleading because, by keeping the floundering WildHealth, the Company had not in fact created a clean P&L; Defendants did not have a reasonable basis for representing a reliance on WildHealth, i.e. its health care business, going forward because LivePerson had constrained WildHealth's growth with capital cuts and layoffs.

219. The next day, on March 16, 2023, before market hours, the Company filed its 2022 10-K with the SEC, signed by Defendant LoCascio, Defendant Collins, and the remaining eight Board members. The 2022 10-K revealed a "material weakness in the Company's internal control over financial reporting." Specifically, the 2022 10-K stated, in relevant part:

> **Item 9A. Controls and Procedures**
>
> **Evaluation of Disclosure Controls and Procedures**
>
> Our management, including the Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our "disclosure controls and procedures," as that term is defined in Rule 13a-15(e) promulgated under the Exchange Act, as of December 31, 2022.
>
> Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, ***due to certain control deficiencies which aggregated to a material weakness in the Company's internal control over financial reporting*** as further described below, our disclosure controls and procedures were not effective as of December 31, 2022.
>
> **Management's Annual Report on Internal Control over Financial Reporting**
>
> Our management evaluated the effectiveness of our internal control over financial reporting as of December 31, 2022 based on the framework established in "Internal Control — Integrated Framework (2013)," issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). ***As a result of its review, management identified deficiencies in the Company's internal control over financial reporting as of December 31, 2022 that in the aggregate constitute a material weakness as further discussed below. As a result, our management concluded that as of December 31, 2022, our internal control over financial reporting was not effective.***

> ***The control deficiencies, which in aggregate constitute a material weakness, were identified in connection with the Company's previously disclosed review of certain transactions related to its subsidiary WildHealth, which was acquired in February 2022, and primarily include a combination of ineffective operation of controls and inadequate controls related to: formal review, approval, and evaluation of non-core, complex transactions as well as engagement with government agencies; segregation of duties between accounting and contracting approval functions for non-core, complex transactions; and formal review, approval and evaluation of manual journal entries.***

220. However, even this disclosure of a material weakness in LivePerson's internal controls continued to mislead investors. Nowhere did the Company explain or identify the "certain transactions" or "complex transactions" at issue, how they relate to WildHealth, or precisely how the material weakness related to "engagement with government agencies; segregation of duties between accounting and contracting approval functions for non-core, complex transactions; and formal review, approval and evaluation of manual journal entries." This disclosure also falsely represented that the internal control failures "did not result in any material misstatements to our previously issued financial statements," though in reality the Company had misstated revenues in Q1 2022 and issued inflated and unreliable revenue guidance throughout 2022 as a result of the ineffective internal controls.

221. Moreover, in the 2022 10-K, Defendants revealed ***for the first time*** that WildHealth was facing regulatory scrutiny from ***more than one regulator***, and that LivePerson's "other products and services related to COVID-19 testing and accompanying software…***have also been the subject of inquiry and pending review by governmental agencies***," and that LivePerson and WildHealth would ***both*** discontinue all COVID-19 related products and services as a result:

> As has been widely reported, there is heightened scrutiny by the federal government across many programs related to COVID-19 that were introduced during the COVID-19 pandemic. ***The Company <u>and</u> its wholly-owned subsidiary WildHealth*** were each previously engaged in the delivery of products and services related to COVID-19 testing, and have been subsequently subject to governmental inquiries with respect to those COVID-19 related products and services, ***including inquires***

> ***by Medicare, the Department of Justice and the U.S. Food and Drug Administration ("governmental agencies")***.
>
> In November 2022, a professional corporation managed by WildHealth received notice that Medicare reimbursements for its services rendered under a Medicare demonstration program related to COVID-19 testing (the "Program") were suspended pending further review. Subsequently, WildHealth has received and is responding to inquiries from ***additional governmental agencies*** with respect to its participation in the Program.
>
> The Company previously provided other products and services related to COVID-19 testing and accompanying software. Those COVID-19 related products and services have also been the subject of inquiry and pending review by governmental agencies.
>
> The Company and WildHealth have discontinued all products and services related to COVID-19, and have responded to and intend to continue to cooperate with governmental inquiries related to their previous engagement in COVID-19 related product and service offerings.

222. On this news, LivePerson's share price fell $5.64 per share, or 57.73%, to close at $4.13 per share on March 16, 2023, damaging investors.

223. Following these revelations, Barclays issued a report lowering its price target 64% from $11.00 to $4.00, noting that "investors left the LPSN call disappointed that the size of the core business is smaller than anticipated (FY23 B2B Core recurring rev. expected ~$334-$347 mil.) and guided to core business growth slower than investors would have liked (guidance of 0% to 4% YoY growth in FY23)." Barclays further observed that LivePerson should have taken steps to divest of non-core assets and focus on its core business sooner, i.e., "over the last few years."

224. Despite the revelations regarding the regulatory scrutiny surrounding LivePerson and WildHealth's COVID-19 related activities, the lack of transparency in prior financial disclosures regarding non-core revenues, the diversion of focus away from the Company's core operation, and the material internal control deficiencies, Defendants' statements in the March 15, 2023 press release, on the earnings call that same day, and in the 2022 10-K regarding the causes of the Company's revenue decline and the steps undertaken to fix the P&L, expected growth from

WildHealth, revenue guidance, and the reasons for altering the NRR metric were false and misleading because: 1) the root causes of the Company's financial deterioration included customer attrition, down-selling, poor sales force execution, soft bookings, and a decline in conversational cloud conversations volume; 2) as a result of LivePerson's rapidly deteriorating financial condition, LivePerson imposed capital cuts and layoffs upon WildHealth which constrained its growth; 3) Defendants had altered NRR and other metrics to keep investors in the dark regarding the accelerating rate of customer attrition and declining revenues; 4) Defendants had purposefully manipulated FY guidance by including revenue for projects that had not yet closed in order to mask the severity of the Company's deteriorating financial condition; and 5) Defendants had disseminated falsified financial disclosures due to deficient internal controls.

225. Following an investor event, Barclays issued another report on April 11, 2023, wherein it credited LivePerson management's representations touting WildHealth, specifically that:

> WildHealth rev. will flow into B2B core rev. in 2023 and highlighted expectations for the WildHealth business to grow ~100% YoY.

226. Then, on May 9, 2023, LivePerson issued a press release announcing its financial results for the first quarter of 2023 ("Q1 2023"). Therein Defendants misled investors by once again blaming the Company's revenue declines solely on non-core ventures that the Company divested as part of a massive "restructuring" and promised that, with the restructuring complete, LivePerson could deliver on its profitability goals beginning in Q2 2023 and beyond:

> We completed one of the largest restructuring plans in the Company's history, enabling us to enter the second quarter with a profitable run rate and a focused go-to-market strategy for accelerating growth within our B2B core. We also divested Kasamba, wound down several lower margin and non-core business lines, and strengthened the balance sheet by retiring $157.5M of the $230M 2024 convertible notes at a discount. We are now well positioned to deliver on our profitability goals in 2023 and beyond."

227. The foregoing statements were false and misleading because, despite the "restructuring," 1) the Company had not resolved root causes of its declining revenues including increased customer attrition, increased down-selling, soft bookings, soft sales, and declining conversational cloud conversations volume and thus was far from "well positioned to deliver on [its] profitability goals in 2023 and beyond;" and 2) the Company had not divested itself of non-core venture WildHealth, which did not contribute meaningfully to revenue but did contribute meaningfully to losses as its growth capabilities had been constrained by capital cuts and layoffs.

228. Regarding WildHealth, the press release stated:

> WildHealth's growth in the first quarter was consistent with the expectations we set last quarter for its core revenue to double for the full year.

229. The foregoing statements were false and misleading because Defendants did not have a reasonable basis for projecting WildHealth's revenue to double for the full year given that capital cuts and layoffs meant that WildHealth had insufficient resources with which to meaningfully grow.

230. In the press release, Defendants also reported on revenue guidance, stating:

> In terms of guidance, considering we achieved our expectations in the first quarter and remain on target for the year, we are reaffirming our full-year revenue guidance range.

231. The foregoing statements were false and misleading because: 1) LivePerson did not "remain on target for the year" given increased customer attrition, increased down-selling, soft bookings, soft sales, and declining conversational cloud conversations volume; and 2) Defendants therefore had no basis for reaffirming guidance.

232. On an earnings call with analysts the same day Defendant Collins once again blamed revenue declines primarily on the exit of non-core revenue from the P&L:

> From a geographic perspective, U.S. revenue declined - U.S. revenue declined 21% year-over-year and international revenue declined 9% year-over-year. Again, the

> primary drivers for these declines are the non-core business lines that we are winding down.

Moreover, Defendants Collins and LoCascio repeatedly blamed the Company's poor financial condition on the "distraction of the restructuring" and the prior lack of focus on core.

233. The foregoing statements blaming revenue declines on the exit from the non-core business lines, i.e., the restructuring, were false and misleading because Defendants failed to identify that the Company's revenues continued to decline as a result of increased customer attrition, increased down-selling, soft bookings, soft sales, declining conversational cloud conversations volume, and losses from WildHealth.

234. Addressing WildHealth, Defendant Collins continue to assure investors that WildHealth's growth rate continued to perform consistently and was set to double core revenue in 2023:

> Finally, WildHealth growth rate in the first quarter was consistent with the expectations we set last quarter for its core revenue to double for the full year 2023.

235. The foregoing statement was false and misleading because Defendants did not have a reasonable basis for projecting WildHealth's revenue to double for the full year given that it contributed significant losses to LivePerson's bottom line, and that capital cuts and layoffs meant that WildHealth had insufficient resources with which to meaningfully grow its revenue.

236. Moreover, when questioned by analyst Jeff Van Rhee regarding how the continued relationship with WildHealth jives with Defendants' representations regarding a refocus on core, Defendant LoCascio attempts to portray WildHealth as part of the Company's core business:

> Yes. I mean we have a large group of health care companies in our core…
>
> And it's important as an investment - and I think in the future, we'll see some pretty massive returns with that product.

237. The foregoing statements were false and misleading because WildHealth was not in fact part of LivePerson's core operation and Defendants did not have a reasonable basis for projecting "massive returns" from WildHealth given that it contributed significant losses to LivePerson's bottom line, and that capital cuts and layoffs meant that WildHealth had insufficient resources with which to meaningfully grow its revenue.

238. On May 11, 2023, the Company filed its Form 10-Q for Q1 2023, reiterating the financial disclosures made in the earnings release and earnings call on May 9, 2023. Appended to the Q1 2023 10-Q as exhibits were signed certifications pursuant to SOX by the Individual Defendants, certifying that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered this report," and further certifying that "the information contained in the [Q1 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

239. On August 8, 2023, Defendants issued a press release attached to a Form 8-K announcing quarterly results for the second quarter of 2023, which included a narrowed range of guidance for FY 2023 of $388-400 million. In the press release, Defendants continued to tout WildHealth's strong core growth:

> Finally, for WildHealth, we continue to expect strong growth from its core business.

240. Similarly, on the Q2 2023 earnings call held that same day, Defendant LoCascio stated:

> Sure. We shared last quarter that we expect strong growth in WildHealth, and we continue to expect strong growth. Keep in mind, though, we have observed some increased time line for certain WildHealth business lines, owing to the highly regulated nature of health care. However, again, we expect strong growth for the business in 2023.

241. In response to an analyst question regarding the revenue impact of WildHealth, Defendant Collins responded:

> We haven't put a number out, Jeff, but I would say relative to the commentary in the prior quarter, where we said there was a likely doubling in WildHealth's core business. I would just reiterate that expectation, it's still possible.

242. The foregoing statements regarding WildHealth's strong growth and expectations of doubling core revenue were false and misleading because Defendants did not have a reasonable basis for projecting strong growth from WildHealth given that WildHealth had consistently performed poorly, sustained millions in losses, had been constrained from meaningful growth due to capital cuts and layoffs that Defendants implemented, and therefore could not double its core revenue in 2023.

243. Further, Defendants announced in the press release that going forward they had altered the way they calculate ARPU:

> In order to provide a more consistent and meaningful measure of ARPC, we expect to calculate this metric using only B2B Core recurring revenue going forward, which is consistent with the revenue base for calculating Net Revenue Retention.

244. Similarly, on the Q2 2023 earnings call, Defendant Collins stated the following regarding the NRR and ARPU metrics:

> Net revenue retention was below our target range of 105% to 115%, but up sequentially, consistent with expectations. We continue to expect sequential improvement in net retention in the third quarter. RPO decreased 20% year-over-year to $326 million, due primarily to the completion of professional services for the clear JV. Due to the wind down of non-core business lines and their impact on key operating metrics, average revenue per customer based on total revenue declined 4% year-over-year to $635,000.
>
> In order to provide a more consistent and meaningful measure of ARPC, we expect to calculate this metric using only B2B core recurring revenue going forward, which is consistent with the revenue base for calculating net revenue retention as we discussed last quarter. So, for the second quarter, ARPC based on B2B core recurring revenue, grew 14% year-over-year to $575,000.

245. The foregoing statements were false and misleading because the true motivation behind the alteration of the NRR, ARPU, and other metrics was to keep investors in the dark regarding the accelerating rate of customer attrition and declining revenues

246. Additionally, Defendant Collins continued to blame the Company's declining revenues on its exit from non-core revenue ventures:

> Turning to our standard reporting segments. Within total revenue for the second quarter, revenue from B2B segment declined 21% year-over-year, and revenue from hosted software declined 14% year-over-year. As discussed last quarter, the primary drivers of these declines are the wind down of non-core business lines, including COVID-19 testing, gainshare labor and pandemic-driven gainshare variable revenue.

247. The foregoing statements blaming revenue declines on the exit from the non-core business lines were false and misleading because Defendants failed to identify that the Company's revenues continued to decline as a result of increased customer attrition, increased down-selling, soft bookings, soft sales, declining conversational cloud conversations volume, and losses from WildHealth.

248. On November 8, 2023, Defendants issued a press release attached to a Form 8-K announcing quarterly results for the third quarter of 2023, which included a narrowed range of guidance for FY 2023 of $389-399 million. In the press release, Defendants once again provided false justification for the alteration of the NRR and ARPU metrics:

> Beginning with the second quarter of 2022, in order to provide a more consistent and meaningful measure of ARPC, we started calculating this metric using only B2B Core recurring revenue, which is consistent with the revenue base for calculating Net Revenue Retention.

249. The foregoing statements were false and misleading because the true motivation behind the alteration of the NRR, ARPU, and other metrics was to keep investors in the dark regarding the accelerating rate of customer attrition and declining revenues

250. In the Q3 2023 earnings call held the same day, in response to an analyst question seeking an update on WildHealth, Defendant Collins stated:

> Yes, as we've discussed previously, Wild Health is a valuable asset to a LivePerson, but not necessarily strategic to its core and is run on a standalone basis at this time. I don't have further updates beyond what I had provided previously for Wild Health's growth, which has moderated relative to the expectations we had very early in the year when we first launched in 2023 but remain consistent with the expectations we set last quarter.

251. The foregoing statements regarding WildHealth were false and misleading because WildHealth was not a valuable asset to LivePerson, had performed poorly, contributing minimal revenue but substantial losses to LivePerson's bottom line, would not double its core revenue in 2023, and had been constrained from meaningful growth due to capital cuts and layoffs, which, given LivePerson's deteriorating financial condition, would necessitate that it sell off WildHealth.

252. Regarding the Company's revenue declines as well as the NRR and ARPU metrics, Defendant Collins stated:

> From a geographic perspective, US revenue declined 20% year-over-year, while international revenue declined 3%. Again, the primary driver of these declines was the wind-down of non-core business lines, including revenue related to the Claire JV, the Gainshare labor, and pandemic driven Gainshare variable Revenue. Net revenue retention was below our target range of 105% to 115%, but up sequentially, consistent with previously set expectations. We continue to expect sequential improvement in net revenue retention in the fourth quarter. RPO decreased 27% year-of-year to $313 million due primarily to completing the professional services engagement for the Claire JV. For the third quarter, ARPC grew 13% to $595,000, driven in part by upsells from our largest customers.

253. The foregoing statements were false and misleading because: 1) Defendants failed to identify that the Company's revenues continued to decline as a result of increased customer attrition, increased down-selling, soft bookings, soft sales, declining conversational cloud conversations volume, and losses from WildHealth; and 2) the true motivation behind the alteration of the NRR, ARPU, and other metrics was to keep investors in the dark regarding the accelerating rate of customer attrition and declining revenues

## The Truth is Revealed

254. On February 28, 2024 after market close, LivePerson filed a Form 8-K attaching a press release announcing LivePerson's financial results for the fourth quarter and FY 2023. The Company held an earnings call with analysts the same day, during which Defendant Collins presented. In the press release and on the earnings call, Defendants revealed revenue outlook for 2024 at $100 million below expectations, equal to 25% of LivePerson's revenue base, and blamed the dramatic cut on customer attrition issues due to massive instability at the Company over the prior twelve months. The Company further revealed that WildHealth, down to ~$6-8 million revenue run rate and generating over $10 million in annual losses, had not in fact performed as promised and would be sold.

255. On the earnings call, blindsided analysts expressed shock because its "not every day you see a recurring model miss by 25%" and because the "the suddenness and the magnitude is something rarely seen." On the Q4 2023 earnings call, the Company revealed, in relevant part:

> The guidance given today is significantly driven by renewals issues that have root causes in events that occurred nine to 12 months ago.
>
> ***
>
> As John mentioned, and I'll discuss further in the context of guidance, the past lack of focus in multiple strategic pivots caused disruption to our sales and rental cycles, which is reflected in our guidance for the first quarter and the full year 2024.
>
> ***
>
> Regarding Wild Health, we are actively marketing a sale of the business, which is the only noteworthy noncore asset remaining and we are now providing the revenue contribution from that business.
>
> ***
>
> And as we discussed in the prepared remarks, we're seeing previously expected down-sell risk manifest as accumulations.

256. Moreover, Defendant Collins admitted to the lack of transparency regarding performance metrics and revenue segmentation:

> Considering the divestiture and wind-down of noncore business lines over the last year and the multi-quarter rebuild we have just embarked on, we recognize the need for additional specificity on key performance indicators and revenue segmentation to better measure our progress.

257. When asked about the EBITDA contribution from WildHealth, Defendant Collins responded that: "It's a negative value. And again, we are actively marketing the sale of that business and expect to have more to share in that sense very soon."

258. Stunned by the Company's revelations, LivePerson share price plummeted $1.13, or approximately 47%, to close at $1.27 on February 29, 2024 on unusually heavy volume.

259. In the wake of Defendants' unexpected and shocking revelations, Roth MKM lowers its price target to $2 on February 29, 2024, noting:

> However, further guidance cuts leaves roughly $100M or 25% of its lowered revenue base missing in 2024. Citing spiking cancellations caused by mid-2023 operational disruptions, we are left dramatically cutting revenue and AEBITDA forecasts which leaves its ability to refinance maturing convertible notes far more at risk than expected.
>
> ***
>
> ***alarmingly***, while our prior unguided 2024 forecast assumed minimal growth (adding $11M over a $405M base), initial 2024 guidance of $300-315M leaves a roughly $100M shortfall. Cancellations apparently spiked as a lack of focus emerged mid-2023 while former leadership was battling outside agitators for control of the company.
>
> ***
>
> While LPSN is focused on slowing customer defections near-term, ***its financial foundation remains problematic***, with $517.5M in convertible debt due by the end of 2026 (another $72M will be paid in 1Q24 to leave 4Q23 cash of $211.8M falling to $138M). LPSN needs to generate roughly $375M in cash by the end of 2026, or to at least prove to credit investors that its cash generation is adequately sized and stable enough to refinance its obligations at a reasonable cost. ***We have little confidence in this outcome now***.

260. The same day, Craig Hallum expressed similar surprise at Defendants' revelations, writing, "***We are extremely disappointed with the blindside and lack of grip on the business coming into the quarter leading to the terrible guide***." Craig Hallum's report further stated:

> The quarter was a bit ahead of revenue ($95.5M vs $94.4M consensus) and just shy on EBITDA ($3.7M v $4.7M consensus). ***That is where the "expected" ended and the very disappointing began***. ***Commentary late in '23 had been for improvements in revenue retention in Q4'23 and for B2B hosted ex-WildHealth to also grow sequentially. Retention fell badly and B2B hosted declined***. ***The forward outlook was gutted ($307.5M '24 revenue vs $401.9M cons.) in a way we can't recall on a recurring model***.

261. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## **POST CLASS PERIOD EVENTS**

262. On March 4, 2024, the Company filed its Form 10-K for the year ended December 31, 2023 revealing a non-cash impairment charge of $11.9 million relating to WildHealth:

> Based on our 2023 annual goodwill impairment test, the Company recorded a non-cash impairment charge of $11.9 million in our consolidated statements of operations, representing a portion of goodwill related to the WildHealth reporting unit. This conclusion was primarily based upon slower growth in existing revenue streams and strategic decisions to reduce or eliminate investment in new and existing revenue streams previously planned for expansion. ***Our latest available financial forecasts at the time of the annual goodwill impairment test reflected lower cash flows than previously projected related to the WildHealth reporting unit***. There were no impairments of our Business reporting unit, as the fair value of this reporting unit substantially exceeded its carrying value.

## **SCIENTER ALLEGATIONS**

263. During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in

a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

264. Defendants had a motive to falsify LivePerson's financial disclosures to provide investors and Starboard with the misimpression that the Company thrived rather than floundered to thwart Starboard's proxy contest. Given that not all companies are battling active proxy contests, this is not a motive generally applicable to all companies.

265. Moreover, Defendants possessed a financial incentive to inflate LivePerson's stock price. *See supra,* ¶¶154-58. During the Class Period, Defendants LoCascio and Collins received millions in compensation, including stock awards. Defendant Collins sold or otherwise disposed of *hundreds of thousands of dollars'* worth of stock in November 2022 prior to the first corrective disclosure, and *another hundred thousand* worth of stock around the time of the July 31, 2023 misstatements. From February 22-April 11, 2022, Defendant LoCascio sold or otherwise disposed of *$722,360* worth of stock at artificially inflated prices. Defendants did not acquire *any LivePerson stock through open market purchases* but rather received their shares free as part of their compensation.

266. The allegations of knowing and/or reckless misconduct set forth *supra* also establish Defendants' scienter. The sworn testimony of Mr. Haywood, documentary evidence LivePerson produced to Starboard in discovery, and the statements of corroboratory CWs establish that Defendants LoCascio and Collins' directly manipulated and inflated reported guidance for FY 2022 by approximately $50 million (comprised of approximately $12 million in double counted bookings revenue and $40 million in baseless "expected" bookings revenue) to stave off Starboard's proxy contest and obfuscate LivePerson's deteriorating financial condition.

267. Testimonial and documentary evidence uncovered in discovery in the Starboard Action reveals that: (i) in April 2022, Defendant Collins directly manipulated the model used to generate FY 2022 guidance to achieve an output at the midpoint of existing guidance, by inputting ~$40 million worth of baseless bookings revenue; and (ii) Defendants LoCascio and Collins knew about the ~$12 million worth of double counted bookings revenue no later than July 13, 2022.

268. As the perpetrators of the manipulation of LivePerson's FY 2022 guidance, Defendants had firsthand knowledge thereof.

269. Defendants also personally issued false justifications for the subsequent guidance reduction in Q2 2022, which they told investors resulted from LivePerson's divestiture of low-quality revenue. Defendants further told investors that this divestiture had already "materially improved" the P&L, though the P&L remained weak given declining revenues, rising customer attrition, down-selling, soft sales, and soft bookings (and continued to worsen, ultimately necessitating a mammoth $100 million guidance reduction). Indeed, Defendants have since conceded that they had not materially improved the P&L because the optimization steps they claimed to have taken "proved insufficient to turn around the Company's financial performance." *See* Brief for Defendants-Appellees at 43, *Damri v. LivePerson, Inc.*, No. 25-964 (2d Cir. Oct. 28. 2025).

270. Moreover, according to CW2, Defendant LoCascio was very involved with both the day-to-day operations at LivePerson and the earnings process. He held regular meetings with the Head of Sales, the Board, and with Defendant Collins via Google Meet.

271. CW2 also made clear that Defendant Collins held regular weekly meetings with the FP&A team and the Head of Accounting during which Defendant Collins reviewed the Company's

finances. In those meetings participants would evaluate where the Company stood versus its targets for the quarter or for the year.

272. Further, according to CW2, Defendants LoCascio and Collins made the decision to hide WildHealth's revenue and loss contributions in order to mask WildHealth's minimal revenue contribution and sizable loss contribution, and that WildHealth did not perform as Defendants represented. Moreover, Defendants LoCascio and Collins instituted the capital cuts and layoffs at WildHealth that constrained its growth. The foregoing matters were discussed during weekly meetings attended by Defendants with the finance team.

273. Additionally, pursuant to 42 C.F.R. § 405.372, Defendants knew months prior to November 2022 that Medicare would suspend reimbursements to WildHealth and thus knew that a material portion of WildHealth's revenue was in jeopardy (Defendants later revealed that WildHealth contributed $10 million in losses; $2 million in withheld reimbursements that would offset 20% of that loss was material). Nevertheless, Defendants continued falsely touting WildHealth's performance.

274. Moreover, CW2 made clear that Defendants directed the alteration of the NRR and ARPU metrics and falsely told investors that they had altered the metrics because "investors and analysts would benefit more," when in fact the true motivation for Defendants' alteration of these key metrics was to hide increasing rates of customer attrition.

275. CW2 made clear that Defendants LoCascio and Collins had full control, final approval, and the power to change all disclosed financial information.

276. CW2 further attested to Defendant LoCascio and Collins' knowledge of material deficiencies in the Company's internal controls that enabled the dissemination of falsified financial disclosures including a lack of procedures in place to ensure the input of accurate information into

and communication between the various systems Defendants used to ascertain guidance, including Salesforce. CW2 confirmed that Defendants discussed these matters with the FP&A team.

277. Additionally, Defendants LoCascio and Collins personally signed SOX certifications attesting that the Company's filings did not contain any untrue or misleading statements, and certifying the effectiveness of the Company's internal controls, though they knew that internal control deficiencies had enabled their dissemination of falsified disclosures.

278. CW2 stated that Defendants LoCascio and Collins purposefully delayed the filing of the Q2 2022 results and the scheduling of the 2022 annual shareholder meeting in order to dupe Starboard into signing the Settlement Agreement and abandoning its proxy contest before the Company revealed disastrous earnings results.

279. Defendant LoCascio's ouster in the Summer of 2023, described *supra,* ¶¶151-53, further supports the inference of scienter.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

280. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired LivePerson securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

281. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, LivePerson securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can

be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by LivePerson or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

282. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

283. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

284. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of LivePerson;
- whether the Individual Defendants caused LivePerson to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of LivePerson securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

285. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

286. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- LivePerson securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased, acquired and/or sold LivePerson securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

287. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

288. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

289. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

290. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

291. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of LivePerson securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire LivePerson securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

292. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for LivePerson securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about LivePerson's finances and business prospects.

293. By virtue of their positions at LivePerson, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

294. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of LivePerson, the Individual Defendants had knowledge of the details of LivePerson's internal affairs.

295. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of LivePerson. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to LivePerson's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements,

the market price of LivePerson securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning LivePerson's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired LivePerson securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

296. During the Class Period, LivePerson securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of LivePerson securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of LivePerson securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of LivePerson securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

297. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

298. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases,

acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

299. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

300. During the Class Period, the Individual Defendants participated in the operation and management of LivePerson, and conducted and participated, directly and indirectly, in the conduct of LivePerson's business affairs. Because of their senior positions, they knew the adverse non-public information about LivePerson's misstatement of income and expenses and false financial statements.

301. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to LivePerson's financial condition and results of operations, and to correct promptly any public statements issued by LivePerson which had become materially false or misleading.

302. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which LivePerson disseminated in the marketplace during the Class Period concerning LivePerson's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause LivePerson to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of LivePerson within the meaning of Section 20(a) of the Exchange Act. In this capacity, they

participated in the unlawful conduct alleged which artificially inflated the market price of LivePerson securities.

303. Each of the Individual Defendants, therefore, acted as a controlling person of LivePerson. By reason of their senior management positions and/or being directors of LivePerson, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, LivePerson to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of LivePerson and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

304. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by LivePerson.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 23, 2026 Respectfully submitted,

POMERANTZ LLP

*/s/ Tamar A. Weinrib*
Jeremy A. Lieberman
Tamar A. Weinrib
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
taweinrib@pomlaw.com

THE LAW OFFICE OF JACOB SABO
Jacob Sabo
22a Mazzeh Street
Tel-Aviv, Israel
Telephone: (++972) 39070770

*Attorneys for Plaintiff*